IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | | |
|---|---|---|
| PUBLIC UTILITY DISTRICT NO. 1 OF PEND OREILLE COUNTY, WASHINGTON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06cv00365 RMC |
| | ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| KALISPEL TRIBE OF INDIANS | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

_____

| | | |
|---|---|---|
| PONDERAY NEWSPRINT CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06cv00768 RMC |
| | ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| KALISPEL TRIBE OF INDIANS | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

_____

<u>DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS</u>

# TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.  Because plaintiffs are in effect challenging the PUD's license conditions,
    jurisdiction is exclusively vested in the Courts of Appeals . . . . . . . . . . . . . . . . 2

2.  Having disavowed any challenge to the conditions themselves,
    plaintiffs lack standing because they have suffered no injury
    in fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

3.  Should the Court conclude that it has jurisdiction in this action,
    dismissal is appropriate under rule 12(b)(6) because the allegations
    of the complaint are legally insufficient . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.  Plaintiff PUD's license is fully effective . . . . . . . . . . . . . . . . . . . . . . . 14

    B.  After license issuance, withdrawal of an application
        or rejection of a license do not render a license order
        ineffective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    C.  The PUD's theory that it remained a license applicant after
        license issuance produces inequitable results . . . . . . . . . . . . . . . . . . . 16

    D.  The PUD's argument that, upon license issuance,
        the licensee becomes some other "party to the proceeding"
        renders the term "applicant" in Section 241 meaningless . . . . . . . . . . 18

    E.  Interior appropriately determined the temporal reach
        of the statute based on its use of the term
        "license applicant" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    F.  Interior's regulations implementing the Act properly
        exclude licenses issued prior to its enactment . . . . . . . . . . . . . . . . . . . 21

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

## CASES

Alaska Dept. of Environmental Conservation v. EPA,
540 U.S. 461 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Asgrow Seed Co. v. Winterboer,
513 U.S. 179 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

California Save Our Streams Council, Inc. v. Yeutter,
887 F.2d 908 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 5, 7

Center for Law and Educ. v. United States Dept. of Educ.,
396 F.3d 1152 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

City of Rochester v. Bond,
603 F.2d 927 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

City of Tacoma v. NMFS,
383 F. Supp. 2d 89 (D. D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7, 8

Consolidated Edison Co. of New York v. FERC,
315 F.3d 316 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Florida Audubon Soc'y v. Bentsen,
94 F.3d 658 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Idaho Rivers United v. Foss,
373 F. Supp. 2d 1158 (D. Idaho. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

International Brotherhood of Teamsters v. Pena,
17 F.3d 1478 (D. C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Johnson v. United States,
529 U.S. 694 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

Kokkonen v. Guardian Life Ins. Co.,
511 U.S. 375 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Landgraf v. USI Films Products,
    511 U.S. 244 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23


Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12

McNary v. Haitian Refugee Center,
    498 U.S. 479 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Merritt v. Shuttle,
    245 F.3d 182 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

National Mining Association v. Dept of Labor,
    292 F.3d 849 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Public Citizen v. Federal Trade Commission,
    829 F.2d 149 (D. C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Settles v. United States Parole Commission,
    429 F.3d 1098 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Southwest Center for Biological Diversity v. FERC,
    967 F. Supp. 1166 (D. Ariz. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Wellife Products v. Shalala,
    52 F.3d 357 (D. C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9


**STATUTES**

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Energy Policy Act of 2005 ("the Act"), Pub. L. No. 109-58§ 241,
    16 U.S.C. § 797(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13, 20

16 U.S.C. § 799 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
16 U.S.C. § 825l(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2
16 U.S.C. § 825l(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 6, 8, 9
16 U.S.C. § 825l(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Federal Power Act ("FPA")
    16 U.S.C. §§ 791 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

30 U.S.C. §§ 901-945 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## REGULATIONS

18 C.F.R. § 385.102(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
18 C.F.R. § 385.713(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
43 C.F.R. § 45.1(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
43 C.F.R. § 45.4(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
43 C.F.R. § 45.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## OTHER AUTHORITIES

American Jurisprudence, Second Ed.
        73 Am Jur 2d Statutes § 165 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

City of Richmond, 38 FERC ¶ 61,100 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
City of Tacoma, 72 FERC ¶ 61,239 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
City of Tacoma, 73 FERC ¶ 61,210 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
City of Tacoma, 87 FERC ¶61,197 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Neshkoro Power Associates, LLC, 111 FERC ¶ 62,099 (2005) . . . . . . . . . . . . . . . . . . 17
PacifiCorp Electric Operations, 58 FERC ¶ 61,283 (1992) . . . . . . . . . . . . . . . . . . . . . . 14
PacifiCorp Electric Operations, 60 FERC ¶ 61,292 (1992) . . . . . . . . . . . . . . . . . . . . . . 14

**Introduction**

Defendant, the U.S. Department of the Interior, files this reply brief in support of its

motion to dismiss ("Motion") and in response to the opposition briefs filed by plaintiffs, the

Public Utility District #1 of Pend Oreille County, Washington ("PUD"), and the Ponderay

Newsprint Company ("PNC").

