**KANJI & KATZEN, PLLC**
ATTORNEYS AT LAW
100 SOUTH KING STREET, SUITE 560
SEATTLE, WASHINGTON 98104
(206) 344-8100 ·FAX (866) 283-0178
www.kanjikatzen.com

CORY J. ALBRIGHT
RIYAZ A. KANJI
PHILLIP E. KATZEN
JOHN C. SLEDD
ANN E. TWEEDY

ANN ARBOR OFFICE
101 NORTH MAIN STREET
SUITE 555
ANN ARBOR, MI 48104
PHONE: (734) 769-5400
FAX: (734) 769-2701

November 9, 2006

**Via ECF Filing System**

Nancy Mayer-Whittington, Clerk
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

RE:   *Public Utility District No. 1 of Pend Oreille County, Washington v. United States Department of the Interior*, Case No. 1:06cv00365 RMC (consolidated with Case No. 1:106cv00768RMC)

Dear Ms. Mayer-Whittington:

  Intervenor-Defendant Kalispel Indian Tribe submits this letter for two reasons: (1) to inform the Court of a recent filing with the Federal Energy Regulatory Commission ("FERC") by Plaintiff Ponderay Newsprint Company ("PNC") that is relevant to PNC's statements to the Court in this proceeding; and (2) to briefly respond to the October 11, 2006, letter to the Court by the PNC.

The PNC's Submission To FERC:

  The PNC's recent filing with FERC, entitled Ponderay Newsprint Company's Answer In Support Of Motion For Stay Of License Conditions ("Answer"), was filed as part of the proceedings regarding Plaintiff Pend Oreille County Public Utility District No. 1's ("PUD") license to operate the Box Canyon Dam Project. In that filing the PNC supports the PUD's attempt to stay Department of Interior license conditions, the same license conditions with respect to which the PUD claims in this litigation that it is entitled to a trial-type hearing pursuant to the Energy Policy Act of 2005 ("EP Act"). The relevant portion of the Answer is found at page 4:

> In addition to requesting rehearing of the mandatory conditions and prescriptions and potentially pursuing judicial review of the Commission's rehearing order, PNC and

the Licensee have filed suit in the Federal District Court for the District of Columbia (the "Court") requesting that the Court determine that the trial-type hearing and alternative conditions provisions of the Energy Policy Act of 2005 ("EP Act") apply to this relicensing, and that action remains pending. If PNC and the Licensee are successful in their efforts to modify the Section 4(e) and Section 18 conditions, *either through judicial review of the License or through trial-type hearing and alternative condition proceedings* under the EP Act, *the Commission will be required to amend the conditions of the License.*

(Emphasis added.)

Thus, the PNC admits that the PUD and the PNC are seeking changes in the FERC license conditions through two simultaneous avenues: their litigation before this Court and their rehearing and Circuit Court appeal proceedings under 16 U.S.C. §825*l*. This is contrary to the intent of Congress that any challenge to license conditions occur exclusively pursuant to §825*l*. In addition, whereas the PNC argues to this Court in its Response In Opposition To Motions To Dismiss that the Interior rule and the license conditions imposed by Interior are not inescapably intertwined, at 8-12, and that there is a "disconnect" between them, at 13, in its submission to FERC it admits that if it prevails via either avenue, "the Commission will be required to amend the conditions of the License." This demonstrates that Plaintiffs' claims in this litigation are indeed inextricably intertwined with their appeal of the license conditions within the FERC proceedings.

A copy of the PNC's Answer is attached.