In its opening brief, defendant demonstrated that plaintiffs' allegations amount to nothing

less than a challenge to the PUD's new hydropower license; therefore, this court lacks

jurisdiction because Congress has vested exclusive jurisdiction over such claims in the Courts of

Appeals.  Specifically, the Federal Power Act ("FPA"), 16 U.S.C. §§ 791 *et seq.*, provides that a

party to a FERC[1] licensing proceeding that is aggrieved by a licensing order must file a petition

for rehearing within 30 days of the order.  16 U.S.C. § 825*l*(a).  Plaintiffs have done so, and their

challenges are presently pending before FERC, including their claims that they are entitled to

trial-type hearings.[2]  Under the FPA, if a party remains dissatisfied following FERC's order on

rehearing, it may then appeal the order to the Courts of Appeals under the exclusive review

provision of the FPA.  16 U.S.C. § 825*l*(b).  As discussed below, the Courts of Appeals are

"properly constituted to hear all relevant arguments" in a license challenge.  California Save Our

Streams Council, Inc. v. Yeutter, 887 F.2d 908, 912 (9th Cir. 1989)

In addition, defendant showed in its opening brief that plaintiffs' allegations fail to

---

[1] The Federal Energy Regulatory Commission ("FERC") is also occasionally referred to herein as the Commission.

[2] PUD's and PNC's rehearing requests, submittal numbers 20050810-5001 and 20050812-0226, filed August 10, 2005 (docket number 2042-031), are publicly available at http://www.ferc.gov/docs-filing/elibrary.asp (search: project number = P-2042, date = August 2005).

1

demonstrate their entitlement, as a matter of law, to the benefits of the new procedures established by the Energy Policy Act of 2005 ("the Act"), Pub. L. No. 109-58 § 241, 16 U.S.C. § 797(e), and, for this reason, the complaint is legally insufficient.  Accordingly, dismissal is also appropriate under Rule 12(b)(6).

1.      **Because plaintiffs are in effect challenging the PUD's license conditions, jurisdiction is exclusively vested in the Courts of Appeals.**

The opposition briefs filed by the PUD and PNC each assert, through an exercise in hair-splitting, that plaintiffs are not challenging the conditions themselves, but rather are challenging only Interior's regulation at 43 C.F.R. § 45.1(d), and a decision based thereon, which limits availability of trial-type hearings in proceedings "for which [a] license has not been issued as of November 17, 2005."  Plaintiffs' attempt to surgically separate the *procedures* for establishing conditions from the conditions themselves lies at the heart of this dispute.

As defendant explained in its opening brief, Motion at 13, the FPA provides that a party to a FERC licensing proceeding who is dissatisfied with an order issued by FERC must file a petition for rehearing within 30 days of FERC's order.  16 U.S.C. § 825*l*(a).  As noted, plaintiffs did so on August 10, 2005.  If they remain dissatisfied after FERC rules, they may appeal the order to the United States Court of Appeals. 16 U.S.C. § 825*l*(b).  This review procedure is expressly exclusive.  Id.

Despite pursuing this appropriate avenue of relief, plaintiffs concurrently bring suit in this Court, raising the possibility that two tribunals might reach conflicting results in redundant or at least overlapping proceedings.  This would be inefficient, and would undermine Congress's purpose in "creating a special review procedure in the first place."  California Save Our Streams, 887 F.2d at 912.  See also City of Tacoma v. NMFS, 383 F. Supp. 2d 89, 93 (D. D.C. 2005) ("As

2

with many administrative review provisions, exclusive appellate review of FERC licensing orders was established to promote efficiency by eliminating redundancy and inconsistency at the district court level"). For these reasons alone, this action must be dismissed.

Plaintiffs argue that this case is not a challenge to the conditions of its license, but to Interior's regulation and a decision denying them the opportunity to contest the conditions through trial-type hearings. PUD Opp at 2; PNC Opp at 2. As the PUD's complaint makes plainly evident, plaintiff's true concern lies with the conditions themselves. See PUD Complaint at ¶ 1 (identifying its goal "to have declared unlawful certain of Interior's actions that have violated [the Act] and due process with respect to onerous conditions that Interior specified for inclusion in [its] license"); ¶ 24 (referring to the "burdensome license conditions"); ¶26 (referring to the "unnecessary and unsupported conditions" as causing the "cost of project power" to "nearly double"); Count 1, ¶ 48 (linking the hearing with the conditions by asserting that "Section 241 of the [Act] . . . provides that the District is entitled to such a hearing *and license conditions that are based thereon*") (emphasis added). And more recently in its opposition brief, plaintiff PUD echoes these same themes, explaining that it has been "concretely and adversely affected by the conditions." PUD Opp at 2.

This case is not merely a challenge to a procedural denial, as plaintiffs contend, but in effect a challenge to the conditions as well – a "thinly veiled collateral attack on the FERC licensing process." City of Tacoma, 383 F. Supp. at 92. Despite the fact that plaintiffs now disavow challenging the conditions, PUD Opp at 2, PNC Opp at 6, the relief they ultimately hope to achieve is, quite clearly, relief from the conditions. Without this as a goal, there is no advantage to be gained from participating in and incurring the expense of trial-type hearings. As

3

defendant explained in its opening brief, Motion at 1, the trial-type hearings authorized by the Act are intended to resolve, through an adversarial process, disputed issues of material fact *underlying the conditions themselves*.  The factual legitimacy of the conditions is at the heart of these hearings, and thus the conditions cannot be artificially separated from the hearings merely to confer jurisdiction on a district court.

This court should reject plaintiffs' attempt to craft jurisdiction through reasoning which divorces the *purpose* of the hearing (i.e., ensuring a sound factual basis for the imposition of conditions) from the mere *right* to a hearing.  The two are inescapably intertwined, as further discussed below.  Alleged deprivations of the purported right to a hearing should not be addressed in a vacuum.  The District of Columbia Circuit has held that "bifurcating judicial review" is disfavored where Congress has clearly vested jurisdiction in the Courts of Appeals. City of Rochester v. Bond, 603 F.2d 927, 936 (D.C. Cir. 1979).