<u>The PNC's Letter To The Court Re *American Rivers v. United States Dept. of Interior*:</u>

The PNC submitted to the Court an analysis of a recent decision in *American Rivers v. United States Department of the Interior*, No. C05-2086P, Order on Defendants' Motion to Dismiss and Plaintiffs' Motion for Summary Judgment (W.D. Wash. October 3, 2006). The Kalispel Tribe believes that the PNC's analysis is flawed in many respects. In particular, with respect to the PNC's concluding paragraph regarding the Tribe's and Interior's motions to dismiss on the basis that this Court lacks subject matter jurisdiction, the PNC's analysis is not well taken.[1]

The PNC first argues that Interior acted inconsistently by not moving to dismiss in the *American Rivers* case for lack of subject matter jurisdiction. This ignores the fact that Interior was not required to assert every possible basis to dismiss in *American Rivers*. In addition, the posture of the two cases are very different. In the instant case, the PNC and the PUD are both seeking to change specific conditions placed on the PUD's FERC license; these are conditions established by Interior and required to have been incorporated into the license by FERC.

---

[1] Because the Tribe has only moved to dismiss for lack of subject matter jurisdiction, and only Interior moved to dismiss for failure to state a claim, the Tribe limits its comments here to the issue of subject matter jurisdiction.

Pursuant to 16 U.S.C. §825*l*, challenges to specific licensing conditions are subject to the exclusive jurisdiction of the Circuit Courts of Appeals. Indeed, the PUD and the PNC are pursuing relief from the Interior conditions through the §825*l* process. Simultaneously, however, the PUD and the PNC are seeking a second attack on those conditions through their action in this Court. In contrast, the plaintiffs in *American Rivers* only sought relief against Interior's Interim Final Rule; they did not seek any relief against any specific conditions of any particular license. Thus their position was the direct opposite of the PUD and the PNC here; they were trying to prevent challenges to conditions imposed by Interior but not yet made part of a license; they were not trying to change any license conditions. Thus, at a minimum, §825*l* was not clearly implicated in the *American Rivers* context, as it is in this case.

The PNC argues that it is not logical that subject matter jurisdiction should depend upon whether or not a party is seeking to overturn particular conditions of a specific license order. Regardless of the PNC's view of the logic of that choice, Congress made the choice to limit challenges to FERC license conditions through §825*l*. What the PNC does not explain is why it is logical, or fair, that it should have two separate and simultaneous opportunities to challenge license conditions it finds disagreeable.

Thank you for your considering these comments.

Sincerely,

/s/ RIYAZ A. KANJI
Riyaz A. Kanji (D.C. Bar No. 455165)
KANJI & KATZEN, PLLC
101 N. Main Street, Suite 555
Ann Arbor, MI 48104
Telephone: 734-769-5400
Fax: 734-769-2701
Email: rkanji@kanjikatzen.com

/s/ PHILLIP E. KATZEN
Phillip E. Katzen
KANJI & KATZEN, PLLC
100 S. King Street, Suite 560
Seattle, WA 98104
Telephone: 206-344-8100
Fax: 866-283-0178
Email: pkatzen@kanjikatzen.com

*Attorneys for the Kalispel Tribe of Indians*

C:   Eric J. Wycoff
     John S. Most
     James B. Vasile

Enclosure

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Public Utility District No. 1 of | ) | |
| Pend Oreille County, Washington | ) | Project No. 2042 |
| Box Canyon Hydroelectric Project | ) | |

PONDERAY NEWSPRINT COMPANY'S
ANSWER IN SUPPORT OF MOTION FOR STAY OF LICENSE
CONDITIONS

Pursuant to Rule 213(a)(3) of the Commission's Rules of Practice and Procedure, intervener Ponderay Newsprint Company ("PNC")[1] hereby files its answer in support of the motion of Public Utility District No. 1 of Pend Oreille County, Washington ("District" or "Licensee") to stay certain conditions of the Commission's Order Issuing New License ("Order" or "License") for the Box Canyon Hydroelectric Project (the "Project") (112 FERC ¶ 61,055).