In their oppositions, plaintiffs attempt to distinguish the highly relevant cases on which defendant relies in support of its contention that exclusive jurisdiction lies in the Courts of Appeals, in particular California Save Our Streams.  There, the Ninth Circuit considered whether a district court had jurisdiction over a challenge to the U.S. Forest Service's compliance with the procedural requirements of the National Environmental Policy Act ("NEPA") and the American Indian Religious Freedom Act ("AIRFA"), when it imposed conditions in a FERC license proceeding.

In resolving the case, the Ninth Circuit found that exclusive jurisdiction rests with the Court of Appeals.  But plaintiff PUD argues that the instant case is distinguishable because in California Save Our Streams, they contend, plaintiff sought to challenge "the legality of the

conditions," PUD Opp at 9, whereas here, plaintiff is not challenging the conditions but rather the regulations implementing the Act.  Id.  Actually, in each case, plaintiffs in effect challenged the conditions, but they did so by characterizing their challenges as something else.  Plaintiff in California Save Our Streams characterized its claims as a challenge to the alleged failure of the conditioning authority to comply with "the procedural and substantive steps outlined in [NEPA and AIRFA]."  California Save Our Streams, 887 F.2d at 911.  Plaintiffs in the instant case characterize their claims as a challenge to a generic DOI rule.  PUD Opp at 8, PNC Opp at 4.  The Ninth Circuit looked past plaintiff's characterizations, and concluded that the claims were actually an attempt to avoid the "strict jurisdictional limits imposed by Congress."  Id. at 911.  This court should do the same, particularly where plaintiffs here stand to gain nothing by having their supposed procedural rights vindicated if, in the end, they cannot undo the conditions.

Plaintiff PUD also argues that this case does not "fit the mold" of California Save Our Streams, PUD Opp at 11, because the challenged agency action in that case, it contends, was "taken specifically to support a particular FERC licensing procedure."  Plaintiff PNC similarly argues that California Save our Streams is a case that involved "individualized input into agency adjudications," PNC Opp at 9, and thus, in its view, is also distinguishable.  Plaintiff PNC reasons that it is challenging the promulgation of a regulation, an action independent of the FERC licensing process and an action which the Act required Interior to take without regard to whether the PUD sought a new license.  PUD Opp at 12.

This is a distinction without a difference.  The judicial review provision at issue in this case in no way limits appellate court jurisdiction to actions "taken specifically to support a particular FERC licensing procedure."  In fact, the provision specifically entitles a party

5

"aggrieved by an order" to challenge it in the Courts of Appeals and makes no distinction between various causes of a party's aggrievement.  It does not provide, as plaintiffs' arguments might be read to suggest, that a party aggrieved on substantive grounds under the FPA must pursue redress in the Courts of Appeals, but those aggrieved for procedural or non-FPA reasons may seek redress elsewhere.  The limitation plaintiffs read into the statute is nowhere to be found in the text, which provides:

> Upon the filing of such petition, such court shall have jurisdiction, which upon the filing of the record with it *shall be exclusive*, to affirm, modify, or set aside the order in whole or in part.

16 U.S.C. § 825*l*(b) (emphasis added). This provision in no way qualifies or limits the circumstances in which the Courts of Appeals may exercise jurisdiction.

The Ninth Circuit in <u>California Save Our Streams</u> clearly recognized this when it said that the conditions at issue "have no significance outside of the licensing process."  The same is true here.  The purportedly "independent action" of Interior in promulgating the challenged regulation has no significance outside of the licensing process because the purpose of the trial-type hearings authorized by this regulation is to test the factual foundations of the license conditions.[3]  Without the conditions, there is no basis for a hearing.  Plaintiffs are not affected by the promulgation of the regulation in a vacuum.  Their requests for rehearing are presently before FERC, and if they remain aggrieved once FERC issues an order on their rehearing requests, they

---

[3] Plaintiff PNC further argues that the "individualized input" in <u>California Save our Streams</u> (i.e., the Forest Service condition) has "no life independent from that adjudicatory order."  PNC Opp at 9.  This recognition – that something with no life independent of the licensing process would not support district court jurisdiction – actually undermines plaintiff's own theory because the same can be said of the regulation here.  Independent of the licensing process, the challenged regulation has no significance.

will have the opportunity to appeal to the Courts of Appeals which, as the Ninth Circuit stated, are "properly constituted to hear all relevant arguments" in a license challenge.  California Save Our Streams, 887 F.2d at 912.

Plaintiff PUD also attempts to distinguish City of Tacoma v. NMFS, 383 F. Supp. 2d 89 (D. D.C. 2005), Idaho Rivers United v. Foss, 373 F. Supp. 2d 1158 (D. Idaho. 2005), and Southwest Center for Biological Diversity v. FERC, 967 F. Supp. 1166, (D. Ariz. 1997), relied upon by defendants.  Motion at 14-15.  The PUD argues that, in these cases, the plaintiffs were challenging actions of agencies other than FERC that were "taken specifically to support a particular FERC licensing proceeding."  PUD Opp at 10-11.

This too is a distinction without a difference.  In the cited cases, as in the instant case, plaintiffs challenged allegedly unlawful conduct as a means of obtaining relief from license conditions.  Here, plaintiff seeks a declaration that Interior violated section 241 of the Act by denying plaintiff certain process which might result in invalidation of the conditions, whereas in the three cited cases, plaintiffs argued that the agencies violated the Endangered Species Act ("ESA"), and that those violations rendered the conditions invalid.  In both settings, a violation of law was alleged, the vindication of which might result in the invalidation of the conditions. But more importantly, the three cited cases, as well as California Save Our Streams, all recognize that a plaintiff may not undermine Congressional intent and circumvent an exclusive judicial review provision through artful pleading.