I. **Background**

On October 6, 2006, the Licensee filed a Motion for Stay of certain mandatory conditions and prescriptions[2] pending the Commission's decision on the pending requests for rehearing and possible court appeals of the Commission's decision. With its Motion, the Licensee filed an affidavit that estimated that the costs for compliance with the specified conditions will be approximately $1.54 million in the first 180 days of 2007 and

---

[1] As noted in the License, FERC granted PNC intervener status as of November 19, 2002. *License*, ¶ 8, n.8.
[2] Specifically, the District has requested a stay of the Department of Interior's 4(e) conditions 3.E, 6, and 7; the U.S. Forest Service's 4(e) conditions 7, 11, 13, 14, 17, and 18; and Interior's section 18 prescriptions at 1.2, 1.5, 1.2.1.6, and 1.3.1.1. The District also seeks a stay of any license article or portions thereto, which may also seek to impose the requirements of the afore-referenced mandatory conditions and prescriptions. Both the Licensee and PNC have filed requests for rehearing on the mandatory conditions and prescriptions.

{W0600480.6}

$1.3 million in the second six months of 2007. Total expected expenditures to comply with the specified condition for 2007 are $2.84 million. The estimates set forth in the District's affidavit did not include the costs for compliance with the numerous other terms and conditions of the License. The contested conditions for which a stay has been requested require the construction of fish passage facilities and investment of funds to implement a Trout Assessment and Restoration Plan ("TARP"), the costs of which will not be recoverable once spent.

## II.    Socioeconomic Impact to PNC and Pend Oreille County

As set forth in its August 8, 2005 Motion for Stay of Mandatory Conditions and Request for Rehearing ("Rehearing Request"), PNC is the largest user of power generated by the Project. The PNC mill is power-intensive, and electricity is one of the mill's highest operational costs. As the Commission recognized in its Order, at the time of license issuance, PNC used about three-quarters of the energy produced by the Box Canyon Project and absorbed the vast majority of the Project's operating costs. *Order*, at ¶ 109. In 2001, PNC purchased about 80 percent of the power produced at the Project. *Id.* at ¶ 122, n.116. Also as set forth in its Rehearing Request, PNC estimates that its electricity costs will increase by more than $5 million annually as a result of the License. This represents a 31% increase over PNC's 2001 energy costs. The increase primarily is attributable to the cost of the mandatory conditions and prescriptions.

The Commission's Final Environmental Impact Statement ("FEIS") acknowledged that fiber mills operate under tight operating margins and that it could be difficult to pass the increased costs on to customers by raising rates, because in highly competitive markets increased costs often result in reduced sales. The FEIS also found

2

{W0600480.6}

that reducing electricity use to absorb the increased costs may be difficult because PNC already has invested in energy-efficient machinery to reduce total electricity consumption. *Final Environmental Impact Statement*, at 253-54 (FERC No. 2042-013, September 2004). The FEIS concluded:

> The Composite Scenario [all mandatory conditions and prescriptions] could have large adverse impacts on the socioeconomic resources in Pend Oreille County if rate increases force PNC to close operations of the mill with disproportional adverse effects on low-income and elderly populations in Pend Oreille County. Even modest job losses, reduced disposable income and consumer spending, and reduced industrial output would further depress the already depressed economic conditions of the county.

*Id.* at 255.

As a result of the expiration of other power contracts, PNC now uses approximately 95% of the Project's power. The District passes on to the mill the costs incurred by the District to comply with the license, shortly after the District incurs them. Thus PNC has assumed an even higher proportion of the Project's costs than when the Commission analyzed the impacts of the mandatory conditions on the District, the mill, and the socioeconomic resources of the County. Between the fourth quarter of 2005 and August 2006, the District has passed on to PNC approximately $ 4.3 million in costs of compliance, much of which will become unrecoverable when funds deposited in the TARP are spent. PNC's power costs continue to be one of the mill's highest operational costs, the mill continues to operate under tight operating margins, and markets are softening. It is reasonably foreseeable that incurring unrecoverable costs would put the mill in an uncompetitive position.