Plaintiff PNC's additional contention that the instant case lacks the "individualized input" to licensing orders involved in "the decisions cited by [defendant] in its Motion, such as California Save our Streams," PNC Opp at 9, completely ignores the function which trial-type

7

hearings serve in the licensing process.  Because they test the factual foundations for the conditions, the trial-type hearings are just as intertwined with any order that might ultimately be issued as the biological opinions were in <u>City of Tacoma v. NMFS</u> and <u>Idaho Rivers United v. Foss</u>, as the alleged failure to consult under the ESA was in <u>Southwest Center for Biological Diversity v. FERC</u>, or as the alleged failures to comply with NEPA and AIRFA were in <u>California Save Our Streams</u> (<u>see also</u> related discussion in footnote 6, *infra*).

In further support of the theory of district court jurisdiction, plaintiff PNC relies heavily on <u>National Mining Association v. Dept of Labor</u>, 292 F.3d 849 (D.C. Cir. 2002) ("<u>NMA</u>"). PNC Opp at 9-12.  However, the FPA provision at issue in the instant case, 16 U.S.C. § 825*l*(b), differs from the statute at issue in <u>NMA</u> (specifically, the Black Lung Benefits Act, 30 U.S.C. §§ 901-945) because the former employs the term "exclusive," while the latter does not.  The D.C. Circuit in <u>NMA</u> recognized this, stating "Congress was silent on how review of regulations was to be accomplished." 292 F.3d at 856.  Moreover, <u>NMA</u> involved a constitutional challenge - an allegation that the rules were impermissibly retroactive, and that such retroactive application denied plaintiff's substantive rights.  Similarly, <u>McNary v. Haitian Refugee Center</u>, 498 U.S. 479 (1991), on which the district court in <u>NMA</u> principally relied in reaching its result, involved a challenge to the constitutionality of certain INS practices and policies.  This is not the case here, where the challenge is statutory.[4]

---

[4] Although plaintiffs contend that Interior also violated their constitutional due process rights by promulgating a rule which denies them trial-type hearings, <u>see</u> PUD Complaint ¶ 55 (Count IV), PNC Complaint ¶ 50 (Count IV), they offer no argument or supporting authority, nor do they explain what considerations, founded in the Fifth Amendment's due process clause, entitle them to the hearings they seek.  Their only potential entitlement to such hearings is based in statute, not the United States Constitution, and they have only been denied *process* (let alone whether that process is "due" in the constitutional sense) if their theory is correct that the Act guarantees

Finally, the PUD contends that the APA confers jurisdiction on this court "because there is no other review procedure provided by any other relevant statute."  PUD Opp at 7.  Plaintiff is simply incorrect, because the Federal Power Act's exclusive review provision, discussed above, expressly vests jurisdiction over license challenges in the Court of Appeals.  Plaintiff cites three cases in support of its mistaken view of the law (Wellife Products v. Shalala, 52 F.3d 357, 358 (D. C. Cir. 1995), International Brotherhood of Teamsters v. Pena, 17 F.3d 1478 (D. C. Cir. 1994) and Public Citizen v. Federal Trade Commission, 829 F.2d 149 (D. C. Cir. 1987)).  Although all three cases recognize the propriety of judicial review in a United States District Court pursuant to the APA where the relevant substantive statutes makes no provision for judicial review, such is not the situation here.  As we have discussed at length, the FPA expressly vests jurisdiction over license challenges in the Courts of Appeals. 16 U.S.C. § 825*l*(b).  Plaintiffs identify no case where jurisdiction over an FPA license challenge was found to lie in a district court.  Consequently, plaintiff has failed to demonstrate the existence of subject matter jurisdiction.  See Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994) ("It is to be presumed that a cause lies outside [federal courts'] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.") (citations omitted).

**2.     Having disavowed any challenge to the conditions themselves, plaintiffs lack standing because they have suffered no injury in fact.**

Plaintiff's contention that this is solely a challenge to the deprivation of a procedural right, coupled with its disavowal of any challenge to the conditions themselves, raises an

---

them a hearing.  But for Count IV in each complaint, the focus of their complaints and opposition briefs is that the regulation violates the Act.  In sum, plaintiffs have only been denied process if their statutory theory is correct. Thus, the constitutional considerations at issue in NMA and McNary are lacking.

additional jurisdictional concern: lack of an injury-in-fact sufficient to confer Article III

standing.  Although defendant did not raise a standing argument in its opening brief, plaintiffs'

responses requires that the argument be raised here because plaintiff asserts that this court has

jurisdiction to review the denial of a procedural right alone, without any accompanying injury.

Such jurisdictional issues may be raised at any time.  Settles v. United States Parole Commission,

429 F.3d 1098 (D.C. Cir. 2005).

Plaintiffs insist their challenge is targeted at Interior's actions in promulgating the

Interim Final Rule and in denying plaintiffs' requests for trial-type hearings.  But plaintiffs do

not seek the opportunity for trial-type hearings merely for the satisfaction of participating in

them.  If this action is really not a challenge to the conditions, then plaintiffs have suffered no

injury.  Plaintiffs identify no other harm to their concrete interests, and instead contend they may

challenge in this Court the denial of *process* alone – specifically, process designed to allow

resolution of disputed facts underpinning the license conditions they oppose.[5]

An injury-in-fact is one of the three "irreducible constitutional minim[a]" required to

establish standing.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  In Lujan, the

Supreme Court explained that an injury-in-fact requires "an invasion of a legally protected

interest which is . . . concrete and particularized."  Id.  Having disavowed any challenge to the

conditions, plaintiffs identify no other injury to a legally protected interest.  Instead they insist

---

[5] Plaintiff PNC puzzlingly argues that the reference to the conditions in the complaints is "relevant for standing purposes, to show how [plaintiffs] fall within the zone of interests to complain about the challenged aspect of the generic rule," but then goes on to say that the "specific conditions themselves are immaterial to the merits of the APA cause of action." PNC Opp at 13.  PNC contradicts itself.  If the conditions are immaterial for purposes of the merits, then they cannot be a basis of plaintiffs' standing.

that this court may address a free-standing procedural injury in a vaccuum.