### III. The Need for a Stay

In addition to requesting rehearing of the mandatory conditions and prescriptions and potentially pursuing judicial review of the Commission's rehearing order, PNC and the Licensee have filed suit in the Federal District Court for the District of Columbia (the "Court") requesting that the Court determine that the trial-type hearing and alternative conditions provisions of the Energy Policy Act of 2005 ("EP Act") apply to this relicensing, and that action remains pending. If PNC and the Licensee ultimately are successful in their efforts to modify the Section 4(e) and Section 18 conditions, either through judicial review of the License or through trial-type hearing and alternative condition proceedings under EP Act, the Commission will be required to amend the conditions of the License. Unless the Commission stays the contested conditions, which require imminent, substantial, and unrecoverable costs, PNC will be forced to sustain unrecoverable and potentially needless rate increases, which could result in needless adverse socioeconomic impacts to PNC and the County.

PNC supports and incorporates by reference the arguments set forth in the District's October 6 Motion for Stay, and will not repeat those arguments here.[3] In short, the standards that the Commission considers in ruling on a motion for stay are met. First, granting a stay will avoid potentially needless, adverse, irreparable socioeconomic harm to both PNC and Pend Oreille County. Second, granting a stay will allow for meaningful administrative and judicial review because, unless a stay is issued, administrative and judicial review will be meaningless because the conditions being contested will already have been implemented. Third, granting a stay will not result in irreparable harm to other parties or to the environment. As set forth in the District's Motion, the record shows that

4

continued operation of the Project would result in relatively minor, if any, environmental impacts. Further the District already has prepared 31 compliance plans in accordance with the new license, and is continuing to comply with the conditions of the License.

The current facts and request for stay are considerably different from those addressed in the Commission's November 17, 2005 Order Denying Stay (the "November 17 Order").[4] The November 17 Order contemplated the possibility that a stay of license conditions might be appropriate under the right circumstances. The Commission stated "[i]n previous cases, we have generally declined to require licensees to expend substantial sums for construction of facilities or implementation of other significant measures that ultimately might not be required should the movant prevail on appeal. The District's stay motion is much broader . . . ." *November 17 Order*, at pp 61,150-61,151. The Commission also noted that (i) the funds deposited into the TARP would not become unrecoverable until the field season of 2007 and (ii) the District would not incur capital expenditures for fish passage facilities for several years. *Id.*, at p. 61,151. In other words, the Commission essentially based its denial on the finding that costs incurred during the first six to twelve months after license issuance would be recoverable. *Id.*, at paragraphs 11-13.

This Motion for Stay is different because it presents different circumstances than those discussed in the November 17 Order. It only requests a stay of compliance for conditions that require significant and unrecoverable expenditures in 2007. For instance, in 2007 funds deposited into the TARP will begin to be expended and fish passage condition compliance includes among other things construction and operation of a

---

[3] See District's Motion for Stay, Section II, at pp. 5 – 17.
[4] See Order Denying Stay and Granting Extension of Time, 113 FERC ¶61,166 (November 17, 2005).

5

{W0600480.6}

temporary fishway and construction of a hydraulic model for downstream fish passage. Once spent, these costs are unrecoverable should the District and PNC ultimately prevail in administrative and judicial appeals. These new circumstance make a stay appropriate now even if it may not have been appropriate a year ago.

IV.     **Conclusion**

For the foregoing reasons, PNC supports the District's Motion for Stay of certain Section 4(e) and Section 18 mandatory conditions and prescriptions and requests that the Commission stay the specified conditions and prescriptions, pending administrative and judicial review.

Dated: October 23, 2006

*Sarah A Verville*
Matthew D. Manahan
Sarah A. Verville
Pierce Atwood LLP
One Monument Square
Portland, ME 04101
(207) 791-1100

Attorneys for Intervener
Ponderay Newsprint Company

## CERTIFICATE OF SERVICE

I hereby certify that I will, within the timeframe and means established in 18 C.F.R. § 385.2010, serve the accompanying materials upon each person designated on the official service list compiled by the Secretary in this proceeding, unless such person is no longer a representative of the party to be served, in which case I will serve the accompanying materials on an alternate representative of that party.

Dated at Portland, Maine, this 23rd day of October, 2006.

*[signature]*
Sarah A. Verville
Pierce Atwood LLP
One Monument Square
Portland, ME 04101-1110
(207) 791-1100

Attorneys for Intervener
Ponderay Newsprint Company