Plaintiffs' theory is unavailing. In a procedural rights case, the focus of the standing inquiry is on whether the plaintiff has established an injury-in-fact. <u>Florida Audubon Soc'y v. Bentsen</u>, 94 F.3d 658, 664 (D.C. Cir. 1996) (citing <u>Lujan</u>, 504 U.S. 572 n. 7), <u>Center for Law and Educ. v. United States Dept. of Educ.</u>, 396 F.3d 1152 (D.C. Cir. 2005) ("while we relax the imminence and redressability requirements, the procedural-rights plaintiff must still satisfy the general requirements of the constitutional standards of particularized injury and causation.").

<u>Center for Law</u> involved a challenge to the composition of a negotiated rulemaking committee, assembled by the Department of Education to propose regulations implementing the No Child Left Behind Act. In concluding that plaintiff lacked standing, the D.C. Circuit explained the critical difference between a "procedural right" and a "concrete interest" in a procedural-rights case:

> The two things are not one and the same. [Plaintiffs] must show both (1) that their procedural right has been violated, and (2) that the violation of that right has resulted in an invasion of their concrete and particularized interest. "[A] prospective plaintiff must demonstrate that the defendant caused the particularized injury, and not just the alleged procedural violation." <u>Fla. Audubon Soc'y</u>, 94 F.3d at 664.

<u>Center for Law and Educ.</u>, 396 F.3d at 1159. As the D.C. Circuit noted, the Supreme Court has also recognized that procedural injury alone does not satisfy the concrete injury requirement:

> If we understand this [argument] correctly, it means that the Government's violation of a certain . . . class of procedural duty satisfies the concrete-injury requirement by itself, without any showing that the procedural violation endangers a concrete interest of the plaintiff (apart from his interest in having the procedure observed). We cannot agree.

<u>Lujan</u>, 504 U.S. at 573, n. 8. Nor should this court accept such a proposition.

In the final analysis, even if a procedural deprivation has occurred, and defendants do not concede that one has, it is clear that plaintiffs in this case may not seek to remedy that

11

deprivation without demonstrating an injury to a concrete interest. To satisfy the injury-in-fact requirement of a procedural standing claim, plaintiffs must show that the "procedures in question are designed to protect some threatened concrete interest ... that is the ultimate basis of [their] standing." Lujan, 504 U.S. at 573. Plaintiffs have not shown that here. The only concrete interest identified by plaintiffs is their interest in being free from "onerous" and "burdensome" conditions," Complaint ¶ 1, ¶ 24, yet they disavow that this is their injury.[9]

Plaintiffs cannot have it both ways: either they are challenging the conditions, in which case exclusive jurisdiction lies in the Courts of Appeals, or they are challenging a procedural deprivation, in which case they have alleged no injury, and therefore do not have Article III standing in federal court. In either case, this Court lacks jurisdiction. Accordingly, defendant respectfully requests that its 12(b)(1) Motion to Dismiss be granted.

3.    **Should the Court conclude that it has jurisdiction in this action, dismissal is appropriate under rule 12(b)(6) because the allegations of the complaint are legally insufficient.**

In its opening brief, defendant demonstrated that the Interim Final Rules, and specifically 43 C.F.R. § 45.4(d)(1), are consistent with the express language of section 241 of the Act, which extends the new procedural rights only to "license applicant[s]" and "any part[ies] to the proceeding." 16 U.S.C. § 797(e). Because FERC issued plaintiff PUD's license on July 11,

---

[9] Plaintiff PNC also contends that the challenged rule is not "inescapably intertwined" with the licensing proceeding, and therefore, under Merritt v. Shuttle, 245 F.3d 182 (2nd Cir. 2001), jurisdiction in a district court is not precluded. As this standing discussion illustrates, they are intertwined: any supposed deficiencies in the rule are meaningless except in the context of a licensing proceeding. The sole reason for seeking the trial-type hearing is to test factual foundations of the conditions themselves. In Merritt, plaintiff's allegations under the Federal Tort Claims Act were viable independent of the FAA's license-suspension proceedings, and thus the Federal Aviation Act's exclusive review provision was, quite understandably, found not to be an impediment to district court review.

2005, the project was licensed, and the PUD was a "licensee" for purposes of the FPA, when the Act became law on August 8, 2005. As explained below, plaintiff PNC's rights to request section 241 procedures cannot be broader than the PUD's. Accordingly, PNC's rights to such procedures also terminated when FERC issued a license to the PUD. Section 241 of the Act neither requires nor authorizes Interior to provide trial-type hearings in these circumstances, nor to consider alternative conditions or prescriptions recommended by a licensee. Thus, the Act does not provide for the relief plaintiffs seek.

In opposition, plaintiffs contend that Interior's construction of section 241 of the Act is not the only permissible construction,[7] because section 241 is silent as to its temporal reach, and therefore dismissal is improper. PUD Opp at 20. They argue that the PUD continued to be a license applicant after license issuance, effectively giving the PUD dual status of licensee and applicant. PUD Opp at 15; PNC Opp at 19; see also, PUD Opp at 17 (license application "still [considered] alive"). Yet plaintiffs identify no provision in the Act that would make its new procedures applicable to licensees and their theory is contradicted not only by the Act's express application to "license applicants," but also by the FPA's statutory and regulatory scheme, as explained below.

_____

[7] As discussed in defendant's opening brief, Motion at 20, the ordinary meaning of the term "license applicant" is a person or entity that has requested, but to which FERC gas not yet granted, a license. In contrast, plaintiffs argue that the term "license applicant" should be read to also include entities to which FERC *has* granted a license (in other words, licensees) but that have also requested rehearing of the license order and, therefore, have not yet accepted their licenses. Thus, PUD's definition of "license applicant" *includes* "licensees." Such an interpretation, that a license applicant can be a licensee, renders the statutory definition of "licensee" meaningless and defies logic.

13

A.    **Plaintiff PUD's license is fully effective.**

Under the plaintiffs' view, the PUD's license is conditional because, they contend, the PUD has requested rehearing and, therefore, has not accepted its license. PUD Opp at 15. This assertion is contradicted by section 313(c) of the Act, 16 U.S.C. § 825*l*(c), which provides that a party may be excused from a license's operative effect only by affirmatively seeking an order from FERC staying the license. Section 313(c) also specifically provides that a request for rehearing does not operate as a stay of a licensing order:

> The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

16 U.S.C. §825*l*(c). FERC typically issues licenses effective upon issuance, or as in the PUD's case, "effective on the first day of the month in which this license is issued." PUD, 112 FERC 61,055 at 27. Thus, upon license issuance, a license is effective and binding. FERC's regulations are equally clear on this point. See 18 C.F.R. § 385.713(e) ("[u]nless otherwise ordered by the Commission, the filing of a request for rehearing does not stay the Commission decision or order."). In addition, FERC has held that the filing of a request for a stay is "the only means available to delay the effectiveness of a Commission directive." PacifiCorp Electric Operations, 60 FERC ¶ 61,292, 61,038 (1992). See also PacifiCorp Electric Operations, 58 FERC ¶ 61,283, 61,893 (1992) (pendency of rehearing request had no bearing on the immediate effectiveness of FERC order). As discussed in defendant's opening brief, Motion at 9-10, the PUD attempted unsuccessfully to obtain a stay from both FERC and the D.C. Court of Appeals. Accordingly, the PUD's license was effective upon issuance, and it has not been stayed.

14

In addition, FERC has flatly rejected the argument that an annual license does not terminate, and thus a new license does not become effective, until a licensee chooses to accept its license.  City of Tacoma, 87 FERC ¶61,197 (1999) ("Tacoma 1").  In doing so, FERC explained that such an interpretation would undermine Congress's intent in enacting § 313 by:

> giv[ing] the licensee an absolute right to avoid the terms of the new license indefinitely, simply by requesting rehearing and judicial review. . . . [T]his view contravenes section 313 of the FPA, which provides that the filing of a request for rehearing does not operate as a stay of a Commission order.  Tacoma's interpretation would simply read this provision out of the statute for all hydroelectric licensing orders.

Tacoma 1, 87 FERC ¶ 61,197, 61,732.  Thus, Tacoma 1 also confirms that an applicant becomes a licensee – subject to the license's terms – upon issuance.

**B.      After license issuance, withdrawal of an application or rejection of a license do not render a license order ineffective.**

The PUD also contends that its application is alive because its application may be withdrawn up until the point in time when it accepts its license.  The PUD relies on the decision in City of Tacoma, 73 FERC ¶ 61,210, 61,578 ("Tacoma 2"), *inter alia*, in which Tacoma notified FERC of its intent to reject a new license within 30 days of license issuance, and FERC issued an order dismissing Tacoma's application, and rescinding its new license.  Thus the PUD reasons, if FERC may dismiss a license application, even after issuance, then the application must still have some viability and the PUD must remain an applicant.  PUD Opp at 15.

Plaintiff misconstrues the holding in Tacoma 2.  The licensee in that case rejected its license by requesting an order of rescission.  As in this case, Tacoma's license had been issued "effective the first day of the month in which this order is issued," City of Tacoma, 72 FERC ¶ 61,239 (1995) (order issuing new license), so it was effective upon issuance.  As such,

Tacoma's so-called "rejection" had no effect until FERC issued an order rescinding the license. Contrary to plaintiffs' assertion, <u>Tacoma 2</u> does not stand for the proposition that a licensee remains an applicant after license issuance. Rather, it confirms and recognizes that, once issued, a license order is binding unless and until it is rescinded by FERC.

Plaintiff's reliance on <u>City of Richmond</u>, 38 FERC ¶ 61,100, 61,267 (1987) is equally unavailing. There, the licensee notified FERC of its intent to withdraw its license application while its rehearing request was pending. As in <u>Tacoma 1</u> and <u>Tacoma 2</u>, FERC had already issued a new license, so Richmond could not escape its license obligations simply by withdrawing its application. Rather, Richmond needed an order from FERC rescinding the new license, which FERC ultimately issued.

Thus, in both <u>Tacoma 2</u> and <u>City of Richmond</u>, the licensees sought to be relieved of the obligations of their respective license orders, so the action sought from FERC was *rescission* of the license order. Further, in neither case did the licensee's status revert back to that of applicant, nor did FERC anywhere say that it did. Thus, neither decision supports plaintiffs' contention that the PUD remains a license applicant.

### C.   The PUD's theory that it remained a license applicant after license issuance produces inequitable results.

Plaintiffs contend that, following license issuance, the PUD remained a license applicant or, in the alternative, simply a "party" to the proceeding. PUD Opp at 15-18; PNC Opp at 19. However, accepting plaintiffs' theory would lead to an inequity in the FERC licensing process by producing a possible scenario where *only* other parties to the proceeding – and *not* the original applicant – could request trial-type hearings.

Under the statutory scheme, a license is not accepted if the licensee requests rehearing of

16

the license order or otherwise informs FERC that it intends to reject the license.  PUD Opp at 15

(citing 16 U.S.C. § 799).  If the licensee does not affirmatively reject the license or request

rehearing within 30 days of license issuance, the license is deemed "accepted."  *Neshkoro Power*

*Associates, LLC*, 111 FERC ¶ 62,099 (2005).  Thus, even under the PUD's reasoning, a license

applicant becomes a licensee and loses applicant status upon acceptance of the new license.

However, in interpreting section 241 and promulgating reuglations, Interior had to

consider two situations (one of which plaintiffs ignore):  (1) the PUD's situation, where FERC

had issued a license prior to August 8, 2005 and the licensee (i.e., the PUD) had requested

rehearing; and (2) the situation where a license was issued and accepted prior to August 8, 2005,

but some other party requested rehearing.  To understand the flaw in plaintiff's theory, consider

a scenario where a license was issued on May 1, 2005, over three months prior to the Act's

enactment, and where the licensee did not reject the license or request rehearing (in other words,

the license had been accepted).  Further suppose that during the month of May, another party to

the proceeding timely requested rehearing.  Applying existing law and the PUD's reasoning to

this situation, on August 8, 2005 there would have existed (1) an accepted license, (2) a pending

rehearing proceeding, (3) a licensee, and (4) other parties to the *rehearing* proceeding.  Because,

in this scenario, the license was accepted prior to August 8, 2005, there is no longer a "license

applicant."  As such, on August 8, 2005, the licensee (or former license applicant) would enjoy

none of the new procedural rights established by the Act, while the other parties would.  Interior

rightly drafted the regulation to avoid that inequitable result, because Congress clearly intended

the right to trial-type hearings to be enjoyed equally by both applicants *and* other parties to the

proceedings.

17

**D.    The PUD's argument that, upon license issuance, the licensee becomes some other "party to the proceeding" renders the term "applicant" in Section 241 meaningless.**

The PUD also argues that, assuming it lost applicant status upon license issuance, it is still a "party" to the ongoing proceedings.  Thus, it still has rights as a "party to the proceeding."  PUD Opp at 18.  This interpretation, however, renders the term "license applicant" meaningless.  Under FERC and Interior regulations, a "license applicant" is *de facto* a "party" to the license proceeding.  Interior's regulations define "license party" as "a party to the license proceeding, as that term is used in 18 C.F.R. 385.102(c)."  43 C.F.R. § 45.2.  FERC's definition of "party" includes, (1) "[a] person filing an application," (2) a "respondent," and (3) "[a]ny person whose intervention in a proceeding is effective."  18 C.F.R. § 385.102(c).  In a licensing proceeding, a person or entity becomes a party, or license party, by (1) filing a license application, or (2) intervening in the license proceeding.  By separately identifying license applicants and other parties to a proceeding, Congress clearly sought to accommodate the established scheme which distinguishes between applicants, respondents and intervenors.  A license applicant becomes a "party" once it files an application for a new license with FERC.  Any other entity becomes a "party" upon FERC's recognizing intervention through a notice or motion.  Upon license issuance, a license applicant does not transform into an intervenor, nor does it become some other "party to the proceeding."[9]  A license applicant is a party upon filing an application, but upon license issuance becomes a licensee.  Plaintiffs' tortured construction of these terms should be rejected.

---

[9]This would also apply to the situation where a licensee accepted a license prior to August 8, 2005, but another party requested rehearing of the license order.  The licensee would not transform into some other "party" to the rehearing proceeding.

The distinction between license applicants and other parties to the proceeding is relevant in another significant way.  Section 241 of the Act expressly grants certain rights to license applicants and other parties to a proceeding.  However, as explained above, both license applicants and intervenors are considered parties (or "license parties") to the proceeding, so the term "party to the proceeding" could be read to encompass both license applicants and intervenors.  Construing applicants and other parties (i.e., intervenors) as one and the same would render Congress's use of the term "applicant" superfluous, and it is "a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." Alaska Dept. of Environmental Conservation v. EPA, 540 U.S. 461, 489 n. 13 (2004) (citations and internal quotation marks omitted); see also, American Jurisprudence, Second Ed., 73 Am Jur 2d Statutes § 165 (2006).

Considered in this light, it is clear that Congress identified license applicants apart from other parties to the license proceeding in order to identify the temporal scope of section 241.  Prior to license issuance, there is a license applicant and other parties to the proceeding (via the intervention process).  All have equal procedural rights under section 241 of the Act.  Upon license issuance, however, there ceases to be a license applicant, so neither the licensee (i.e, the former applicant) nor any other "party to the proceeding" enjoys the new procedural rights granted in section 241.  To read section 241 in any other way, would build inequity into the process and render the term "license applicant" meaningless.[9]

---

[9] Plaintiffs' additional contention that the term "license applicant" is undefined, PUD Opp at 15, is irrelevant, as the ordinary meaning is hardly subject to any meaningful debate.  See Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning.").

**E.    Interior appropriately determined the temporal reach of the statute based on its use of the term "license applicant."**

Ignoring the significance of the term "license applicant," plaintiff PUD argues that there is no language in section 241 specifying its effective date and therefore the statute became effective on August 8, 2005, and applies to all proceedings where a license is on rehearing.  PUD Opp at 20.  In support of its view, the PUD points to the Electric Consumer Protection Act of 1986 ("ECPA"), Pub. L. No. 99-495, arguing that "if Congress wanted the amendments . . . to apply to only licenses issued after the date of enactment, it is clear that [Congress] knew how to include such language and it would explicitly state that intent." PUD Opp at 21.  This reasoning ignores an important difference between ECPA and section 241 of the Act.

In enacting ECPA, Congress included an applicability provision because certain provisions of ECPA applied only to licenses issued after enactment, while other provisions applied both to licenses issued prior to and those issued after enactment.  Pub. L. No. 99-495, § 18.  In contrast, all three subsections of section 241 of the Act apply equally to the same license proceedings, so there was no need to make the specific distinctions Congress made in ECPA.  The absence of a similar applicability provision in section 241 simply means that it applies prospectively to any license proceeding where there was a "license applicant," as opposed to a "licensee," as of the date of enactment. 16 U.S.C. § 797(e).

In this same vein, plaintiff PUD also contends that the Act "must be presumed to apply" to the licensing decision made nearly a month prior to enactment.  Id. at 20.  Plaintiff cites no authority for such a presumption, and it is in fact contrary to Supreme Court authority.  See Johnson v. United States, 529 U.S. 694 (2000).  In Johnson, the Supreme Court reiterated the rule of construction that "the omission of an express effective date from the statute" simply

20

"remits us to the general rule that when a statute has no effective date, 'absent a clear direction by Congress to the contrary, [it] takes effect on the date of its enactment.'" Id. at 702 (citation omitted). Because plaintiff PUD became a licensee on July 11, 2005, the Act is simply inapplicable to its circumstances.

Plaintiffs also argue that the meaning of the Act is not as plain as defendant asserts in its opening brief, because Interior set the cutoff date for November 17, 2005, rather than August 8. The issue of whether the Act applies to applicants whose licenses were issued in the interim period between August 8 and November 17 is not even before the court. But even if one assumes that Interior erred in selecting a cut-off date in November, rather than an August 8 cut-off date, such error is harmless because plaintiff's license was issued in July, well before the statute was even enacted. See 5 U.S.C. § 706 (in reviewing the lawfulness of agency action, "due account shall be taken of the rule of prejudicial error" by the reviewing court).

### F.    Interior's regulations implementing the Act properly exclude licenses issued prior to its enactment

Plaintiff PNC cites Consolidated Edison Co. of New York v. FERC, 315 F.3d 316 (D.C. Cir. 2003) in support of the proposition that, when an agency changes the law by rulemaking, there is a presumption that the rule is to be applied retroactively. PNC Opp at 20. But Consolidated Edison did not involve a rulemaking. Rather, it involved the issuance in 1999 of a new policy statement to be used by FERC in processing requests for rate increases. The plaintiff in Consolidated Edison had argued that the agency erred in evaluating the rate request under a 1995 policy statement, even though the 1999 policy statement had been issued while a request for rehearing was still pending before FERC. The court held that retroactive application of a new policy statement to pending cases may be permissible, but it is not required, and stated that

21

"[a]n agency may decide to apply a pre-existing policy to resolve a pending case, so long as that policy is not otherwise arbitrary and the agency provides a reasoned explanation for its decision." 315 F.3d at 319. Continued the court:

> A new rule may be applied retroactively to the parties in an ongoing adjudication, so long as the parties before the agency are given notice and an opportunity to offer evidence bearing on the new standard, and the affected parties have not detrimentally relied on the established legal regime.

Id. at 323. On this basis, it upheld the agency's application of the earlier policy statement. The language regarding presumed retroactive effect quoted by PNC in its opposition, PNC Opp at 20, is dictum, has no bearing on the actual facts before the D.C. Circuit, and falls far short of explicating the complexities of retroactivity jurisprudence. Moreover, it is at odds with the Supreme Court's observation in Landgraf v. USI Films Products, 511 U.S. 244 (1994) that there is a presumption *against* the retroactive application of statutes. Id. at 273 ("we have long embraced a presumption against statutory retroactivity").

Finally, plaintiff PUD points to the often "salutary" benefits to be derived from the retroactive application of civil legislation, particularly where that legislation is jurisdictional, procedural, or remedial in nature, PUD Opp at 26, and quotes a passage from Landgraf stating that, "in many situations, a court should apply the law in effect at the time it renders its decision, even though the law was enacted after the events that gave rise to the suit." Landgraf, 511 U.S. at 273 (citation and internal quotation marks omitted). While these principles make sense in a variety of circumstances, they have no applicability in circumstances where Congress has specifically limited the applicability of a new provision to a certain class of individuals or entities, specifically "license applicants," of which plaintiff PUD is not a member.

**Conclusion**

For the reasons set out above, defendant respectfully requests that its Motion to Dismiss be granted.

August 4, 2006                                    Respectfully submitted,

                                                SUE ELLEN WOOLDRIDGE
                                                Assistant Attorney General
                                                Environment & Natural Resources Division
                                                _____/S/  JOHN S. MOST_____
                                                JOHN S. MOST, Virginia Bar #27176
                                                Trial Attorney, Natural Resources Section
                                                Environment & Natural Resources Division
                                                United States Department of Justice
                                                P.O. Box 663
                                                601 D Street N.W., Room 3536
                                                Washington, D. C.  20004
                                                (202) 616-3353, (202) 305-0274 (fax)

                                                Counsel for Defendants

Of Counsel
J. Kevin Tanaka
Christopher Watson
Office of the Solicitor
U.S. Department of the Interior