117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

# EXHIBIT 1

Public Utility District No. 1 of Pend Oreille County, Washington

Project Nos. 2042-031, 2042-086

FEDERAL ENERGY REGULATORY COMMISSION - COMMISSION

*117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656*

ORDER ON REHEARING, DENYING STAY, DENYING MOTIONS TO SUPPLE-
MENT THE RECORD, AND DENYING MOTION TO DEFER CONSIDERATION OF
REQUESTS FOR REHEARING

November 17, 2006

**PANEL:**
 [*1]

Before Commissioners: Joseph T. Kelliher, Chairman; Suedeen G. Kelly, Marc Spitzer, Philip D. Moeller, and Jon
Wellinghoff

**OPINION:**

1. On July 11, 2005, the Commission issued a new license for continued operation of the 72-megawatt (MW) Box Can-
yon Hydroelectric Project, located on the Pend Oreille River in northeastern Washington and northwestern Idaho. n1
The project occupies about 717 acres of federal lands, including about 190 acres within the Colville National Forest and
about 493 acres within the Kalispel Indian Reservation. n2 The project licensee, Public Utility District No. 1 of Pend
Oreille County (District), filed a timely request for rehearing, as did the following other parties: Kalispel Tribe of Indi-
ans (Tribe); U.S. Department of the Interior (Interior); U.S. Department of Agriculture, Forest Service (Forest Service);
Washington Department of Fish and Wildlife (Washington DFW); and Ponderay Newsprint Company (Ponderay). For
the reasons discussed below, we grant rehearing in part and deny rehearing in part.

n1 *Public Utility District No. 1 of Pend Oreille County, Washington, 112 FERC P61,055 (2005).*
 [*2]

n2 The project also occupies lands administered by the Bonneville Power Administration, U.S. Fish and
Wildlife Service (FWS), U.S. Army Corps of Engineers, and Bureau of Land Management. *Id.* at P1.

## Background

2. A more detailed procedural history appears in the order issuing a new license for the project. The relicensing proceed-
ing was complex and contentious, and the Tribe opposed issuance of a new license. The Commission found that the new
license, as conditioned, would not interfere or be inconsistent with the purposes of the Kalispel Indian Reservation. The
Commission issued a new license that included mandatory conditions submitted by Interior and the Forest Service pur-
suant to section 4(e) of the Federal Power Act (FPA), but limited their applicability to project works located on reserva-
tion lands and within the project boundary. n3 Shortly thereafter, the District and Ponderay filed motions for a stay of
numerous license conditions, which the Commission denied after a court-ordered administrative stay was dissolved. n4

n3 *16 U.S.C. § 797*(e) (2000).

[*3]

n4 *Public Utility District No. 1 of Pend Oreille County, Washington, 113 FERC P61,166 (2005).* As discussed in that order, the U.S. Court of Appeals for the District of Columbia Circuit initially granted an administrative stay on August 9, 2005, and subsequently dissolved the stay on September 26, 2005.

3. Following issuance of the license order, the Tribe filed a motion for acceptance of additional evidence, which it included with its rehearing request. The District filed an answer opposing the Tribe's motion, but requested that if the Commission granted the motion, it also grant the District's request to supplement the record. With its rehearing request, the District filed a request that the Commission reopen the record to make the additional findings that it asserted were required for compliance with the newly-passed Energy Policy Act of 2005. n5 The District and Ponderay also requested that the Commission defer acting on all rehearing requests pending consideration of those Energy Policy Act matters. More recently, on October 6, 2006, the District filed a second [*4] request for a stay of certain mandatory conditions pending rehearing and judicial review.

n5 Pub. L. 109-58 (Aug. 8, 2005).

4. On rehearing, the District and Ponderay argue that the new license is unreasonable because it includes costly mandatory conditions submitted by Interior and the Forest Service that are not supported by substantial evidence. The Tribe maintains that the Commission should rescind the new license because the project interferes and is inconsistent with the purposes of the Kalispel Indian Reservation. Interior and the Forest Service argue that the Commission improperly rejected some of their mandatory conditions. Washington DFW seeks clarification of certain license conditions.

**Preliminary Matters**

    A. **Section 241 of the Energy Policy Act**

5. Section 241 of the Energy Policy Act, which was signed into law on August 8, 2005, provides an opportunity for an expedited trial-type hearing on disputed issues of material fact with respect to mandatory conditions in hydroelectric licensing [*5] proceedings. It also adds a new section 33 to the FPA, allowing parties to propose alternative conditions and requiring that the conditions be accepted if they meet certain requirements. As noted, the District and Ponderay request that the Commission defer acting on all pending rehearing requests to allow time for Interior and the Forest Service to hold hearings and consider alternative conditions pursuant to that section. The District also requests that we reopen the record to make the additional findings that it asserts are required under that Act.

6. On August 25, 2005, Interior filed a response to the District's request, stating its view that the new legislation should not be applied retroactively to licenses issued before the statute was passed. n6 The Departments of Interior and Agriculture subsequently published interim final rules implementing section 241 of the Energy Policy Act that make the new hearing procedures available to any license applicant or other party to a licensing proceeding for which a license had not been issued as of November 17, 2005, the effective date of the rules. n7

n6 Interior's Response to District's rehearing request (filed Aug. 25, 2005).

[*6]

n7 *See* Resource Agency Procedures for Conditions and Prescriptions in Hydropower Licenses, *70 Fed. Reg. 69804* (Nov. 17, 2005).

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

7. On December 19, 2005, the District filed requests with Interior and the Forest Service for a trial-type hearing and consideration of proposed alternative conditions. By letter dated February 1, 2006, Interior rejected the District's request. On March 1, 2006, the District filed a civil action against Interior in the U.S. District Court for the District of Columbia, seeking to set aside the regulations and Interior's decision to deny the District's request for a hearing on alternative conditions. Shortly thereafter, on March 7, 2006, the District filed a motion requesting that the Commission defer consideration of all pending rehearing requests until after the district court litigation is concluded. On April 27, 2006, Ponderay filed a similar complaint with the same district court, and filed a request with the Commission on May 2, 2006, to defer consideration of all pending requests for rehearing.

8. As noted above, the agencies responsible [*7] for implementing section 241 have determined that the new procedures are not applicable to this proceeding. In addition, Interior has denied the District's request for a hearing on alternative conditions. We have no authority to rule on this matter. Although the outcome of the district court litigation has the potential to affect the license conditions at issue, we need not defer action on the pending rehearing requests, and indeed, are concerned that doing so would be contrary to the public interest in that it could delay implementation of the conditions of the new license. Instead, we will reserve our authority to make any changes that might be needed as a result of the court's decision. n8

> n8 On October 31, 2006, the District filed a letter discussing and attaching a copy of a recent decision in *American Rivers v. United States Department of the Interior*, No. C05-2086P (W.D. Wash. Oct. 3, 2006). *See* Letter from James Vasile, Counsel for the District, to Magalie Salas, Commission Secretary (filed Oct. 31, 2006). In that decision, the U.S. District Court for the Western District of Washington granted summary judgment in favor of the agencies, finding that their decision to apply the new rules to pending cases in which a final order had not yet been issued did not result in an impermissible retroactive application of the Act. The District maintains that the *American Rivers* decision supports its position in the District's D.C. District Court civil suit, and states that the relief requested in its March 7 motion to defer consideration of the pending rehearing requests remains appropriate. The District acknowledges, however, that, although the case addressed "somewhat related" issues, it did not resolve the issues that are currently pending in the District's civil suit. For the reasons explained above, we continue to believe that the best course of action is to issue our decision on rehearing, reserving our authority to make any changes that may be needed as a result of the D.C. District Court's decision.

[*8]

## B. Requests to Supplement the Record

9. The Tribe requests that the Commission accept into the record additional evidence that it asserts is needed to address erroneous factual assumptions in our relicense order about the Tribe's use of its reservation, potentially incorrect assumptions regarding rate impacts of the license, and assertions in the District's stay motion concerning district court litigation (separate from the Energy Policy Act litigation) challenging administration of the Clean Water Act (CWA) by the U.S. Environmental Protection Agency (EPA) with respect to the Box Canyon Project, including EPA's issuance of water quality certification for the Calispell Creek pump works located on the Kalispel Reservation. n9

> n9 Tribe's motion for acceptance of additional evidence as part of the record (filed August 8, 2005).

10. The District argues that we should reject the Tribe's motion. The District maintains that the Tribe had sufficient opportunity to seek inclusion of this evidence earlier in the [*9] proceeding, most of it is duplicative of information and opinions already submitted, and the Tribe should not be permitted to await a final decision and then seek to bolster its case after learning of weaknesses in its evidence. n10 In the alternative, the District requests that, if the Commission grants the Tribe's motion with respect to Attachment D to the Tribe's request, which contains part of the District's 2004 Annual Report, the Commission also admit the remainder of the report.

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

n10 District's answer to Tribe's motion for acceptance of additional record and conditional motion to supplement the record (filed August 24, 2005).

11. Under our rules, the Commission or the presiding officer may reopen the record for good cause, if reopening is warranted by any changes in conditions of fact or law or by the public interest. n11 However, if the request is filed after the initial decision, only the Commission may grant it. n12 The decision to reopen is within our discretion, and we need not grant such a request unless [*10] it "clearly appear[s] that the new evidence would compel or persuade to a contrary result." n13 As discussed below, the Tribe's proffered evidence does not meet that standard.

n11 *See* 18 C.F.R. § 385.716(a) (2004).

n12 *Id.* § 385.716(d).

n13 *Friends of the River v. FERC, 720 F.2d 93, 98 n. 6 (D.C. Cir. 1983)* (citations omitted).

12. The Tribe's additional evidence consists of five Appendices. Appendix A, entitled "Report on Alternative Reservation Areas for Traditional Practices and Uses of Flooded Reservation Lands," is largely a summary of evidence that is already in the record, coupled with additional arguments about project effects and the Tribe's use of its reservation. Basically, the report states that the flooded reservation lands had value to the Tribe that went well beyond seasonal agriculture, and that they were used for fishing, hunting, and gathering of vegetative resources to support the Tribe's traditional practices. The report further states that the [*11] flooded lands offered the potential for other uses, such as the construction of a lodge or restaurant or other riverfront development for commercial purposes. Because the information cited in the report is not new, and the arguments relying on that information simply amplify arguments already made in the Tribe's rehearing request, we deny the Tribe's request to supplement the record with this report.

13. Attachments B and E are related to EPA's CWA water quality certification for the project. n14 Attachment B is a report concerning EPA's certification for the Calispell Creek Pumping Plant. The report's stated purpose is to provide technical information that supports EPA's certification. In it, a professional engineer reviews evidence already in the record and disputes statements made in the District's complaint, filed in the federal district court for the District of Columbia, challenging the certification. The report includes as attachments a draft report prepared in 1996 on the history of the diking districts of Pend Oreille County; and an analysis of a three-year study of higher lake levels at Lake Pend Oreille to benefit kokanee salmon, prepared by the U.S. Army Corps of Engineers [*12] in 1999. Attachment E consists of EPA's certified index to the record in the District's litigation challenging several EPA decisions concerning EPA's administration of the CWA with respect to the Box Canyon Project, including EPA's issuance of water quality certification for the Calispell Creek pump works. It is simply a list of documents comprising the administrative record in the district court litigation.

n14 Under section 518 of the CWA, *33 U.S.C. § 1377*(e) (added in 1987), EPA is authorized to treat Indian tribes as states for purposes of certain sections of the CWA, including section 401. Section 401 requires an applicant for a federal license or permit for any activity that may result in a discharge to obtain certification from the state where the discharge originates that the activity complies with all applicable water quality standards. The Calispell Creek pumping plant discharges into Box Canyon Reservoir within the Kalispel Indian Reservation. EPA issued certification for the Calispel Creek pumping plant on January 2, 2003, using Washington's water quality standards, because the Tribe's standards had not yet been approved. EPA subsequently approved the Tribe's water quality standards for the Kalispel Reservation on June 24, 2004.

[*13]

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

14. The Tribe does not address issues concerning EPA's certification in its rehearing request. In its motion for acceptance of additional evidence, the Tribe maintains that, although the certification issues are not appropriate matters for Commission review on rehearing, the court of appeals has jurisdiction to review certification conditions included in a Commission license. The Tribe therefore asserts that this information should be included in the record before us to permit judicial review of the issues that the District has raised in the district court action. n15

    n15 Tribe's motion for acceptance of additional evidence at 2-3.

15. As the Tribe recognizes, we lack jurisdiction to review EPA's administrative actions implementing the CWA. Similarly, we lack jurisdiction to review the validity of conditions included in EPA's water quality certification, although we may express our disagreement with the conditions to assist the parties and the court in reviewing the issues presented. n16 Our authority is limited [*14] to a determination of whether a discharge "originates" on the reservation within the meaning of CWA section 401, and is therefore subject to EPA's (or the Tribe's) certification authority. The existing record is sufficient to support our finding to that effect, and no purpose would be served by our admitting and reviewing additional evidence regarding EPA's certification at this late stage of the proceeding. We therefore deny the Tribe's request to include Attachments B and E in the record. n17

    n16 *See American Rivers v. FERC, 129 F.3d 99, 110-11* (2 nd Cir. 1997).

    n17 Citing the analysis in Attachment B, the Tribe states that operation of the Calispell Creek pumping plant in accordance with Plan E is not necessarily incompatible with operation of the project in accordance with the water quality certifications. However, the Tribe asserts that, at least during certain times of the year, the certifications will determine how Plan E must be implemented. The Tribe therefore requests that we clarify that compliance with the requirements of the state's and EPA's water quality certifications take precedence and Plan E must be implemented to satisfy the conditions of those certifications. Request for rehearing at 16. Article 404 of the new license requires the District to operate the Calispell Creek pumping plant in coordination with the project, subject to the District's agreement with Diking District No. 2 of Usk, Washington (Plan E). Ordering Paragraphs (G) and (H) of the relicense order state that the new license is subject to the conditions of the state's and EPA's water quality certifications, as set forth in Appendices D and E, respectively. Thus, the certification conditions are part of the license. We clarify that the District must operate the project to satisfy the requirements of both the certification conditions and the Plan E agreement. Although we are not aware of any conflicts, we further clarify that, in the event of a conflict, the more stringent conditions must be observed. The Tribe also asks that we include in the license a statement that, if there is a conflict between the license order and the terms of the license, the license terms shall control. *Id.* We agree that, in the event of a clear conflict between the discussion in the license order and the conditions of the license, the license conditions shall control. However, we need not include such clarification in the license.

[*15]

16. Attachment C is a map entitled, "Public Access To Tribal Recreation Sites." According to the Tribe's description, the map shows the location of the Pow-Wow camp grounds and the boat launch, recreation facilities that are within the project boundary, and additional areas that the Tribe requests be encompassed within the project boundary for purposes of tribal recreation. n18 The map is fairly small and difficult to read. Moreover, apart from the description of it, the Tribe does not refer to the map in support of its arguments concerning public access to tribal recreation sites. Therefore, we need not include the map in the record in order to address the Tribe's arguments, which we consider later in this order.

    n18 Tribe's request for rehearing at 16.

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

17. Attachment D consists of the cover, introductory message, and a single page of the District's 2004 Annual Report that addresses power purchase contractual agreements with Ponderay and the City of Seattle. The Tribe requests that this attachment be included [*16] in the record to support the Tribe's argument that the rate impact from a loss of power sales to Ponderay would be minor, provided that generation from Seattle's Boundary Project is retained as a power resource for the District. n19 The Tribe argues that the Boundary contract appears to be a critical factor in determining future rates, and requests that the Commission determine the status of this contract if it has not already done so. As noted earlier, the District argues that we should deny the Tribe's motion to reopen the record, but requests that, if we accept the Tribe's Attachment D, we also accept the rest of the District's 2004 Annual Report.

      n19 *Id.* at 48.

18. We address issues related to project economics and possible rate impacts later in this order. For present purposes, we find that the District's 2004 Annual Report has been available for some time, and parties could have sought to include it in the record earlier, before we issued our relicensing decision. Moreover, it does not materially add [*17] to the information already before us. We therefore deny the Tribe's request to admit part of this report, and deny as moot the District's requests to include the entire report.

### C. The District's Renewed Stay Request

19. On October 6, 2006, the District filed a second motion for a stay, pending rehearing and judicial review, of certain mandatory conditions of the new license for the Box Canyon Project. Interior, the Forest Service, and the Tribe filed answers in opposition to the District's stay motion. Ponderay filed an answer in support of the motion. n20

      n20 On November 9, 2006, the District filed additional information and a request for expedited action on its renewed stay motion. The District stated that it had received bids for the temporary upstream fish passage facility and hydraulic modeling for the downstream fishway facility that would require expenditures on the order of $1 million within the next twelve months, and that it would be required to execute contracts for these two measures by November 22, 2006, and the end of November, respectively, in order to meet the schedule required by the challenged license conditions. As discussed above, we deny the District's renewed stay request in this order (thus mooting the request for expedited action), and find that the information provided in the District's November 9 filing does not persuade us to a contrary result.

[*18]

20. The District asserts that the facts have changed since we denied its earlier stay request, because it is now "on the verge of having to expend substantial sums of money to construct fish passage facilities and otherwise implement conditions that are unreasonable and unnecessary for the reasons set forth in the District's rehearing request." n21 The District adds that a stay is needed to prevent irreparable injury and to preserve an opportunity for meaningful judicial review. Ponderay argues (as it did previously) that the socioeconomic impacts to Ponderay and to Pend Oreille County could be large and adverse if rate increases cause the company to close. Ponderay and the District maintain that the new license will require significant and unrecoverable expenditures of $2.84 million in calendar year 2007, making a stay now appropriate.

      n21 District's stay motion at 1-2.

21. Interior, the Forest Service, and the Tribe argue that the Commission should dismiss the District's motion as an untimely request for rehearing [*19] of the Commission's earlier denial of a stay. They assert that the Commission's reasons for denying a stay are still valid, and the District has shown no basis for its request that the Commission reconsider its decision.

22. In acting on stay requests, the Commission applies the standard set forth in the Administrative Procedure Act; that is, a stay will be granted if the Commission finds that "justice so requires." n22 Under this standard, the Commission considers such factors as whether the moving party will suffer irreparable injury without a stay, whether issuance of a stay would substantially harm other parties, and where the public interest lies.

    n22 *5 U.S.C. § 705; see, e.g.*, Clifton Power Corp., 58 FERC P61,094 (1992).

23. The District seeks to stay certain aspects of Interior's section 18 fishway prescriptions that would require construction and operation of temporary upstream (trap-and-haul) fish passage facilities, and the conduct [*20] of entrainment, fish passage behavior, and conceptual design studies for downstream fish passage facilities. The District seeks to stay aspects of Interior's section 4(e) conditions that would require soils geotechnical studies for erosion control, possible land purchases to replace Kalispel Indian Reservation wildlife habitat, and fish population surveys in connection with Interior's trout assessment and restoration plan (trout plan). The District also seeks to stay aspects of the Forest Service's section 4(e) conditions concerning operation and maintenance of recreation facilities, surveys of birds and sensitive plants, creation of habitat for native amphibians, and management of weeds and non-native aquatic plants.

24. All of these measures were included in the District's earlier stay motion, which we denied. n23 The District did not seek rehearing of that denial. Although it argues that the facts have changed, the District has shown no basis for its request that we reconsider our decision. The Districts motion is thus, in essence, either a late rehearing request or an unsupported motion for reconsideration.

    n23 *See Public Utility District No. 1 of Pend Oreille County, Washington, 113 FERC P61,166 (2005).*

 [*21]

25. Although the list of conditions for which a stay is requested is shorter, the facts and arguments in support of a stay are essentially the same as those advanced earlier, and the costs are of similar magnitude. The District asserts that it is now facing costs of $2.84 million during calendar year 2007. The earlier stay motion was premised on costs of $2.4 million during the first six months of the license, and included an initial payment of $1.46 million to the trout plan. In denying the earlier stay request, we observed that the contribution to the trout plan and fish passage requirements are conditions that are intended to benefit bull trout, a species listed as threatened under the Endangered Species Act (ESA), and a different balance is called for when a stay request would affect ESA-listed species. We concluded that issuing a license that would adversely affect ESA-listed species and then staying measures to protect those species would not be in the public interest. The fishway expenditures for 2007, like those in the earlier motion, are for studies and an interim trap-and-haul facility, not permanent structures. The trout plan expenditures for 2007 are for fish population [*22] surveys, and account for less than ten percent of the total costs for that year. n24

        n24 Contrary to the District's assertion, most of the conditions for which the District seeks a stay are supported by the record, as discussed throughout this order.

26. As we observed in denying the District's earlier stay request, we are unable to find that the costs of compliance with the new license would cause irreparable injury to the District. Pecuniary loss, without more, is not considered irreparable harm, and the costs of compliance with new license conditions are part of the costs of doing business under today's environmental standards. Accordingly, we find no reason to depart from our earlier decision to deny a stay.

**Commission Concerns about Mandatory Conditions**

27. The new license includes various mandatory conditions that the Commission must require pursuant to sections 4(e) and 18 of the FPA, and section 401 of the CWA. The District argues that many of these mandatory conditions contradict

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

the comprehensive [*23] development standard of section 10(a)(1) of the FPA n25 or are not supported by substantial evidence. The District further argues that the FPA requires us to make findings with respect to these matters.

n25 *16 U.S.C. §  803*(a)(1) (2000).

28. As discussed in more detail below, the Commission has no authority to decide whether mandatory conditions are either reasonable or lawful. If the Commission believes that a particular condition is not consistent with the comprehensive development standard of FPA section 10(a)(1), or is not supported by substantial evidence as required by FPA section 313(b), the Commission may express its disagreement with the condition. n26 In many instances, the evidence supporting or controverting a particular condition is fully examined in the final EIS. However, by expressing our views here, we hope to encourage a more complete understanding of the issues and to facilitate judicial review.

n26 *See Escondido Mut. Water Co. v. La Jolla Band of Mission Indians, 466 U.S. 765, 778 n. 20 (1984).*

[*24]

29. The District argues that, by issuing a relicense order that failed to discuss the merits of the mandatory conditions, the Commission has violated the FPA, the National Environmental Policy Act of 1969 (NEPA), the Administrative Procedure Act (APA), and fundamental principles of due process. Ponderay similarly argues that the Commission must comment on mandatory conditions and prescriptions to fulfill its public interest obligations under the FPA and to provide a comprehensive analysis of all the factors that entered into its decision under NEPA. Ponderay adds that, when the Commission finds that mandatory conditions are unsupported, it has an obligation to take a position in its administrative proceedings in order to fulfill its responsibility to compile the record for judicial review.

30. We recognize the value in expressing our disagreement with mandatory conditions and prescriptions, and do so in this order. The FPA, by its terms, compels us to accept mandatory conditions under section 4(e) and fishway prescriptions under section 18. Similarly, CWA section 401(d) provides that conditions of a state's water quality certification become conditions of any license that is [*25] issued. The conditions or prescriptions will stand or fall on their own merits, and parties other than the Commission will be responsible for defending or challenging them in court. n27 Thus, while we must determine whether a license that includes mandatory conditions is "best adapted to a comprehensive plan for improving or developing a waterway," as required by FPA section 10(a)(1), it is not legal error if we choose not to discuss the merits of conditions regarding which we have no discretion, except to the extent that they would affect our comprehensive development analysis.

n27 For example, if one or more parties to this case should seek judicial review, it will be the agencies that prescribed the mandatory conditions, and not the Commission, that will have the responsibility for defending them. *See Bangor Hydroelectric Co. v. FERC, 78 F.3d 659, 662 (D.C. Cir. 1996).*

31. As noted, under FPA sections 4(e) and 10(a)(1), the Commission must determine whether the license issued will [*26] be best adapted to a comprehensive plan for improving or developing a waterway for all beneficial public uses. In doing so, the Commission must give equal consideration to the purposes of power and development, energy conservation, fish and wildlife, recreation, and other aspects of environmental quality. The District and Ponderay argue that, because the new license includes mandatory conditions and prescriptions that the Commission staff did not support in the final EIS, it necessarily follows that the license fails to meet these statutory standards. This ignores our finding that relicensing the Box Canyon Project as described in our order "is best adapted to a comprehensive plan for improving or developing the Pend Oreille River." n28 If we were unable to make this finding as a result of including the agencies' mandatory conditions, we could not have issued a new license for the project.

n28 *Public Utility District No. 1 of Pend Oreille County, Washington, 112 FERC P61,055 at P 126.*

[*27]

32. Similarly, our licensing decision satisfies NEPA because it is accompanied by our EIS, which includes a comprehensive analysis of all the relevant environmental factors and takes the necessary "hard look" at the environmental effects of our proposed action. The APA simply requires that we explain the basis for our action, which we have done. Because the District will have an opportunity to challenge the mandatory conditions and prescriptions on judicial review, its due process rights are preserved. As noted, we indicate our views regarding mandatory conditions in the remainder of this order because we believe this will assist the parties and the court in evaluating the issues presented.

### Section 4(e) of the FPA

33. Section 4(e) of the FPA authorizes the Commission to issue licenses for hydroelectric project works on specified U.S. lands and waters, and provides that licenses may be issued "within any reservation" only if the Commission finds "that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired." Section 4(e) further provides that such licenses "shall be subject to and contain such conditions as [*28] the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation." n29 Many of the parties' arguments on rehearing concern various aspects of this section.

> n29 *16 U.S.C. § 797*(e) (2000).

34. As explained in the license order, Box Canyon Dam impounds about 55 miles of the Pend Oreille River to create Box Canyon reservoir. The dam is located at river mile (RM) 43.4 (*i.e.*, the distance upstream of the Pend Oreille River's confluence with the Columbia River). The reservoir's surface area is between 7,000 and 9,000 acres, depending on its elevation, which is determined by flow levels. At a pool elevation of 2,041.0 feet above mean sea level (m.s.l.), as measured at the town of Cusick (RM 70.1), the reservoir covers about 8,850 acres and occupies about 493 acres within the 5,060-acre Kalispel Indian Reservation. n30 The Kalispel Reservation borders the river for approximately 10 river [*29] miles (between approximately RM 63 and RM 73), and the reservoir occupies a strip of reservation land of varying width that borders the shoreline and is located below elevation 2,041 m.s.l. The Box Canyon Project also occupies about 190 acres of National Forest System lands within the Colville National Forest.

> n30 The order incorrectly stated the size of the Kalispel Indian Reservation as 4,500 acres. *See Public Utility District No. 1 of Pend Oreille County, Washington, 112 FERC P61,055 at P 1* and Tribe's rehearing request at 6.

35. Interior, the Tribe, and the District contest different aspects of our findings regarding the purpose of the Kalispel Indian Reservation. Interior and the Tribe take issue with our determination that relicensing the Box Canyon Project will not interfere or be inconsistent with the reservation's purposes. Interior and the Forest Service object to our decision to limit the applicability of their section 4(e) conditions to project works located on reservation [*30] lands within the project boundary. Interior, the Forest Service, and the District also raise various arguments regarding specific section 4(e) conditions. We address these issues in turn.

### A. Purpose of the Kalispel Indian Reservation

36. In the relicense order, we found that the Kalispel Indian Reservation was established not merely for agricultural purposes, but also to provide the Tribe with a permanent homeland where its members could continue to engage in their traditional practices of hunting, gathering, and fishing. We further found that, although the reservoir's occupancy of reservation lands constituted some interference with the Tribe's use of those inundated lands, the lands had historically been subject to seasonal flooding before the project was built, and were primarily useful for seasonal agriculture. We found that the rest of the reservation remains available for the Tribe's unrestricted use, and appeared adequate to provide

a suitable permanent homeland and to allow the tribe to continue its traditional practices. We therefore found that issuing a new license for the Box Canyon Project would not interfere or be inconsistent with the purposes for which the [*31] Kalispel Indian Reservation was created.

37. Both the District and the Tribe take issue with these findings, although for different reasons. The District argues that we failed to recognize that the primary purpose of the reservation was to provide for an agricultural lifestyle that was designed to facilitate Indian assimilation. The Tribe maintains that we improperly found that the project, which inundates ten percent of the reservation, will not interfere or be inconsistent with the purposes for which the reservation was created.

38. The District argues that we erred in overstating that the original purpose of the Kalispel Indian Reservation was to establish a permanent homeland for the Tribe, and in failing to recognize the priority of agriculture among reservation purposes. The District relies on two reports, prepared by its consultant J. Bertolet, addressing the history of the Kalispel Tribe and its reservation. n31 According to the District, these reports demonstrate that the reservation was established to encourage members of the Tribe to engage in farming, and that the government was pursuing a policy of allotting tribal lands to individual Indians to encourage that activity. [*32] The District therefore argues that the purposes of providing a homeland for the Tribe and allowing the Tribe to continue its traditional practices must be accorded secondary importance.

> n31 *See* J. Bertolet, The Kalispel Indians of the Pend Oreille Valley (filed August 17, 2004) (Bertolet I); and J. Bertolet, Indian Farmers and the Federal Government's Allotment Policy, 1887-1934 (filed April 14, 2005) (Bertolet II).

39. We disagree. As the Supreme Court has recognized, it is presumed that, in establishing an Indian reservation, the United States intends to provide the Tribe with a suitable, permanent homeland. n32 In *Colville*, the Ninth Circuit Court of Appeals found that the Colville reservation was established for the dual purposes of providing a homeland for the Indians and preserving their access to fishing grounds. n33 Like the Kalispel Indian Reservation, the Colville Reservation was established in a one-paragraph Executive Order stating that the land would be set apart as a reservation for the Indians. [*33] We recognize that, at certain times during the reservation's history, the government had an interest in promoting agriculture and in allotting reservation lands to individual Indians for that purpose. However, we do not regard the government's interest in promoting agriculture and its allotment policy as overriding the government's primary purposes in establishing the Kalispel reservation: establishing a permanent homeland for the Tribe and allowing the Tribe to continue its traditional practices there. Accordingly, we deny the District's request for rehearing on this issue.

> n32 *See Menominee Tribe v. United States, 391 U.S. 404 (1968); Colville Confederated Tribes v Walton, 647 F.2d 42 (9 th Cir.), cert denied, 454 U.S. 2092 (1981).*

> n33 *Colville Confederated Tribes v. Walton, 647 F.2d 42, 47-48 (9 th Cir), cert. denied, 454 U.S. 2092 (1981).*

### B. Finding [*34] of No Interference or Inconsistency

40. The Tribe supports our finding regarding the purposes of the reservation, and acknowledges that the new license includes resource measures that will provide significant new protections for the Tribe, Indian trust lands, and the Tribe's rights and interests in resources. However, the Tribe takes issue with our finding that licensing the project as conditioned will not interfere or be inconsistent with the purposes for which the reservation was created. n34 Interior and the Tribe argue that our consistency analysis is too narrow, and must consider not only the use of reservation land for seasonal agriculture, but also for the Tribe's use as a homeland and for its traditional practices of hunting, gathering, and fishing.

n34 The Tribe also argues that our order characterizes the Tribe's opposition to the project too narrowly, focusing on the project's inundation of about ten percent of the reservation without also reflecting the effects of decades of flooding on the Tribe's use of the reservation, as well as the project's adverse effects on fish and wildlife resources. Tribe's request for rehearing at 6. We addressed the Tribe's concerns throughout the license order, and discuss them here in connection with the Tribe's arguments about our interference/inconsistency finding under section 4(e).

[*35]

41. In our relicense order, we interpreted the Tribe's argument to mean that, because operation of the Box Canyon Project prevents the Tribe from using the inundated reservation lands for tribal purposes, it interferes and is inconsistent with the purposes for which the reservation was created. We rejected this interpretation of section 4(e), finding it necessary to make a distinction between interference with the Tribe's use of the inundated portion of the reservation, on the one hand, and interference with the purposes of the reservation as a whole, on the other. We reasoned that whenever project works are located on reservation lands, some interference with a tribe's use of those particular lands would necessarily result, because the tribe would be unable to use them for alternate purposes. Accordingly, we concluded that, as long as the Commission can make the finding that the license will not interfere or be inconsistent with the purposes of the reservation as a whole, some interference with a tribe's use of some part of its lands must be permissible under the FPA. Otherwise, section 4(e) would serve no purpose, because it would never be possible to make a " no interference [*36] or inconsistency" finding.

42. The Tribe argues that, in characterizing its argument in this manner, we erroneously assumed that the Tribe's interpretation of section 4(e) would make it impossible to license any power project on Indian lands. As the Tribe correctly points out, hydroelectric projects do exist on Indian reservations and interference/inconsistency issues do not always arise. In support, the Tribe cites the Pelton Project, in which the Confederated Tribes of the Warm Springs Reservation participates fully as a co-licensee and no allegations of interference or inconsistency were made. n35 The Tribe asserts that, because conditions on Indian reservations vary, it is inappropriate for the Commission to assume that the Tribe's objections to licensing the Box Canyon Project on the Kalispel Indian Reservation would preclude the licensing of hydropower on all reservations. The Tribe adds that this assumption raises the question of whether the Commission will ever deny a license to occupy an Indian reservation.

n35 *See Portland General Elec. Co. and Confederated Tribes of the Warm Springs Reservation of Oregon, 111 FERC P61,450 (2005), on reh'g, 117 FERC P61,112 (2006).*

[*37]

43. We are unaware of any instance in which a treaty or order establishing a tribal reservation includes hydropower as a purpose of the reservation. In light of this, Congress could have simply barred hydropower development on Indian reservations, but did not. Thus, it must be possible for there to be hydropower project works that occupy reservation lands but do not interfere and are not inconsistent with the purposes of the reservation. We have found that this is such a case.

44. We reject any suggestion that our interpretation of section 4(e) would always lead to licensing. n36 We agree that each interference/inconsistency finding must be made on a case-by-case basis, taking into account all available information about conditions on the reservation and the effects of project operation. In making our finding in this case, we drew a distinction between possible interference with a tribe's use of the particular lands on which project works are located, and interference with the purposes of the reservation as a whole. It was in this context that we concluded that some interference or inconsistency with a tribe's use of some part of its land may be permissible under section 4(e), [*38] if it does not amount to interference or inconsistency with the reservation's purposes, which is not permissible under that section. If, in making this distinction, we misinterpreted the Tribe's argument, this was not our intention. However, in questioning whether the Commission would ever deny a license on an Indian reservation, the Tribe blurs or overlooks our analysis.

n36 *See, e.g., Northern Lights, Inc., 39 FERC P61,352, at 62,101.* Although that case involved section 10(a)(1) of the FPA rather than section 4(e), it denied a license to construct, operate, and maintain a hydroelec-

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

tric development on the Kootenai River at Kootenai Falls in Montana on the grounds that the project was not best adapted for beneficial public uses of the river, including its use for wildlife and aquatic habitat and other recreational purposes, and for religious practices of the Kootenai people.

45. Interior and the Tribe argue that our consistency analysis is inadequate, because it considers [*39] only the use of the flooded lands for seasonal agriculture, and does not also consider the Tribe's use of its reservation as a homeland and for continuing its traditional practices of fishing, hunting, and gathering. We disagree. In analyzing this issue, we found that the project interferes with the Tribe's use of the flooded lands for seasonal agriculture, but it does not interfere with the reservation's purpose of providing a homeland for the Tribe where it can continue its traditional practices. n37 We further found that, although the project floods a part of the reservation that was used for seasonal agriculture, the remainder of the reservation appears adequate and is available to the Tribe for its unrestricted use.

n37 Interior maintains that, in finding that the project interferes with the use of the flooded lands for seasonal agriculture, we conceded that the project interferes with the Tribe's use of the reservation for agriculture, which we found was one purpose of the reservation. Interior therefore agues that we must consider whether other reservation lands are available and are suitable for the Tribe's agricultural use. Throughout this proceeding, the Tribe has disputed the District's assertion that agriculture was a primary purpose of the reservation. In fact, the Tribe has placed little, if any, importance on the suitability of the inundated lands for seasonal agriculture. Rather, the Tribe has stressed that these lands were important as fish and wildlife habitat and for the Tribe's traditional practices. Interior does not disagree with these assertions. For this reason, we do not regard effects on seasonal agriculture as providing a basis for a finding of interference or inconsistency in this case.

[*40]

46. The Tribe takes issue with this finding, arguing that we made erroneous assumptions about the suitability of alternative areas for the Tribe to exercise its reserved rights. Specifically, the Tribe argues that the Box Canyon Project has reduced both fish and wildlife habitat on the reservation, and has diminished the amount of fish, game, and vegetative matter that would otherwise be available to the Tribe on or along the reservation. The Tribe maintains that this has reduced its ability to engage in its traditional practices of fishing, hunting, and gathering.

47. As discussed in the final EIS, a number of factors have influenced fisheries, wildlife habitat, and vegetation in the Pend Oreille River basin, not all of which are attributable to the Box Canyon Project. As discussed in more detail below, the new license includes conditions that are designed to help restore native salmonid populations through tributary and mainstem habitat restoration, fish passage facilities, and measures to improve water quantity and quality. It also includes measures to protect and enhance wildlife habitat. These conditions provide the factual basis for our finding of no interference or inconsistency [*41] finding in this case.

48. The Tribe argues that our no interference/inconsistency finding "reflects an inappropriate infringement on the Tribe's management and development choices for the Reservation." n38 The Tribe adds that it is "beyond the Commission's role to decide the importance to the Tribe and the potential uses of particular reservation lands." n39

n38 Tribe's request for rehearing at 8.

n39 Id. at 10.

49. In essence, the Tribe seems to be arguing that, because the Tribe opposes relicensing the Box Canyon Project, the Commission should not be permitted to issue a new license, because, in the Tribe's view, that would infringe on the Tribe's ability to decide for itself how reservation lands should be managed and developed. This argument suggests that, in making our no interference/inconsistency finding, the Tribe would have us defer to the Tribe's objection to the use of part of its reservation for a hydropower project. However, the Supreme Court has made it clear that the FPA does not

require [*42] a tribe's consent to the use of its reservation lands for power purposes. n40 Thus, if we find that a project is consistent with the reservation's purposes, we may license it, notwithstanding that the Tribe might prefer that the project not be licensed.

> n40 *Escondido, 466 U.S. at 786-87.*

50. The Tribe maintains that, because of the project's adverse effects on fish, wildlife, and water quality, there are no alternative areas on the Kalispel Reservation where the Tribe can carry out its traditional practices. The Tribe argues that the District's decades of unauthorized flooding of reservation lands not only prevented the Tribe from pursuing agricultural uses of the flooded area, but also impaired and continues to impair the Tribe's right of access to and use of native fish and wildlife species and other resources. The Tribe points out that, as discussed in the final EIS, dam construction resulted in loss of access to coldwater habitat that has likely contributed to the decline of native [*43] salmonids in the Pend Oreille River. n41 Similarly, the Tribe argues that operation of the pumps at Calispell Creek blocks upstream and downstream fish passage, and adversely affects water quantity and quality, n42 and that the project adversely affected important cottonwood habitat. n43

> n41 *See* FEIS at 83-84 and C-42.

> n42 *Id.* at 59 and C-42.

> n43 *Id.* at C-71 to C-72.

51. The decline of native salmonids in the mainstem Pend Oreille River and its tributaries and the demonstrated shift in the resident fishery from a coldwater fishery to a warmwater fishery is not simply a result of construction of the Box Canyon Dam. Rather, it is the result of a number of activities that have taken place within the watershed and have affected the habitat, including: residential development, timber harvest, mining, road development, agriculture, and the propagation and stocking of warmwater fish species. Although the Pend Oreille River historically supported native salmonids, and that habitat in the Box Canyon [*44] Reservoir now favors warmwater species, n44 the Box Canyon Project is not the single contributing factor that has affected the Tribe's native salmonid fishery.

> n44 *Id.* at iii.

52. The Tribe seems to suggest that, because the project has adversely affected resources of importance to the Tribe during the term of the original license, it cannot now be found consistent with the reservation's purposes. However, the new license includes conditions that are designed to help restore native salmonid populations through tributary and mainstem habitat restoration, fish passage facilities, and measures to improve water quantity and quality. It also includes measures to protect and enhance wildlife habitat. Section 4(e) does not require a hypothetical determination of whether a hydroelectric project will interfere with a reservation's purposes. Rather, by specifically referring to the license, rather than the project, section 4(e) requires an interference/inconsistency finding with respect to the license, as conditioned. [*45] Thus, the conditions included in the new license to protect and enhance fish and wildlife resources and water quality are an essential component of our finding that the new license for the Box Canyon Project will not interfere or be inconsistent with the purposes for which the Kalispel Indian Reservation was created.

53. The Tribe argues that, in allowing for the possibility of "some" interference or inconsistency, our finding rewrites the statutory language and violates the plain meaning of section 4(e). The Tribe maintains that no interference or inconsistency with a reservation's purposes is ever permissible under that section, and that a project either requires a finding of interference/inconsistency or it does not.

54. As discussed above, the Tribe's argument blurs or overlooks the distinction we made between possible interference with a tribe's use of the particular lands on which project works are located, and interference with the purposes of the reservation as a whole. We acknowledge that, under section 4(e), we must find that a license will not interfere or be inconsistent with the reservation's purposes. Thus, our finding gives full effect to the plain meaning of that [*46] section.

55. The Tribe argues that, in making our no interference/inconsistency finding, we ignored the special canons of construction that apply to statutes affecting Indians. In support, the Tribe cites *Montana v. Blackfeet Tribe of Indians*, n45 in which the Supreme Court reiterated that "[t]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians," n46 and that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." n47 Relying on these principles, the Tribe asserts that the Commission "must respect the reserved rights of an Indian tribe to exercise its resource rights anywhere within the Reservation that the Tribe deems appropriate." n48 The Tribe further maintains that, if the Commission construes section 4(e) in accordance with its plain language but liberally, in favor of the Tribe, and resolving any ambiguities in the Tribe's favor, the Box Canyon Project "would obviously fail the [section] 4(e) prerequisite for licensing." n49

    n45 *471 U.S. 759 (1985).*
[*47]

    n46 *Id.* at 766, citing *Oneida Country v. Oneida Indian Nation, 470 U.S. 226, 247 (1985).*

    n47 *Id.* at 768 (citations omitted).

    n48 Tribe's request for rehearing at 24.

    n49 *Id.* at 25.

56. The Tribe's argument presumes that section 4(e) is ambiguous. We find no ambiguity in the statute, such that it can or should be construed liberally, in the Tribe's favor. Rather, section 4(e) is clear. It plainly provides that a license may not be issued within an Indian reservation (or any other federal reservation) unless the Commission finds that the license will not interfere or be inconsistent with the purposes for which the reservation was created. As explained above, we have so found in this case. In essence, this is simply a variation of the argument that we should defer to the Tribe's views in making our interference/inconsistency finding.

57. Interior and the Tribe maintain that, in construing and applying section 4(e), we violated the Commission's trust responsibility to the Tribe. The Tribe points out that, despite [*48] the Commission's acknowledgement of the "well-established federal trust responsibilities toward Indians" n50 in an earlier decision regarding the Box Canyon Project, the relicense order does not mention the trust responsibility and fails to consider how it should affect the Commission's conclusions. The Tribe maintains that the trust responsibility should guide the Commission's exercise of "any discretion it has when interpreting and applying a statute so as to protect the rights and interests of Indian tribes." n51

    n50 *Public Utility District No. 1 of Pend Oreille County, 77 FERC P61,146 at 61,549 (1996).*

    n51 Tribe's request for rehearing at 26.

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

58. The Commission recognizes the unique relationship between the United States and Indian tribes as defined by treaties, statutes, and judicial decisions. We carry out our responsibilities towards Indian tribes in the context of the FPA and other statutes that govern the Commission's actions. n52 Throughout this proceeding, we have  [*49]  taken the Tribe's concerns into account and considered the effects of the Box Canyon Project on the Tribe's rights and interests. Nothing more is required in this case. n53

    n52 *See Skokomish Indian Tribe v. FERC, 121 F.3d 1303* (9 th Cir. 1997).

    n53 Interior also argues that the Commission's failure to fix a reasonable annual charge for the use of reservation lands violates the Commission's trust responsibility. We reject this argument for the reasons discussed above. We consider the parties' other arguments concerning annual charges later in this order.

## C. Applicability of Section 4(e) Conditions

59. Section 4(e) requires that Commission licenses for projects located within federal reservations "shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation." n54 As noted earlier, the Box Canyon Project occupies 493.03  [*50]  acres of the Kalispel Reservation, consisting of lands on which the Calispell Creek pumping plant is located and submerged lands along the shoreline of the Box Canyon Reservoir. The project also occupies 190.25 acres of Colville National Forest lands along the reservoir's shoreline. n55 In issuing the new license for the Box Canyon Project, the Commission followed its established practice, which at that point had not yet been tested on judicial review, of limiting the geographic scope of the Secretaries' section 4(e) conditions to the effects of project works located within a reservation. In doing so, the Commission relied on its interpretation of the Supreme Court's *Escondido* decision. n56 The Commission also restricted the applicability of section 4(e) to reservation lands within the project boundary. However, the Commission also considered a number of the rejected section 4(e) conditions as recommendations, and included them in the license under FPA section 10(a)(1) or other applicable authority.

    n54 *16 U.S.C. §  797*(e) (2000).

    n55 The license order incorrectly stated that the national forest lands comprise 12 parcels; there are actually 13 such parcels. *See* Forest Service's request for rehearing at 19.
 [*51]

    n56 *Escondido, 466 U.S. at 780.* The Commission based its interpretation on the holding in that case that section 4(e) "imposes no obligation on the Commission or power on the Secretary with respect to reservations that may somehow be affected by, but will contain no part of, the licensed project works," *id. at 780-81,* together with the Court's observation that "the Commission's obligations to make a 'no inconsistency or no interference' determination and to include the Secretary's conditions in the license apply only in the . . . situation . . .when the license is issued 'within any reservation." *Id. at 783.* A close reading of FPA section 4(e) reveals that it authorizes the Commission to license the construction, operation, and maintenance of water power "project works," defined in FPA section 3(12), *16 U.S.C. §  796*(12), as "the physical structures of a project." A "project" is defined in FPA section 3(11), *16 U.S.C. §  796*(11), as "a complete unit of improvement or development." It is well settled that the Commission does not license projects as such, but rather licenses all the physical structures that comprise a complete unit of development, to the extent of its jurisdiction to do so. *See Lake Ontario Land Development & Beach Protection Ass'n v. Federal Power Commission, 212 F.2d 227* (D.C. Cir.), *cert. denied, 347 U.S. 1015 (1954).* Other provisions of the FPA, such as the recapture provision of section 14, refer to the "project" as distinguished from the "project works." When viewed in this light, the express language of section 4(e) referring to "licenses . . . issued within any reservation" appears to contemplate the licensing of "project works" within the reservation, rather than the licensing of a complete project, parts of which are located "within" the reservation and parts of which or not.

[*52]

60. The Tribe, Interior, and the Forest Service argue that this geographic limitation is inconsistent with section 4(e) and that the Commission has no authority to impose it. On August 22, 2006, in a case involving the Cushman Hydroelectric Project (hereafter referred to as the *Cushman* decision), the U.S. Court of Appeals for the District of Columbia Circuit agreed, holding that the Secretary is authorized under section 4(e) to impose any conditions that will protect the reservation, as long as any project works are located on it, and that the Commission has no discretion to reject or modify the Secretary's conditions. n57 In light of this decision, we grant rehearing of this issue and include all of Interior's and the Forest Service's section 4(e) conditions without modification, expressing our disagreement with the conditions, where applicable, to assist the court on judicial review. n58

n57 *City of Tacoma, Washington v. FERC* (*Cushman*), No. 05-1054 (D.C. Cir. Aug. 22, 2006).

n58 As a result, the parties' arguments regarding the scope of section 4(e) are moot, and we need not address them further in this order.

[*53]

61. The *Cushman* decision also establishes that, if the Commission finds that inclusion of the agencies' mandatory section 4(e) conditions would violate the comprehensive development standard of FPA section 10(a)(1), our only recourse is to deny the license application and require that the project be retired. Accordingly, as discussed later in this order, we have reevaluated our comprehensive development finding, including the expanded scope of the agencies' section 4(e) conditions, to ensure that our issuance of a new license appropriately balances power and non-power values under FPA section 4(e) and is consistent with a comprehensive plan for development and improvement of the waterway under FPA section 10(a)(1).

D. **Arguments Concerning Specific Conditions**

1. **Interior's Conditions**

62. The District challenges our acceptance of a number of Interior's section 4(e) conditions, requesting that we reject the conditions and find that they are not supported by substantial evidence. As already discussed, we have no authority to reject or modify Interior's section 4(e) conditions, or to determine whether they are within the scope of Interior's section 4(e) authority. [*54] To the extent that we disagree with specific conditions, we so indicate below.

a. **Implementation and Monitoring**

63. Interior's Condition 1 requires the licensee to prepare and submit for the Secretary's approval an implementation and monitoring plan to provide specific information about how the licensee intends to comply with Interior's Conditions 3 through 13. The District argues that this condition is beyond the scope of Interior's section 4(e) authority and usurps the Commission's authority to oversee license compliance. Commission staff supported this condition in the final EIS. n59 To the extent that Interior can support the imposition of Conditions 3 through 13, we see nothing unreasonable in requiring an implementation and monitoring plan regarding those requirements. In Article 401, we require that the plans and reports required by the agencies' mandatory conditions, including Interior's implementation and monitoring plan, be submitted to the Commission for approval.

n59 *See* FEIS at 271.

b. [*55] **Resource Technical Committee**

64. Interior's Condition 2 requires the District's continued participation in the Resource Technical Committee. The committee was created as part of the 1998 settlement agreement concerning the District's proposed amendment of its original license to change the project boundary in response to the trespass litigation. The District argues that the 1998 settlement was expressly limited to the remaining term of the original license, and that Interior has no authority under

section 4(e) to require that this committee be carried forward under the new license. The District also expresses concern about the committee's authority over the selection and approval of contractors and bidding and procurement procedures.

65. Because of the Resource Technical Committee's proven success, Commission staff supported the District's continued cooperative efforts with the committee's participants for the development and implementation of environmental measures required by the new license. n60 We agree that continuation of this committee is desirable. However, we share the District's concerns regarding the committee's authority to select and approve contractors and  [*56]  to oversee bidding and procurement procedures. As a municipality, the District has a responsibility to make sound financial decisions and to protect its rate payers. Interior's Condition 2 restricts the District's ability to do this. We therefore do not support this aspect of Interior's Condition 2. Nevertheless, under the *Cushman* decision, we must include this condition without modification.

> n60 *Id.* at 297.

### c. Erosion and Fish Stranding

66. Interior's Condition 3 requires a ramping rate, fish stranding studies, and erosion monitoring. The District argues that these fish stranding studies are beyond Interior's section 4(e) authority, because they are not specifically limited to fish believed to be stranded on any portion of the reservation that is occupied by the project reservoir. The District also argues that there is no evidence that such stranding is occurring or is a threat to fish resources in the project area. The District requests that we find this condition unsupported [*57]  or find that it has no application outside of the 493 acres of the Kalispel Indian Reservation that are within the project boundary.

67. In the final EIS, Commission staff supported the District's proposed ramping rate and Interior's Condition 3, finding that limiting the reservoir drawdown rate to three inches per hour would likely be within a safe range to prevent fish stranding. However, staff acknowledged that it would still be possible for stranding to occur, particularly in sloughs and areas of low gradient. n61 Therefore, we agree with staff's conclusion that the fish stranding studies are appropriate, as they will allow for the effectiveness of the required ramping rate to be evaluated. Fish are mobile within the Box Canyon Reservoir; a loss of fish resulting from project-induced stranding could affect the Tribe's fishery resources, regardless of where the stranding were to occur. Therefore, we did not intend to limit the fish stranding studies to the 493 acres of the Kalispel Indian Reservation within the project boundary. Rather, we agree that these studies are required for areas of concern throughout the Box Canyon Reservoir. n62

> n61 *Id.* at 99.

[*58]

> n62 *Id.* at 288.

### d. Water Quality Monitoring

68. Interior's Condition 4 requires that the District operate the Box Canyon Project in compliance with all applicable federal, state, and tribal water quality standards and the requirements of applicable water quality certifications issued under section 401 of the CWA. Condition 4 also requires the District to monitor water quality in the Box Canyon Reservoir and in Calispell Creek. The District argues that this condition is beyond the scope of Interior's authority under section 4(e) and should have been considered and rejected under section 10(a). The District adds that Box Canyon Dam is not located on the reservation, and the discharge of water at the dam does not affect any federal reservation that Interior administers. Finally, the District argues that the specific provisions for fixed station grid monitoring of total dissolved gas below Box Canyon Dam are unwarranted and are not cost effective.

69. Based on the court's holding in the *Cushman* case, Interior's Condition 4 is a valid section 4(e) condition and we have no authority [*59]  to modify or reject it. Therefore, the entire condition is included in the license without modification. Moreover, as discussed later in this order in connection with ESA issues, we were constrained to require the wa-

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

ter quality monitoring provisions of Interior's Condition 4 in Article 406 for the protection of bull trout. We note, however, that Commission staff expressed concerns in the final EIS about some aspects of the water quality monitoring provisions that this condition would require. n63 These concerns are addressed here to assist the parties and the court in the event of judicial review.

n63 *Id.* at 75-76.

70. Under section 401(d) of the CWA, conditions of a state's water quality certification are included in any federal license that is issued for a project. Ecology certification includes conditions for relicensing the Box Canyon Project, and EPA's certification includes conditions for operating the Calispell Creek Pump Works located on the Kalispel Indian Reservation. Among other things, Ecology's [*60] certification requires a defined gas abatement program, which includes the development of a dissolved gas management program and implementation of abatement measures that will ultimately bring total dissolved gas into compliance with water quality standards. Ordering Paragraph (G) of the license order requires compliance with the conditions of Ecology's certification, as set forth in Appendix D to the license. EPA's certification requires a plan for pump operations and monitoring of water quality in Calispell Creek. Ordering Paragraph (H) of the license order requires compliance with the conditions of EPA's certification, as set forth in Appendix E to the license. The District does not challenge the conditions of these certifications.

71. Instead, the District takes issue with certain water quality monitoring requirements of Interior's Condition 4, which we included in Article 406 as measures to protect ESA-listed bull trout. Specifically, the District objects to our inclusion of Interior's Conditions 4C(4)(f) and 4(d)(3) in Article 406.

72. Interior's Condition 4C(4)(f) requires the collection of data hourly, from fixed automated instruments in the Box Canyon Dam tailrace. Interior's [*61] Condition 4(D)(3) requires the District to monitor total dissolved gas (TDG) levels in the tailrace using grid monitoring. As described in the condition, this involves using automated instruments arranged in a spatial pattern adequate to quantify instantaneous TDG data along lateral and longitudinal lines throughout the TDG mixing zone, describing both spatial and temporal variability in TDG exchange processes in relation to Project operations. The condition also requires that the District coordinate grid monitoring with dam operations to collect data encompassing the entire range of flows (up to 90,000 cfs) and associated spillway gate configurations. The District is required to conduct grid monitoring once in the first spill season after license issuance, and then again at the end of the ten-year compliance period allowed in Ecology's water quality certification.

73. As the District points out, Interior's Condition 4 goes beyond the conditions of Ecology's certification. The District argues that these complex and detailed monitoring requirements would cost approximately $200,000 to implement and would serve no useful purpose. The District has already determined that the project [*62] exceeds the numeric water quality criteria for TDG at certain times of the year, and has reached agreement with Ecology to take a series of steps to address this issue. Among other things, the District has agreed to reduce spill through the installation of new turbines and to install a TDG bypass, as required in Ecology's certification.

74. The District maintains that the fixed, automated instruments called for in Article 406 are very difficult, if not impossible, to deploy and use in the deep and very fast-moving water of the Box Canyon tailrace. The District adds that it is possible to obtain adequate longitudinal and spatial measurements of TDG using an array of instruments deployed from a boat instead of installing and then removing a large number of fixed instruments.

75. In the final EIS, Commission staff found that the District's TDG monitoring plan to use a mobile sampling strategy to assess the mixing of TDG below Box Canyon Dam would be of little value, because samples taken would not be directly comparable to each other. n64 Staff found no support for Interior's requirement to conduct grid monitoring to identify baseline conditions during the first spill season. However, [*63] staff concluded that conducting grid monitoring by year ten, after completion of the required TDG abatement measures, would provide the necessary information to evaluate the effects of the Box Canyon Project at that time on the lateral and longitudinal gradient of TDG in the river below Box Canyon Dam. n65 Staff concluded that the cost of this measure would be acceptable in light of the information that would be obtained regarding the project's effects on total dissolved gas levels in the Pend Oreille River. We concur in staff's analysis, and expect that this information will be used to identify the effectiveness of the TDG abate-

ment measures we have required and the potential need for additional abatement measures. As noted, however, the *Cushman* decision requires us to include Interior's Condition 4 without modification. We therefore deny rehearing of this issue.

> n64 With grid monitoring, every sample site is sampled simultaneously, allowing for the mapping of TDG levels within the tailrace. If samples were taken from a boat at each of the grid points, they would not be taken simultaneously, and the duration between the first and last sample could be several hours, rendering the data nearly useless or not directly comparable.

[*64]

> n65 *See* FEIS at 304.

**e. Trout Assessment and Restoration Plan**

76. Interior's Condition 6 requires the licensee to develop a trout assessment and restoration plan. Among other things, it requires the District to assess trout populations and undertake trout habitat restoration measures in tributary streams that are neither on the reservation nor within the project boundary. The District argues that this condition is beyond Interior's authority under section 4(e) and that the Commission should have rejected it under section 10(a) of the FPA. The District also maintains that this program would require it to pay millions of dollars to fund the restoration of over 50 years of damage from many other activities that are unrelated to the Box Canyon Project, such as logging, grazing, and fires that predated the project.

77. The final EIS concludes that, as with various land management practices in the project area, project operations negatively affect native trout within the Box Canyon reservoir and its tributary streams. The District proposed to provide habitat enhancement and restoration [*65] in the tributaries to Box Canyon reservoir. Interior's Condition 6 requires that the District implement a trout assessment and restoration plan that sets trout target population goals to be met, and establishes an implementation schedule for habitat restoration, enhancements, and supplementation. Interior's goal is to produce naturally sustainable trout populations. Interior therefore provides a formula for determining annual funding for the trout plan that uses actual native trout production (as surveyed) and target trout population goals. Interior calculated its target population goals from the population densities of ten streams with stable bull trout populations in the Swan River watershed in Montana. n66

> n66 Because the Swan River system is not directly comparable with the Pend Oreille River, in the final EIS Commission staff questioned the use of the Swan River data as a basis for calculating Interior's target population and funding levels. Given the current land use practices within the Pend Oreille River watershed, staff found that these levels would better serve as a goal to strive for, without expecting that they were likely to be realized. *See* FEIS at 119-20.

[*66]

78. We agree that native trout habitat restoration is needed. However, as noted in the final EIS, there are other activities in the basin that are not project-related, such as timber harvest, agriculture, and mining, that contribute to adverse effects on native trout. Thus, Interior's Condition 6 is not fully supported in the record, because it would compensate for effects of some land management actions that are not project-related. Because of these activities, staff determined in the final EIS that funding of actions to restore native trout populations should be commensurate with the project's effects and should focus on native trout habitats that are in the most recoverable condition. As a result, staff recommended its own trout habitat restoration plan, in lieu of Interior's, to meet these objectives. Staff estimated that the annual cost of its plan would be about $179,300. In contrast, Interior's funding formula assumes that the District is solely responsible for native trout restoration in the Box Canyon reservoir and includes nearly all of its tributary streams. For this reason, Interior's trout plan would cost the District $331,600, or nearly twice as much as the staff's [*67] plan. Additionally, because Interior has reserved the authority to modify the target levels, and funding levels are directly tied to the target levels, program funding could increase.

79. Moreover, Interior's trout plan would require measures in areas well outside of reservation lands. n67 While we must include the condition pursuant to *Cushman*, we question the propriety, under section 4(e), of requiring actions beyond the reservation that the Secretary is authorized to protect. In other words, we are uncertain that the Secretary can properly impose requirements on lands outside of the reservation boundaries. However, as discussed in more detail later in this order, Interior's Condition 6 is directly related to trout habitat restoration and includes measures that FWS determined in its biological opinion are needed to protect and enhance bull trout populations. We therefore adopted it under FPA section 10(a) for the protection of bull trout, and we affirm that action on rehearing.

      n67 *See* FEIS at 119.

[*68] **f. Replacement of Lost Wildlife Habitat**

80. Interior's Condition 7 requires the District to identify lands on the Kalispel Indian Reservation or other lands owned by the Tribe that are suitable for replacing lost wildlife habitat on reservation lands that the project inundates, and to develop a plan to improve habitat on these lands. It requires enhancement of sandbar, deciduous forest, pond, and emergent and/or wet grassland habitat on the Kalispel Indian Reservation or other tribal lands, or on the District's lands if no appropriate reservation or tribal lands are found. We included this condition only to the extent that it applied to Kalispel Reservation lands within the project boundary or to project facilities located on the reservation. Under the *Cushman* decision, we must include Condition 7 in the license without limitation.

81. Interior and the Tribe argue that, because the reservoir inundates reservation lands below the annual flood elevation of 2,041 msl, our geographic limitation of section 4(e) in this instance would make it impossible for the Secretary to mitigate for the loss of wildlife habitat on reservation lands. They also point out that the 1998 settlement [*69] agreement was intended to address project effects only for the remaining term of the original license, and did not consider relicensing. Thus, they view Interior's Condition 7 as providing mitigation for the continuing inundation of reservation lands during the new license term, and allowing opportunities for Tribal access to and use of the additional wildlife habitat.

82. In the final EIS, staff noted that, consistent with the terms of the 1998 settlement agreement, the District had already purchased and managed over 700 acres of land for wildlife at Everett Island and Tacoma Creek to address habitat losses from the reservoir's inundation of all lands within the project boundary, including those on the reservation. Continued management of these lands at Everett Island and Tacoma Creek for wildlife for the duration of the new license, along with other measures required by the license, such as cottonwood and riparian area enhancements, fish-eating bird monitoring, and habitat creation and protection, would provide for the protection of wildlife and its habitat affected by the project for the duration of the new license. Staff therefore found in the final EIS that further enhancement [*70] was not needed. We concur in staff's assessment.

83. The District requests that we clarify that Interior's Condition 7 is limited to the 493 acres of Kalispel Indian Reservation land that are within the project boundary (*i.e.*, those lands that are below the annual flood elevation of 2,041 msl). In light of the measures we required in the new license for the protection of wildlife and its habitat, we conclude that Interior's Condition 7 is not supported by the record. As noted, however, the *Cushman* decision requires us to include this condition without modification. We therefore deny the District's request for clarification.

**g. Recreation Resources**

84. Interior's Condition 13 requires the District to provide funding to the Tribe in the amount of $457,800 for construction of recreational facilities at the Pow Wow Grounds and associated Kalispel boat launch and at Manresa Grotto Beach. It also requires that the District provide funding in the amount of $19,786 each year for operation and maintenance of these facilities. In the relicense order, we included this funding requirement, but limited its applicability to the Kalispel boat launch, which is located on the reservation [*71] and within the project boundary. We also considered whether to adopt this condition as a public recreation measure under FPA section 10(a), but declined to do so because public access to these facilities was either very limited or prohibited. n68

n68 *Public Utility District No. 1 of Pend Oreille County, Washington, 112 FERC P61,055, at P 93.*

85. In the final EIS, Commission staff did not support this measure, because most of the tribal recreation facilities were outside the project boundary, public access to them was either very limited or prohibited, and other sites were adequate to meet public recreation needs. n69 Staff focused its analysis on whether these sites should be funded as public recreation sites under FPA section 10(a), and concluded that the record did not support their inclusion for purposes of public recreation. Under the *Cushman* decision, however, we are now required under section 4(e) to include Condition 13 in the license without modification.

n69 *See* FEIS at 208 and 276.

[*72]

### h. Secretarial Approval

86. Interior's Condition 16 provides that, whenever the licensee is required to obtain the approval of the Secretary of the Interior, the Secretary may accept or reject the submission, in whole or in part. It further provides that, if the Secretary rejects the licensee's submission, or any part of it, the licensee shall have 45 days to resubmit the rejected portion. The District argues that this condition is beyond Interior's authority under section 4(e), interferes with the Commission's responsibility for enforcing compliance with license conditions, and allows Interior to veto the District's compliance efforts.

87. Because the Commission must retain the ultimate authority to administer the license, we included Article 401 in the new license. Article 401 provides that all plans and reports required to be filed pursuant to mandatory conditions under FPA section 4(e), fishway prescriptions under FPA section 18, and water quality certification conditions under CWA section 401, must also be submitted to the Commission for approval. Article 401 also reserves the Commission's authority require changes to the plans that are submitted. This will assist [*73] the Commission in its administration of the license. As discussed above, under the *Cushman* decision, we have no authority to reject or modify Interior's section 4(e) conditions. We therefore deny rehearing of this issue.

### i. Secretarial Authority

88. Interior's Condition 18 reserves Interior's authority to modify its section 4(e) conditions, and reserves authority to review the licensee's compliance with them. The District argues that this condition would allow Interior to modify its conditions continuously, preventing the licensee from making meaningful economic projections and interfering with the Commission's regulatory authority. The District also argues that, once a new license is issued, only the Commission may modify it pursuant to FPA section 6.

89. Section 6 of the FPA provides that licenses "may be modified or surrendered only upon mutual agreement between the licensee and the Commission." n70 A reservation of authority is a well-recognized means of obtaining the licensee's consent to modifications that may be necessary during the term of the license. However, any changes to Interior's section 4(e) conditions would have to be filed with the Commission for [*74] approval, and they could not become part of the license without an amendment application, which would require notice and an opportunity for a hearing. Therefore, contrary to the licensee's assertion, this condition does not allow the Secretary to modify the license unilaterally. Rather, it specifically provides that the licensee shall implement such additional measures as the Secretary may identify, upon order of the Commission. Moreover, under the *Cushman* decision, the Commission has no authority to reject or modify Interior's reservation of authority under section 4(e). We therefore deny rehearing of this issue.

n70 *16 U.S.C. § 799* (2000).

### 2. Forest Service's Conditions

### a. Implementation and Modification of Conditions

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

90. Forest Service Condition 1 reserves the Forest Service's authority to modify its section 4(e) conditions if the license is for a term longer than 30 years. The District argues that the Forest Service is not authorized to modify its section [*75] 4(e) conditions based on the length of the license term, but rather must offer whatever conditions are deemed necessary at the time of license issuance, taking into account the possibility that the license may have a 50-year term.

91. We accepted this condition for project works on the reservation and within the project boundary, but now must include it without modification under the *Cushman* decision. As discussed above, reservations of authority are an acceptable means of obtaining the licensee's consent to modify the license during its term, and any changes requested pursuant to them would require the Commission's approval, after notice and an opportunity for a hearing. Moreover, we find no fundamental difference between a reservation of authority that would apply to whatever license we may issue, and one that would apply only if the license term is greater than 30 years. We therefore deny rehearing of this issue.

   **b. Activities on National Forest Lands**

92. Forest Service Condition 2 precludes the licensee from beginning any habitat-or ground-disturbing activities on National Forest System lands without the Forest Service's authorization. It provides that, if additional [*76] Forest Service lands are necessary for project purposes but are not included within the project boundary, the licensee shall obtain a special use authorization from the Forest Service and file it with the Commission. It further requires written approval from the Forest Service before the District may make "changes in the location of any constructed Project features or facilities, or in the uses of project land and waters on or directly affecting National Forest System lands and resources, or any departure from the requirements of any approved exhibits filed by the Licensee with the Commission." After receiving such approval, and at least 60 days before initiating any such changes or departure, the licensee must file a report with the Commission and the Forest Service describing the changes and the reasons for them.

93. The District argues that this condition would apparently give the Forest Service control over any activity of the project that is "affecting" Forest Service land, and improperly extends to changes in the location of constructed project features and facilities. The District adds that the requirement to file a report 60 days prior to any ground-disturbing activity is [*77] an administrative matter and should be governed by the Commission. The District therefore urges us to reject this condition as beyond the scope of section 4(e).

94. As explained above, any changes in project structures or operation, the use of project lands or waters, or the project boundary would require Commission approval, after notice and an opportunity for a hearing. Moreover, under the *Cushman* decision, we must include Condition 2 without modification. We therefore deny rehearing.

   **c. Resource Coordination and Monitoring**

95. Forest Service Condition 3 requires the District to prepare a resource coordination and monitoring implementation plan. The plan must establish a process for the exchange of information and coordination of implementation of various management plans required under the new license. Commission staff supported this measure in the final EIS. n71

       n71 *See* FEIS at 284.

96. On rehearing, the District argues that section 4(e) does not authorize the Forest Service to maintain [*78] control over project operations and that the condition is overly broad. n72 The District requests that we find that this condition has no application outside of the 190 acres of Forest Service lands within the project boundary. Under the *Cushman* decision, we must include this condition without modification. We therefore deny rehearing.

       n72 The District quotes and takes issue with the Forest Service's explanatory statement that it "must maintain a reasonable level of control over project operations that affect National Forest System lands, resources and programs." District's request for rehearing at 142. This statement is not part of the condition as set forth in Appendix B to the license order. In any event, the statement is consistent with the *Cushman* decision.

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

#### d. Project Boundary and Survey

97. Forest Service Condition 4 requires the District to ensure that any part of the project's boundary on Forest Service land is agreed to by the Forest Service, located on the ground with monuments tied to [*79] known corners of the Public Land Survey System, and encompasses necessary land for project purposes such as public recreation, shoreline control, and environmental resource protection. Forest Service Condition 5 requires the District to re-establish the Public Land Survey Meander Corners governing Forest Service property boundaries "within and adjacent to the Project area," and to pay for the administrative costs of the boundary survey.

98. The District states that it reached an agreement with the Forest Service on a revised project boundary as part of the 1998 settlement agreement, and the Commission approved the existing project boundary lines in 1999. The District adds that it did not propose any boundary changes that affect Forest Service lands. The District argues that reestablishment of the project boundary is not the District's responsibility and is not related to protection of resources on Forest Service lands, and is therefore beyond the scope of section 4(e).

99. We accepted both Conditions 4 and 5 "to the extent that they apply to reservation lands or waters within the project boundary." n73 As required by the *Cushman* decision, we now include these conditions in [*80] the license in their entirety. However, we agree with staff's conclusion in the final EIS that licensing the project would not affect the Colville National Forest boundary and its markers. Therefore, the District should not be responsible for re-establishing lost boundary corners or surveying to establish Forest Service property boundaries, as required by Condition 5. Rather, this should be the Forest Service's responsibility.

> n73 *See Public Utility District No. 1 of Pend Oreille County, Washington, 112 FERC P61,055, at 61,426* (Ordering Paragraph (G)).

#### e. Recreation Management Plan

100. Forest Service Condition 7 requires the licensee to develop a recreation plan "which includes National Forest System lands and facilities within or adjacent to the Project." It requires the District to provide for the rehabilitation of parking facilities at the old Ruby Ferry Landing and the area north and adjacent to Panhandle Campground. It also requires the District to provide for the [*81] operation, maintenance, and replacement of overnight and day use facilities at Edgewater, Panhandle, and Pioneer Parks. Commission staff supported this condition in the final EIS, and recommended that the scope of recreation surveys be expanded under FPA section 10(a)(1) to include non-reservation lands. n74 We accepted staff's recommendation in Article 412, but limited the applicability of this condition for section 4(e) purposes to national forest lands and facilities within the project boundary and project facilities located on those lands. Under the *Cushman* decision, we now include Condition 7 in its entirety, without limitation.

> n74 *See* FEIS at 274.

101. The District argues that relicensing the Box Canyon Project does not change the recreation opportunities on Forest Service lands, and that changes regarding the project's construction and the reservoir's inundation of additional lands are related to pre-project conditions and do not therefore justify the development of Forest Service parcels for recreation. [*82] The District maintains that the Forest Service is manipulating the capacity criteria to make its facilities appear closer to capacity than they actually are. The District adds that the three campgrounds at issue were upgraded at a cost of nearly $1 million in 1999 as part of the settlement agreement for the license amendment, these sites are still underutilized, and further improvements are unnecessary and unreasonable. The District acknowledges that the boat ramps at all three campgrounds are within the project boundary and are reservoir-related structures. However, the District observes that the Commission did not require the remaining areas of Panhandle Park and Edgewater Park to be included within the project boundary, and argues that it should not have done so with respect to Pioneer Park.

102. We find no evidence to support the District's argument that the Forest Service is manipulating capacity criteria. However, in the final EIS, Commission staff's findings support the District's argument that Pioneer Park, Panhandle

Park, and Edgewater Park are underutilized and that further improvements at these are not currently warranted. n75 As we read it, Condition 7 does not require [*83] the District to make further improvements at these facilities now; rather, it would require these improvements as the need is demonstrated. This demonstration of need will be determined by the District's own monitoring efforts, as required by Condition 7 and Article 412.

n75 *Id.* at 211.

103. Under our judicially-approved baseline policy, we use the existing environment as a starting point for our environmental analysis at relicensing. n76 As a result, we do not attempt to re-create or analyze the environmental conditions that existed before a project was built. This does not mean, however, that we ignore past environmental effects. To the contrary, past environmental effects are relevant and may be taken into account in determining what environmental measures may be appropriate for the new license term. Therefore, the fact that the project is already constructed does not preclude us from considering measures that are related to the continuing effects of project operation during the term of the new license. [*84] Nor does the fact that some of these facilities were required to be upgraded in connection with the 1999 license amendment preclude us from considering whether additional measures are needed for the new license term.

n76 *See Conservation Law Foundation v. FERC, 216 F.3d 41, 45-46 (D.C. Cir. 2000); American Rivers v. FERC, 201 F.3d 1186, 1195-99* (9 th Cir. 1999).

104. Based on the information provided in the license application, it appeared that Edgewater Park and Panhandle Park were within the project boundary, but Pioneer Park was not. All three campgrounds were developed and are managed by the Forest Service for public recreation, and we have found them to be necessary for project purposes as public recreation facilities. In the relicense order, we found that Pioneer Park is necessary for project purposes and required that it be included within the project boundary. We did not make a similar finding with respect to Edgewater Park and Panhandle Park [*85] because staff had determined that these parks were already within the project boundary.

105. The Forest Service argues that Edgewater and Panhandle Campgrounds are not fully within the project boundary and that the portions of them that are outside the boundary should be brought within it. It was our intention that all three parks, which are needed for public recreation and are serving project purposes, should be fully within the project boundary. Therefore, to the extent that these parks are not currently included, we are requiring the District, under Article 202, to submit for Commission approval, revised Exhibit G drawings adding the above lands/sites fully within the project boundary.

### f. Erosion Monitoring and Control

106. Forest Service Conditions 8 and 9 require plans for erosion monitoring and control. Condition 8 requires the District to develop and implement an erosion monitoring plan for Forest Service lands "within and adjacent to the Project boundary." Condition 9 requires the District to develop and implement an erosion control, prevention, and remediation plan for Forest Service lands "adjacent to" the Box Canyon Reservoir. Commission staff supported these [*86] conditions in the final EIS, and recommended that the scope of erosion monitoring and control measures be expanded under FPA section 10(a)(1) to include non-reservation lands. n77 We adopted staff's recommendation in Article 408, but limited the applicability of Conditions 8 and 9 for purposes of FPA section 4(e) to Forest Service lands within the project boundary. Under the *Cushman* decision, we now include these conditions without limitation.

n77 *See* FEIS at 274.

107. The District itself proposed measures for erosion control and monitoring throughout the reservoir. However, the District argues that the agencies have vastly overestimated the effects of erosion on fisheries in the main stem of the Pend Oreille River, and that the Forest Service has authorized logging operations over the years that have created massive tributary impacts. The District maintains that it cannot be required to correct problems that the Forest Service created, and requests that we restrict the applicability of these conditions [*87] to the 190 acres of Forest Service land within the project boundary.

108. We disagree with the District's interpretation of the Forest Service's conditions. Conditions 8 and 9 clearly state that the measures are to be applied to "project-caused and project-exacerbated erosion." Furthermore, we find that the intent of these conditions is consistent with our own Article 408. In any event, the *Cushman* decision requires that we include these conditions without limitation.

**g. Sensitive Species Management**

109. Forest Service Condition 11 requires the District to prepare a consultation plan to address the potential effects of the licensee's activities on plants and animals identified on the Regional Forester's list of sensitive species. It also requires the District to complete surveys on National Forest System lands for specified sensitive plant species, and to monitor and protect sensitive plant populations on those lands that are potentially affected by project-induced erosion and related noxious weed infestations. Commission staff supported this condition in the final EIS for Forest Service lands within the project boundary, and recommended that its scope be expanded [*88] under FPA section 10(a)(1) to include all lands within the project boundary. We adopted staff's recommendation in Article 411, but limited the applicability of Condition 11 for purposes of FPA section 4(e) to Forest Service lands within the project boundary. Under the *Cushman* decision, we now include this condition without limitation.

110. The District argues that this condition is excessively broad and vague, and could be construed to extend to activities of the District that are not conducted on Forest Service land. The District adds that, because a variety of environmental conditions and human activities that are not project-related can affect the survival and health of rare plant populations on Forest Service lands, this condition is arbitrary and capricious and is not supported by substantial evidence. The District maintains that it cannot be required to correct problems that the Forest Service created, and requests that we restrict the applicability of these conditions to the 190 acres of Forest Service land within the project boundary.

111. We agree with the District that Condition 11 as written is very broad and, in part, could be read to apply to the entire 1.1 million [*89] acres of the Colville National Forest. The record would not support such application. However, the Forest Service has described this measure as applying only to the thirteen parcels of Forest Service land affected by the project. n78 Moreover, we expanded the scope of this condition and accepted it as reasonable for all licensee-owned lands within the project boundary. In any event, the *Cushman* decision requires that we include these conditions without limitation. We therefore deny rehearing of this issue.

n78 *See* letter from Harv Forgren, Forest Service, to Magalie Salas, FERC (filed May 10, 2002). The cost information in Appendix A to the Forest Service's letter (at 42-46) indicates that the Forest Service intended to limit the applicability of this condition to the thirteen parcels of Forest Service land affected by the project.

**h. Cottonwood and Wet Shrub Habitats**

112. Forest Service Condition 12 requires the District to provide for the protection and restoration of at least 14 acres of cottonwoods [*90] and at least 11 acres of riparian shrub habitat in the project area. It permits the District to use its own lands for this purpose, but does not allow the use of the District's wildlife management areas that were purchased to meet the terms of the 1998 settlement agreement. It requires the District to restore, monitor, and protect three acres of cottonwoods on Forest Service lands in the project area. It also requires the District to complete habitat improvements on Forest Service lands to enhance or maintain alternate mature conifer habitat for bald eagles and other wildlife species within the project area. Commission staff supported this condition in the final EIS, and recommended that the scope of this measure be expanded under FPA section 10(a)(1) to include District-owned lands within the project boundary, as well as private lands if the land owner wished to participate. n79 We adopted this recommendation in Article 407, but limited the applicability of Condition 12 for purposes of FPA section 4(e) to Forest System lands within the project boundary. Under the *Cushman* decision, we now include this condition without limitation.

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

n79 *See* FEIS at 290.

[*91]

113. The District argues that this condition violates section 4(e) because it requires the District to restore and protect habitat in the project area, but outside of Forest Service land. The District maintains that the Forest Service is improperly seeking to require the District to restore the area to pre-project conditions and that the proper baseline for relicensing is current conditions. The District adds that its proposal to enhance cottonwoods on the existing wildlife management areas is sufficient, and that further enhancement is not justified. The District requests that we so find, and further requests clarification that it is not required to restore and protect any habitat outside of the 190 acres of Forest Service land within the project boundary.

114. As discussed above, we must include Condition 12 without limitation. Moreover, we do not regard the District's baseline argument as providing a basis for rejecting this condition. In the final EIS, Commission staff found that the District's proposal is not adequate and determined that further cottonwood enhancement is needed throughout the area surrounding the Box Canyon Reservoir. n80 Specifically, staff found that cottonwood [*92] recruitment (that is, an increase in seed germination and seedling survival) was occurring only in about half of the stands surveyed around the Box Canyon Reservoir and that project operations contribute to reduced cottonwood recruitment. Staff found that, by holding reservoir surface elevations higher than they would otherwise be after flood flows in May and June, the District's operation of the project causes suitable substrates to be inundated too late in the season to support seed germination and seedling survival. n81 We agreed with staff's analysis and adopted staff's recommendation to expand the scope of cottonwood enhancement measures in Article 407 of the new license. We therefore deny rehearing of this issue.

n80 *Id.* at 314.

n81 *Id.* at 143-44.

### i. Bald Eagles, Osprey, Cormorants, and Heron

115. Forest Service Condition 13 requires the District to conduct or provide funding for a qualified wildlife biologist to conduct an annual survey of nests of bald eagles, osprey, double-crested [*93] cormorants, and great blue herons within the project area. It requires the District to develop a monitoring plan in consultation with the Forest Service, implement the plan, and file annual monitoring reports. It further requires the District to take action to mitigate for adverse effects of cormorants on the other birds, if necessary. In the final EIS, Commission staff supported annual nesting and population surveys for these species, but did not agree that the plan should include measures to offset impacts if monitoring indicates that double-crested cormorants appear to be competing with other species for nest or perch sites or for other habitat components. n82 Staff found that impacts on the bald eagle, osprey, or great blue heron would not likely be the first evidence of double-crested cormorant populations reaching pest levels in the project area, would not necessarily constitute a trigger for compensation, and would not be the sole responsibility of the District. n83 We agreed and included staff's recommended conditions in Article 407, but limited the applicability of Condition 13 for purposes of FPA section 4(e) to Forest System lands within the project boundary.

n82 *Id.* at 294.

[*94]

n83 *Id.* at 294-95.

116. The District agues that this condition is overly broad and violates section 4(e) because it requires activities on non-federal lands and on Forest Service lands that are not within the project boundary. Under the *Cushman* decision, we must include this condition without limitation. We therefore deny rehearing of this issue.

### j. Native Amphibian Habitats

117. Forest Service Condition 14 requires the District to create or restore at least 60 acres of amphibian habitats on existing wildlife management areas or other licensee-controlled lands, including measures to reduce non-native bullfrog populations. It further requires that the District include these habitats in its wildlife management plans and monitor amphibian populations at the sites. Commission staff did not support this condition in the final EIS, because other measures being required for wildlife habitat enhancement would also adequately benefit amphibians. n84 Because this condition does not apply to Forest Service lands, we did not accept it as a section 4(e) condition and did not include it in [*95] the license.

n84 See FEIS at 316-17.

118. The District argues that this condition exceeds the Forest Service's authority under section 4(e) because it requires the District to conduct activities on non-federal lands. Under the *Cushman* decision, we must include Condition 14 without limitation.

119. We considered whether to include this condition under FPA section 10(a)(1). We decided not to do so because implementation of the District's proposal to protect and enhance 416 acres of emergent grasslands, as required by Article 407, would provide adequate protection and enhancement for native amphibians as well as numerous other wildlife species that utilize emergent grassland habitats. n85 Therefore, we found that the additional annual cost of $54,400 to comply with Condition 14 was not justified and did not meet the public interest standard of section 10(a)(1).

n85 *Public Utility District No. 1 of Pend Oreille County, Washington, 112 FERC P61,055, at P 74.*

[*96]

120. Among other things, Forest Service Condition 14 would require that any wetlands or ponds created in fulfillment of this condition be designed to incorporate water control devices that allow water levels to be drawn down in the winter, thereby reducing non-native bullfrog populations that compete with and predate native frogs. n86 The District proposed to provide pond habitat for amphibians by excavating in locations that will dry annually, without the need for water control devices or drawdowns. The District argues that the seasonal drawdown requirement is not supported by substantial evidence and should be removed from Article 407.

n86 Interior included a similar provision in its FPA section 10(j) recommendation 25.

121. Bullfrog tadpoles spend up to two years in a permanent pond, whereas most native amphibians spend only a few months in ponds. As a result, draining constructed ponds after native amphibians have completed breeding and metamorphosis has been a valuable method of controlling the bullfrog [*97] population without adversely affecting native amphibians. Recent studies suggest that pond draining must occur frequently for effective bullfrog control. n87 Model simulations showed that, in isolated ponds, annual draining eliminated the bullfrog population within 10 years. Draining every two years successfully reduced bullfrog population densities by fifty percent; however, draining ponds at frequencies less than once every three years had little effect on bullfrog densities. Thus, while we do not support the Condition 14 requirement to create or restore at least 60 acres of amphibian habitats, we agree that the seasonal drawdown requirement is a reasonable measure for the protection of native amphibians. Under the *Cushman* decision, however, we must include Condition 14 without limitation.

n87 Doubledee, R.A.; Muller, E.B.; and Nisbet, R.M.; Bullfrogs, Disturbance Regimes, and the Persistence of California Red-legged Frogs, 67 *Journal of Wildlife Management* (2), 424-438 (2003).

**k. Fish Passage**

[*98]

122. Forest Service Condition 15 requires that the District meet all requirements and timelines that Interior has prescribed for fish passage under section 18 of the FPA. It further reserves the Forest Service's section 4(e) authority to issue terms and conditions in coordination with federal and state fisheries management agencies for volitional fish passage at Box Canyon Dam and Calispell Creek. In the final EIS, Commission staff evaluated this condition with Interior's section 18 fishway prescriptions, the merits of which we discuss later in this order. n88 Although we shared staff's concerns about the cost and need for fishways, we included Interior's fishway prescriptions in the license because they are mandatory conditions under FPA section 18. However, we did not fully include Forest Service Condition 15 because we found that it would apply to project facilities that do not occupy Forest Service lands. n89

n88 *See* FEIS at 100-14.

n89 *See Public Utility District No. 1 of Pend Oreille County, Washington,* 112 FERC P61,055, at P 41.

[*99]

123. The Forest Service argues that we did so incorrectly, because a small portion of the reservoir and the right abutment of Box Canyon Dam occupy National Forest lands. The District argues that the Forest Service does not have the authority under section 4(e) to require fish passage, or to seek to impose additional section 4(e) conditions in the future without first making a formal request to reopen the license. The District adds that this condition is superfluous in light of Interior's fishway prescriptions under section 18. The District therefore requests that we find that this condition lacks substantial evidence and violates section 4(e).

124. Under the *Cushman* decision, we must include all of the Forest Service's section 4(e) conditions without limitation. In addition, as discussed above, the fact that the condition includes a reservation of authority does not provide a basis for rejecting it, because such reservations are an acceptable means of obtaining the licensee's consent to modify the license during its term. Therefore, we deny rehearing of this issue. As noted, we express our concerns about Interior's fishway prescriptions later in this order.

**l. Water** [*100] **Quality**

125. Forest Service Condition 16 requires the District to comply with the conditions of Ecology's water quality certification under section 401 of the CWA. Commission staff supported these conditions in the final EIS, n90 and the District does not take issue with them. We accepted Condition 16, but limited its applicability for purposes of FPA section 4(e) to Forest System lands within the project boundary.

n90 *See* FEIS at 286-88.

126. The District argues that the Forest Service has no authority over water quality in the Pend Oreille River and that this condition is superfluous. The District therefore requests that we find that this condition lacks substantial evidence and exceeds the scope of section 4(e). Under section 401(d) of the CWA, conditions of the water quality certification are conditions of the license, and compliance with them is a license requirement. Moreover, under the *Cushman* decision, we must include this section 4(e) condition without modification. We therefore deny rehearing [*101] of this issue.

**m. Management of Non-Native Aquatic Vegetation**

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

127. Forest Service Condition 17 requires the District to prepare and implement an aquatic plant management plan in consultation with the Forest Service to address the control of Eurasian water milfoil within Box Canyon Reservoir and to prevent the spread of this vegetation to other water bodies on Forest Service lands. In its license application, the District proposed to continue to provide $80,000 annually to fund Pend Oreille County's aquatic plant rotovation program. In the final EIS, Commission staff supported this condition as part of an integrated aquatic vegetation management plan for the entire Box Canyon reservoir, consistent with Ecology's water quality certification for the project. We accepted Forest Service Condition 17, but limited its applicability for purposes of FPA section 4(e) to Forest System lands within the project boundary.

128. The District argues that this condition lacks substantial evidence, exceeds the Forest Service's authority under section 4(e), and has no application outside of the 190 acres of Forest Service lands within the project boundary. We disagree, and adopt staff's recommendation [*102] that this measure should apply not only to Forest Service land, but to the entire Box Canyon Reservoir. In the final EIS, staff found that there is an ongoing concern for, and need for management of, non-native aquatic weeds in the reservoir. n91 Staff recommended that the District finalize the aquatic plant management plan that it had been developing, consistent with Ecology's water quality certification. n92 Ecology's certification makes this a license requirement. In addition, under the *Cushman* decision, we must include Condition 17 without limitation. We therefore deny rehearing of this issue.

  n91 *Id.* at 147-48.


  n92 *Id.* at 312.


  **n. Integrated Weed Management**

129. Forest Service Condition 18 requires the District to prepare and implement an integrated weed management plan in consultation with the Forest Service. In its license application, the District proposed a similar measure for the purpose of combating noxious weeds. In the final EIS, Commission staff supported the Forest Service's [*103] condition as part of an integrated weed management plan for District lands, District-operated campgrounds, reservoir boat launches, and National Forest System lands affected by project operation. n93 Although we accepted Condition 18, we limited its applicability for purposes of FPA section 4(e) to Forest System lands within the project boundary.

  n93 *Id.* at 292.



130. The District argues that this condition is vaguely drafted, lacks substantial evidence, and has no application outside of the 190 acres of Forest Service lands within the project boundary. As noted, in the final EIS, staff recommended that this measure not be limited to Forest Service lands. We accepted staff's recommendation and included Article 410 in the new license. Hence, in addition to Condition 18, Article 410 requires the District to prepare and implement an integrated weed management plan. Moreover, under the *Cushman* decision, we must accept this condition without limitation. We therefore deny rehearing of this issue.

  **E. Effect** [*104] **of the 1917 Power Site Reservation**

131. The District argues that Interior and the Forest Service have exceeded their section 4(e) authority by requiring conditions that are inconsistent with the purposes of a 1917 power site reservation that the District asserts is still in effect. n94 The District maintains that on July 17, 1917, the President withdrew approximately 281 acres of land on the east bank of the Pend Oreille River north and east of the Box Canyon Dam and reserved them for water-power sites under Power Site Reserve No. 639. n95 In 1938, land including this reservation was withdrawn for the Kaniksu National Forest and was subsequently transferred to the Colville National Forest in 1954. The District maintains that, because the 1938 withdrawal for the national forest reservation was made subject to all valid existing claims and entries under the various land laws, Interior and the Forest Service are precluded from requiring any FPA section 4(e) conditions that would be inconsistent with the purposes of the 1917 power site reservation. The District further argues that the Commission is unable to make a section 4(e) consistency finding with respect to this power site [*105] reservation, because

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

the license includes mandatory conditions that "would materially and unduly impair the economic benefits" of the project. n96

n94 Under section 24 of the FPA, any lands of the United States included in any proposed hydroelectric project shall, from the date of filing of the application, be reserved from entry, location, or other disposal under the laws of the United States until otherwise ordered by the Commission or by Congress. The reservation of lands thus created is typically referred to as a power site reservation or withdrawal. The 1917 reservation pre-dates the Federal Water Power Act of 1920, which later became Part I of the FPA.

n95 District's request for rehearing at 76. In support, the District cites the Muhn Report, which the District filed on November 18, 2002, as Appendix A to its comments on the draft EIS. According to the report, the 1917 reservation was created by President Wilson pursuant to the Pickett Act of June 25, 1910, ch. 421, 36 Stat. 847. A copy of the power site reservation is reproduced as "Document MAA 46" and appears as an attachment to the Muhn Reportt. The District makes a similar argument with respect to Interior's authority under FPA section 18 to prescribe fish passage facilities at the Calispel Creek pumping plant. We reject this argument for the same reasons; issuance of a license for the Box Canyon Project is consistent with the purposes of the 1917 power site reservation, and nothing in that reservation would authorize us to disregard the specific provisions of section 18 of the FPA.

[*106]

n96 District's request for rehearing at 77.

132. The District overstates the purpose of the 1917 power site reservation. The purpose of the reservation was to preserve the site for possible use for hydroelectric generation, not to ensure that any project that might eventually occupy the site would be economically beneficial. Because the license for the Box Canyon authorizes use of the site for power generation, we find that it is consistent with the purposes of the 1917 power site reservation.

133. The District correctly argues that the 1938 national forest reservation is a general act that cannot be read to repeal the power site reservation by implication. However, this does not mean that the 1917 power site reservation would prevent the Secretaries of Interior or Agriculture from proposing conditions that could materially affect project economics. The Secretaries' authority to require conditions for the protection and utilization of the reservations at issue in this case derives from FPA section 4(e), and it is well settled that there is no guarantee of profitability for hydroelectric projects [*107] under the FPA. n97 Rather, the Commission must give equal consideration to both developmental and non-developmental values under section 4(e), and must include the Secretaries' conditions for the protection and utilization of federal reservations on which project works are located. In short, the 1917 power site reservation does not authorize us to disregard the specific provisions of section 4(e) of the FPA simply because the conditions that the Secretaries are seeking to require would reduce the project's net economic benefits.

n97 See Wisconsin Public Service Corp. v. FERC, 32 F.3d 1165, 1179 (7 th Cir 1994) ("The FPA cannot be read to require the Commission to protect the economic viability of all hydroelectric projects.").

## Section 18 Fishway Prescriptions

134. Section 18 of the FPA states that the Commission shall require the licensee to construct, maintain, and operate at its own expense such fishways as the Secretary of the Interior or the Secretary of Commerce may [*108] prescribe. n98 Interior's fishway prescriptions include measures for upstream and downstream passage of bull trout, westslope cutthroat trout, and mountain whitefish (target species) at Box Canyon Dam and at the Calispell Creek pumping plant. As described in the license order, the prescriptions use a phased approach for upstream and downstream fish passage and

incorporate temporary, interim, and permanent passage facilities. The prescriptions also include monitoring and effectiveness plans and studies. We included Interior's prescriptions in Appendix C and made them conditions of the new license by Ordering Paragraph (F).

> n98 *16 U.S.C. § 810* (2000).

135. The District argues that Interior's fishway prescriptions are contrary to the record evidence and that the final EIS does not support the prescriptions. The District further maintains that the specific number of fish used to trigger the installation of permanent fish passage facilities is unreasonably low.

136. Interior's prescription [*109] uses a three-phased approach for upstream fish passage. A temporary upstream fish passage facility would be installed and operated between years 2 and 13 of the new license. This would likely be a trap-and-haul operation that uses guidance nets to trap fish. It would be replaced by an interim fish passage facility, which would operate between years 14 and 17. The interim facility would likely be either a trap-and-haul operation or a fish lift that uses a structural trapping facility. The interim facility would then be replaced by a permanent upstream fish passage facility, or fish ladder, that would be operated from year 18 through the remainder of the license term.

137. In the final EIS, Commission staff estimated that the annualized cost of Interior's upstream fish passage prescription at Box Canyon Dam would be approximately $1.1 million. Staff concluded that the need for fish passage facilities has not been established at Box Canyon Dam because of the lack of data indicating that substantial numbers of native trout species are attempting to migrate upstream past the dam, as well as the low numbers of these fish found below the dam. Staff therefore recommended an additional fish [*110] movement analysis to determine the need for fish passage, at an estimated annualized cost of $41,800. Staff also concluded that Interior's interim fish passage facilities would be an unnecessary and costly step if it were determined that fish passage is needed. n99 We agree with staff's analysis and would adopt this approach for upstream fish passage at Box Canyon Dam in the absence of Interior's mandatory fishway prescription.

> n99 In the final EIS, Commission staff estimated that its recommended approach to upstream fish passage at Box Canyon Dam (if found to be necessary) would have an annualized cost of approximately $505,400. Staff's recommended measures would cost about half that of Interior's, because staff's recommendation would not require the design, construction, and monitoring of Interior's upstream fish passage facility, and staff's recommended facilities, if found to be necessary, would be constructed later in the license to allow for completion of the fish movement study. *See* FEIS at 272-76 and 306-08.

[*111]

138. Interior further prescribed that the District begin planning and designing an interim facility for downstream fish passage at Box Canyon Dam within 6 months of license issuance. In the final EIS, staff found that the need for downstream fish passage has not been demonstrated because of the lack of data indicating that substantial numbers of native trout species are attempting to migrate downstream past Box Canyon Dam, as well as the low numbers of these fish found within the reservoir. Staff also noted, that this early stage of planning for downstream fish passage is premature, because the District is proposing to install two "fish-friendly" turbines, which we required in Article 405. If these turbines prove to be effective at passing fish downstream without harm, the District could replace the remaining two turbines with the fish-friendly turbines and eliminate the need for downstream fish passage facilities. Further, staff found that, if the need for downstream fish passage were demonstrated and the turbines were not effective at safely passing fish downstream, then the installation of a permanent downstream fish passage facility would be justified, but the installation [*112] of Interior's interim facility would again be an unnecessary step that carries with it an estimated annualized cost of $272,900. Therefore, we agree with staff's analysis and support staff's recommendation, but must nevertheless include Interior's prescription for downstream fish passage without modification.

139. For similar reasons, in the final EIS staff also did not support Interior's prescription for the construction and operation of fish passage facilities at the Calispell Creek Pumping Plant. Again, staff noted the lack of scientific evidence to

indicate that substantial numbers of native trout species were attempting to migrate between Calispell Creek and the Box Canyon reservoir. Further, staff questioned the need for interim facilities within 10 years of license issuance, given the current state of the habitat in Calispell Creek with its poor water quality, lack of cover, few pools and sediment-laden substrate, and the unlikely prospect that habitat would be sufficiently improved to support native trout populations. Staff concluded that, if the restoration and enhancement efforts required in the new license result in sufficiently improved habitat to support native trout [*113] populations, it would be appropriate to install permanent fish passage facilities and to forego the unnecessary and costly interim facilities that Interior prescribed. Under staff's alternative for upstream fish passage facilities at the Calispell Creek Pumping Plant, the District would save approximately $106,000 annually as compared to Interior's prescription. As a result, we support staff's alternative, and would adopt its recommendations for upstream fish passage facilities at the Calispell Creek Pumping Plant in the absence of Interior's mandatory fishway prescription.

140. Despite our disagreement with the timing and implementation of Interior's fishway prescriptions, we have included them in the license because we recognize that they are mandatory conditions under FPA section 18. Accordingly, we have no discretion to modify or reject them on rehearing. On judicial review, the court of appeals will evaluate the prescriptions and the record in support of them to determine whether they are supported by substantial evidence and are otherwise consistent with the FPA. n100

    n100 *See Escondido, 466 U.S. at 778 n. 70; Bangor Hydro-Electric Co. v. FERC, 78 F.3d 659 (D.C. Cir. 1996); American Rivers v. FERC, 201 F.3d 1186, 1210 (9 th Cir. 2000).*

[*114]

## **Threatened and Endangered Species**

141. Section 7(a)(2) of the Endangered Species Act (ESA) requires federal agencies to ensure that their actions are not likely to jeopardize the continued existence of federally-listed threatened and endangered species, or result in the destruction or adverse modification of designated critical habitat for those species. As discussed in the license order, Interior's Fish and Wildlife Service (FWS) issued a biological opinion that relicensing the Box Canyon Project is likely to adversely affect bull trout and designated bull trout habitat, but is not likely to jeopardize the continued existence of bull trout or result in the destruction or adverse modification of critical habitat. FWS concluded that relicensing the project with Interior's section 18 fishway prescriptions and section 4(e) conditions includes sufficient measures to help minimize and track the level of incidental take of bull trout associated with relicensing and continued operation of the project, and that no additional reasonable and prudent measures or terms and conditions are necessary.

142. In the relicense order, we recognized that Interior's Condition 6 (concerning [*115] trout habitat restoration in tributary streams) and portions of Interior's Condition 4 (concerning total dissolved gas monitoring in the project's tailrace) are directly related to trout habitat restoration, fish passage, and water quality monitoring, all of which are measures to protect and enhance bull trout populations. We therefore required the District to comply with them in Article 406 pursuant to our authority under FPA section 10(a)(1). n101

    n101 *Public Utility District No. 1 of Pend Oreille County, Washington, 112 FERC P61,055, at P 59 and p. 61,431* (Article 406). Article 406 specifically requires the District to comply with Interior's Conditions 4(C)(4)(f), 4(D)(3), and 6.

143. The District argues that Article 406 must be struck in its entirety, because it does not comply with the comprehensive development and equal consideration requirements of the FPA and is not supported by substantial evidence. The District further maintains that the ESA does not expand the Commission's [*116] powers under the FPA, and does not therefore provide a basis for imposing the Article 406 requirements. Under the *Cushman* decision, we must include Interior's section 4(e) conditions without limitation. Thus, although we explain our views here to assist the parties and the court in the event of judicial review, the issue of whether we were authorized to include these conditions under section 10(a)(1) is now moot.

144. The District takes issue with the target levels for trout population density derived from the Swan River drainage in Montana, which it asserts is not comparable to the Pend Oreille River and its tributaries. As discussed earlier in connection with the trout assessment and restoration plan, we agree that these population density target levels may not be directly applicable to the Pend Oreille River. The District also asserts that very few bull trout are present now, and that Interior has presented no data to support its conclusion that the target levels could be reached. We concur in that assessment.

145. The District also argues that the trout assessment and restoration plan is based on Interior's groundless assumption that bull trout were abundant before the [*117] project existed, and that this assessment of pre-project conditions violates the Commission's baseline policy that the starting point for environmental analysis is the existing environment. We disagree. As we have explained, ongoing environmental effects are relevant to a determination of what license conditions should be required for the new license term, and enhancement of environmental resources affected by a project is permissible under the FPA. Thus, we need not find that bull trout were abundant in the area before the project was built before we may consider measures that are designed to promote their increase.

146. The District further argues that the trout plan requires it to assume overall responsibility for the restoration of trout and trout habitat in the Pend Oreille River basin, despite the fact that other factors, including residential development, timber harvest, mining, roads, agriculture, fire, and non-native species, have contributed to the bull trout's decline. The District maintains that this violates the comprehensive development standard of FPA section 10(a), because it fails to strike an appropriate balance between developmental and environmental resources. [*118] Similarly, the District argues that the plan violates the public interest standard of section 4(e), because it fails to balance power and non-power values.

147. As discussed earlier in connection with Interior's Condition 6, we agree that Interior's trout plan would also compensate for the effects of land management actions that are not project-related. Under the *Cushman* decision, however, we must accept Interior's section 4(e) conditions without modification, indicating our views where appropriate. Consequently, we cannot reject a particular mandatory condition based on our assessment of its consistency with FPA sections 10(a)(1) or 4(e), as long as we are able to determine that our issuance of the new license in its entirety is consistent with those statutory standards.

148. The District also argues that the water quality monitoring requirements of Article 406 violate the comprehensive development and equal protection standards. The District maintains that these complex and detailed monitoring requirements would cost approximately $200,000 to implement and would serve no useful purpose. The District argues that monitoring is not needed, because the District has already determined [*119] that the project exceeds numeric water quality criteria for total dissolved gas at certain times of the year, and the measures included in Ecology's water quality certification will address this issue adequately.

149. As noted, we must accept these conditions under the *Cushman* decision. Although we have general concerns about the need for and cost of conducting grid monitoring during the first year of the new license, we cannot be certain that Ecology's water quality certification will require adequate total dissolved gas monitoring strategies. Ecology's certification requires the filing for approval of an unspecified plan for monitoring total dissolved gas. In the final EIS, Commission staff found that the District's plan to use a mobile sampling strategy to assess the mixing of total dissolved gas below Box Canyon Dam would be of little value, because samples taken would not be directly comparable to each other. n102 Staff also found that conducting grid monitoring after the total dissolved gas abatement measures required in the license had been completed would provide the information necessary to evaluate the lateral and longitudinal gradient of total dissolved gas in the [*120] river below Box Canyon Dam, as well as the effectiveness of and need for additional total dissolved gas abatement measures. If the data collected are not directly comparable, as with the District's proposed mobile sampling strategy, then it would not be possible to determine the effectiveness of the abatement measures or the project's continued influence on the persistence of total dissolved gas concentrations downstream of the dam. Conducting grid sampling from a boat, as the District proposed, would not enable samples to be taken simultaneously at each of the grid points. Instead, several hours could occur between sampling at the first and last grid point, and they hydraulic conditions coinciding with spill at the dam could limit the ability to relocate the boat at the planned sampling locations. The resulting collection of data points would be rendered virtually useless for determining lateral and longitudinal differences caused by varying conditions at the dam. Thus, although we agree with the District that grid monitoring does

not need to be conducted during the first year of the license, we also agree with staff's assessment that grid monitoring should be conducted after the [*121] total dissolved gas abatement measures have been completed, in lieu of the District's plan to use a mobile sampling strategy.

n102 *See* FEIS at 76.

150. Moreover, while we might strike a different balance under sections 10(a)(1) and 4(e) of the FPA if bull trout were not listed as threatened under the ESA, the latter Act serves to shift the balance somewhat in the direction of preserving and recovering the listed species. Section 7(a)(1) of the ESA directs the Commission to utilize its authorities to conserve listed species and their habitat, and section 7(a)(2) requires the Commission to ensure that its actions will not jeopardize the continued existence of listed species or destroy or adversely modify their critical habitat. As part of our FPA authority, we are required to consider the effects of a hydroelectric project on environmental as well as developmental values, and effects on listed species and their habitat are a significant element in making that determination. Thus, contrary to the District's assertion, [*122] we are not using the ESA to expand our FPA authority, but rather are using our FPA authority in a manner that gives appropriate weight to the importance of ESA-listed species and their habitat. n103

n103 For this reason, the District's reliance on *Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC, 962 F.2d 27 (D.C. Cir. 1992),* is misplaced. In that case, the court upheld the Commission's determination that it lacked authority to amend a license that did not contain a reservation of authority to make changes to benefit fish and wildlife resources. Here, we are using our existing FPA authority to include license conditions to benefit the listed species.

151. The District argues that, because FWS did not recommend the Article 406 conditions as reasonable and prudent measures in its biological opinion, the Commission is free to reject them and should do so. The District points out that FWS initially included the trout plan and other mitigation and enhancement measures [*123] in the draft biological opinion as terms and conditions to avoid or minimize incidental taking of bull trout. In its March 23, 2005 comment letter, the District argued that under the ESA, implementing regulations, and published guidance, reasonable and prudent measures must be actions that are necessary or appropriate to minimize incidental take, and may not include mitigation and enhancement measures that do not minimize impacts to affected individual members of listed species. n104 The District infers that, because FWS did not include its proposed reasonable and prudent measures in its final biological opinion, FWS implicitly agreed that the measures were legally barred and the Commission may not require them under its FPA authority.

n104 Letter from John Snyder, EES Consulting (for the District), to Magalie Salas, FERC (filed March 23, 2005); *see 16 U.S.C. § 1536*(b)(4)(ii) (2000); 50 C.F.R. § 402.02 (2006); FWS and National Marine Fisheries Service, Endangered Species Consultation Handbook at 4-19 and 4-50 (March 1998).

[*124]

152. Under the *Cushman* decision, we must include these mandatory conditions without modification. Nevertheless, we think it bears noting that, in its incidental take statement, FWS found that incidental taking of bull trout would result from entrainment over the Box Canyon Dam or through the turbines, disruption of normal migration until upstream and downstream fish passage is provided, seasonal exposure to supersaturated levels of total dissolved gas below Box Canyon Dam, operation of the trap-and-haul facility, stranding associated with rapid down-ramping of flows in emergencies, and habitat restoration and monitoring activities. Under the heading "Reasonable and Prudent Measures," FWS concluded in its biological opinion that the proposed action, with Interior's section 18 fishway prescriptions and section 4(e) conditions, included sufficient measures to help minimize and track the level of incidental take associated with relicensing the project, and that no additional reasonable and prudent measures or terms and conditions were required. n105 Thus, although FWS did not specify any incidental take conditions, FWS regarded Interior's section 4(e) conditions and section 18 [*125] fishway prescriptions as reasonable and prudent measures to avoid or minimize incidental taking of

bull trout. In addition, FWS regarded these conditions and prescriptions as integral to its finding that the proposed action is not likely to jeopardize the continued existence of bull trout, or result in destruction or adverse modification of critical habitat for bull trout.

n105 FWS final Biological Opinion at 45 (filed April 29, 2005).

153. FWS found that the measures required in the new license would reduce the level of take from interference with normal migration by restoring connectivity between populations and providing important access to habitat. FWS further found that these measures would reduce the level of take from seasonal exposure to supersaturated levels of total dissolved gas. Thus, although the District regards them as impermissible because they are mitigation measures, they also serve to minimize the level of incidental take from project operation.

154. The District argues that, under the ESA guidance,  [*126]  reasonable and prudent measures can only include actions that occur within the action area, involve minor changes to the project, and reduce the level of take associated with the project. n106 The District argues that, because the trout plan and water quality monitoring measures require actions that take place outside the project boundary and are extremely costly, they do not meet this standard. However, FWS did not adopt these measures as reasonable and prudent measures *per se*, but rather determined that they are necessary for the protection of bull trout and assumed that they would be included in the new license because of their mandatory status. Moreover, unlike the statute and implementing regulations, the ESA guidance is advisory only, and would not preclude the inclusion of these measures in the license.

n106 *See* ESA Consultation Handbook at 4-50.

155. The District further argues that the Commission, not FWS, defines the proposed action, and the assumption of FWS that Interior's conditions are part [*127]  of the proposed action is unlawful. We agree that the Commission is responsible for defining the proposed action. However, under the FPA, we define the proposed action as whether and under what conditions to issue a license for a hydroelectric project. This definition is sufficiently broad to allow the Commission to consider whether to include conditions that FWS has determined are necessary for the protection of ESA-listed species. Moreover, we find nothing unlawful in the assumption that mandatory conditions should be considered part of the proposed action.

156. Washington DFW and the Tribe request that we clarify the scope of Article 406 to provide that the licensee's obligations pursuant to Interior's trout assessment and restoration plan cover all native trout species, and not just threatened bull trout. They point out that, although the language of Article 406 refers specifically to the protection of bull trout, it requires the licensee to comply with Interior's Conditions 4(C)(4)(f), 4(D)(3), and 6, and that those conditions, in turn, address multiple species of fish. n107 Washington DFW points out that we accepted various section 10(j) recommendations for fish habitat restoration [*128]  as consistent with Article 406, and noted that the trout plan required by that article allows for funds to be used for supplementation of native trout populations. Washington DFW also points out that no other license article addresses fish habitat or fish enhancement activities. Washington DFW and the Tribe therefore request that we modify Article 406 to clarify that all of the species covered by Interior's Condition 6 are within the scope of the requirements of that article.

157. It was our intent that, with the inclusion of Article 406, Interior's trout assessment and restoration plan would be implemented as written and would apply to all native trout species. Moreover, under the *Cushman* decision, we must include Interior's section 4(e) conditions without modification. Accordingly, we will amend Article 406 to clarify that the trout plan covers all native trout species, consistent with Interior's Condition 6.

## Fish and Wildlife Recommendations under Section 10(j) of the FPA

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

158. Under section 10(j) of the FPA, the Commission must include license conditions based on recommendations by federal and state fish and wildlife agencies for the protection, mitigation of [*129] damages to, and enhancement of fish and wildlife affected by the project. If the Commission believes that a section 10(j) recommendation is inconsistent with Part I of the FPA or other applicable law, the Commission must attempt to resolve the inconsistency with the agency, giving due weight to the agency's expertise. If the Commission does not adopt a recommendation, it must explain the inconsistency and how the Commission's conditions adequately protect fish and wildlife resources. The Commission accepted most, but not all, of the agency recommendations in this case, and determined that some recommendations were outside the scope of section 10(j).

159. On rehearing, the District argues that several of the section 10(j) recommendations that the Commission accepted are unsupported. Interior recommended that the District prepare and implement a plan for annual monitoring of various water quality parameters in the Pend Oreille River above and below the Box Canyon Dam and the Calispell Creek Pumping Plant (Interior's recommendation 2). We included water quality monitoring conditions consistent with this recommendation in Articles 401 (incorporating conditions of Ecology's and EPA's [*130] water quality certifications for the Box Canyon Project) and 406 (incorporating Interior's section 4(e) Conditions 4(C)(4)(f) and 4(D)(3) for the protection of native trout, including bull trout). The District argues that Interior's section 4(e) conditions, adopted in Article 406, are duplicative of Interior's section 10(j) recommendation and the District's ongoing water quality monitoring programs, as described in the license application. The District argues that we should remove Article 406 in its entirety and find that these water quality monitoring provisions are not supported by substantial evidence. For the reasons already discussed, we find that these Article 406 requirements are required under the *Cushman* decision and FPA section 4(e). The water quality monitoring conditions adopted in Article 401 are required by Ecology's and EPA's water quality certifications. We therefore deny rehearing of this issue.

160. Interior and Washington DFW recommended that the District quantify and provide funding for mainstem Pend Oreille River and tributary restoration to mitigate for the ongoing loss of aquatic habitat in the Box Canyon Reservoir and tributary streams (Interior's recommendation [*131] 4 and Washington DFW's recommendation 7). Article 406 implements Interior's section 4(e) Condition 6, and includes requirements consistent with these section 10(j) recommendations. The District argues that we should remove Article 406 from the license or, in the alternative, make findings that the trout program is not supported by substantial evidence. Under the *Cushman* decision, we must include Interior's Condition 6 without modification. Consequently, we decline to remove Article 406 from the license. We have already expressed our views regarding the need for and cost of Interior's trout assessment and restoration plan. We therefore deny rehearing of this issue.

161. Washington DFW recommended that the District provide $100,000 to revitalize the Usk fish hatchery and $75,000 annually for the production of native salmonids (Washington DFW recommendation 10). Because it was not timely filed, we considered this recommendation under section 10(a) of the FPA and rejected it as unnecessary, because Interior's trout assessment and restoration plan required by Article 406 allows for funds to be used to supplement native trout populations through conservation aquaculture. The District [*132] requests that we acknowledge that, consistent with the findings in the EIS, the Colville hatchery raises rainbow trout, not native fish, and that funding for this hatchery is therefore not consistent with plans to support cutthroat trout.

162. We disagree with the District on this point and cannot therefore grant this request. We recognize that the Colville fish hatchery is currently being used to raise rainbow trout for the purpose of a put-and-take sport fishery and is fully utilized at its production capacity. n108 However, with the proper upgrades to the facility and its management directive, the Colville hatchery could be used to raise native trout for conservation purposes. Therefore, we find that by supporting the District's request, we would be limiting the flexibility of the resource management agencies to meet their goal of increasing native trout populations.

      n107 The first two conditions address water quality monitoring, and do not mention any particular fish species. Interior's Condition 6 specifically mentions bull trout, west slope cutthroat trout, rainbow trout, and brown trout.

[*133]

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

n108 *See* letter from Washington DFW dated August 18, 2004.

163. Interior recommended that the District develop and implement a management plan for wetland habitats on project lands to restore or enhance habitat for native amphibians, particularly the northern leopard frog (Interior's recommendation 25). To provide habitat for amphibians, the District proposed to develop 524 acres of pond and emergent wetlands on the Everett Island and Tacoma Creek wildlife management areas. We adopted Interior's recommendation and included the District's plans in Article 407, which requires a comprehensive wildlife management plan.

164. Article 407 also requires that the plan for wetland creation and enhancement include provisions for drawdowns to impair bullfrog production in the ponds. The District argues that the seasonal drawdown requirement is not supported by substantial evidence and should be removed from Article 407. As discussed above in connection with the Forest Service's section 4(e) Condition 14, we find that the seasonal drawdown requirement is a reasonable measure for the protection of native [*134] amphibians. Moreover, the *Cushman* decision requires that we include this condition without modification. We therefore deny rehearing of this issue.

165. The Idaho Department of Fish and Game (Idaho DFG) recommended that the District establish a technical committee to deal with environmental issues (Idaho DFG's recommendation 4). We found that this recommendation was not within the scope of section 10(j) because it was not a specific measure to protect, mitigate damages to, or enhance fish and wildlife resources. We therefore considered it under section 10(a) of the FPA. However, we noted that the new license contains conditions consistent with this recommendation, because Interior's section 4(e) Condition 2 required the establishment of a resources technical committee. n109

n109 *Public Utility District No. 1 of Pend Oreille County, Washington, 112 FERC P61,055, at P 68.*

166. The District argues that the technical committee was created by the parties to the 1998 settlement agreement [*135] for the 1999 license amendment and was expressly limited, at Interior's insistence, to the remaining term of the initial license. The District further maintains that, in the absence of a settlement agreement for relicensing the project, the Commission should reject this and all conditions requiring a technical committee.

167. As noted, we included this condition because Interior required it under FPA section 4(e). Under the *Cushman* decision, we have no authority to reject or modify it. As discussed earlier, because of the committee's proven success, we agree that its continuation is desirable. However, we share the District's concerns regarding the committee's authority over some aspects of the contracting and procurement process.

## Recommendations under Section 10(a) of the FPA

168. In paragraph 70 of our relicense order, we observed that the new license includes conditions that are consistent with fifteen of the Tribe's recommendations under section 10(a) of the FPA. Similarly, in paragraph 75 of the relicense order, we observed that the new license includes conditions that are consistent with four of the Forest Service's section 10(a) recommendations. The District [*136] requests that we clarify that, with respect to these conditions, the language of the license articles is controlling, and not the language of the recommendations. Although we believe this is self evident, we grant the licensee's request.

169. In paragraph 71 of the relicense order, we did not adopt the Tribe's recommendation that the District purchase or manage 70 acres of deciduous forest for the great blue heron. We found that, as discussed in the EIS, the fairly recent abandonment of two heron colonies near the Box Canyon reservoir appears to have been related to timber harvest rather than project operation, and that staff did not therefore find a connection to project effects. We added that conditions in the new license will meet habitat objectives for this species, including the enhancement of at least 87 acres of deciduous and mixed forest within the project's two wildlife management areas, planting of cottonwood at other locations around the reservoir, and measures to help control shoreline erosion and disturbance at sensitive sites.

170. The Tribe argues that the record supports its position that the project is responsible for declines in cottonwood habitat and reduced [*137] cottonwood recruitment, and that this diminished habitat is important and essential for many species, including heron, osprey, and bald eagle. n110 The Tribe adds that the proposed 70-acre acquisition would provide acres in addition to those available under the wildlife management areas and would address the need for sufficient lands to mitigate project-related impacts. The Tribe therefore requests that we reconsider our decision to omit the 70-acre acquisition.

> n110 In support, the Tribe cites the final EIS and a report by Rood and Braatne (2002). Staff considered that report in its evaluation of this issue. *See* FEIS at 147.

171. We agree with the Tribe's assertion that project operations contribute to reduced cottonwood recruitment. However, we find that with the inclusion of Forest Service Condition 12 and our Article 407, which provide for cottonwood enhancement throughout the project area, the District will be addressing the project's effect on cottonwood. Further enhancements as requested by the Tribe [*138] are unnecessary. We therefore deny reconsideration of this issue.

**Comprehensive Development**

172. Sections 4(e) and 10(a)(1) of the FPA, n111 require the Commission, in acting on license applications, to give equal consideration to the developmental and environmental uses of the waterway on which a project is located. Any license issued shall be such as in the Commission's judgment will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for all beneficial public uses.

> n111 *16 U.S.C. § § 797*(e) and 803(a)(1) (2000).

173. As a result of the *Cushman* decision, we have identified a total of eleven section 4(e) mandatory conditions that have an expanded geographic scope when compared with the limitations we imposed in the license as issued. n112 Of these eleven conditions, two of them (Forest Service's Condition 14 and Interior's Condition 7) have additional costs associated with them beyond what was originally contemplated in [*139] the license. n113 Forest Service's Condition 14, which we did not include in the license as issued, requires the creation and management of 60 acres of pond or wetland habitat on the District's lands, at an estimated annual expense of $54,400. Interior's Condition 7 requires the replacement of lost wildlife habitat on the Kalispel Indian reservation. Because we limited the geographic scope of Interior's Condition 7 to reservation lands within the project boundary, this measure if applied to only 115 acres would have cost $9,300 annually. n114 However, as a result of the *Cushman* decision, we must now apply this measure to the full 142.7 acres of the reservation, and estimate that this measure will cost $11,600 annually. Cumulatively, including these two conditions without limitation increases the annual cost of the license by $56,700.

> n112 These mandatory section 4(e) conditions are: Forest Service Conditions 1, 6, 7, and 11 through 16; and Interior's Conditions 7, 13, and 18.

> n113 As written, Forest Service's 4(e) condition 11 for sensitive plant surveys and protection could be applied to the entire 1.1 million acres of the Colville National Forest, which would increase the annual cost from our original estimate of $13,000 to $12.5 million. However, upon a review of the record we do not believe it is the Forest Service's intent that this condition apply to the entire Colville National Forest or be expanded beyond that which we originally contemplated; therefore, we do not believe there is any additional expense associated this condition as a result of the Cushman decision.

[*140]

n114 When developing the cost estimate for this measure in the new license as issued, we erroneously included the cost of the entire measure as prescribed, without imposing the intended geographic limitation. Therefore, the estimated annual cost of the license as issued should have been $10,504,000, which is $2,300 less than the $10,506,300 previously reported.

174. As now licensed as a result of this order, with the inclusion of these mandatory section 4(e) conditions in their entirety together with staff's recommended measures, the levelized annual cost of operating the project would be about $10,560,700, or $23.2 per MWh. Based on an estimated average annual generation of 456,091 MWh n115 as licensed, the project would produce power valued at $15,965,300 when multiplied by the $36.0 per MWh value of the project's power. Therefore, in the first year of the new license, project power would cost $5,404,600, or $11.8 per MWh less than the likely cost of alternative power.

n115 This estimate of the project's average annual generation accounts for the District's plans to modify the project's turbines.

[*141]

175. Licensing the project with these conditions will have many benefits. The project will continue to provide a beneficial and dependable source of energy. The required environmental measures will improve water quality, protect and enhance fish and wildlife resources, improve public use of recreation facilities and resources, improve multiple use and management of project lands, and maintain and protect historic and archaeological resources within the area affected by project operation. The hydroelectric energy generated from a renewable resource will continue to offset the use of fossil-fueled, steam-electric generating plants, thereby conserving nonrenewable resources and reducing atmospheric pollution. For all these reasons, we find that continued operation of the Box Canyon Project, as described in this order, is best adapted to a comprehensive plan for improving or developing the Pend Oreille River.

## Other Issues

### A. License Denial and Project Decommissioning

176. The Tribe argues that the findings in the final EIS support the conclusion that the purposes of the Kalispel Indian Reservation would best be served if the Box Canyon Project were decommissioned. [*142] In support, the Tribe cites the statement in the EIS that "dam removal would restore a free-flowing river and riverine habitat, eliminate any fish entrainment mortality that may be occurring, provide unobstructed fish passage past the site, provide unobstructed recreational riverine boating, and provide the potential for the Tribe to re-establish some of its traditional uses of the river prior to impoundment." n116

n116 FEIS at 20.

177. The Tribe maintains that the pertinent question should be whether decommissioning would further the purposes of the Kalispel Reservation, not whether decommissioning is a reasonable alternative based on criteria that have nothing to do with the consistency determination required by FPA section 4(e). The Tribe argues that licensing the project would interfere or be inconsistent with the purposes of the reservation, and decommissioning would restore at least some uses for which the Reservation was set aside. The Tribe therefore concludes that the Commission must deny the new license [*143] and order that the project be decommissioned.

178. As discussed earlier in this order, we disagree with the Tribe's assessment and find that licensing the Box Canyon Project with conditions to protect and enhance fish and wildlife resources and water quality will not interfere or be inconsistent with the purposes for which the Kalispel Reservation was created. This threshold determination is a prerequisite for relicensing the project, and it requires that the project be consistent with the reservation's purposes. It does not

require that the Commission choose the alternative that, in the Tribe's view, would best further the purposes of the reservation.

179. Staff's analysis of project retirement in the final EIS serves a different purpose; providing the basis for a determination of whether project retirement, with or without dam removal, should be evaluated as a reasonable alternative to relicensing for purposes of our NEPA analysis. Thus, the findings in the final EIS that the Tribe cites are intended to indicate, in general terms, how the environment would change if the Commission were to deny a new license and order that the dam be removed in connection with project retirement. [*144] The EIS goes on to explain why staff does not regard project retirement with dam removal as a reasonable alternative to relicensing. Specifically, the energy that the project generates would be lost, the environmental measures that the new license requires would be foregone, project-related recreational opportunities would be compromised, and adverse environmental effects of dam removal could result, including the release of sediments accumulated behind the dam and the loss of lacustrine and wetland habitats. n117 Accordingly, we do not regard these findings as providing support for the Tribe's request for license denial and dam removal in this case.

n117 *Id.*

## B. <u>Need for Power and Project Economics</u>

180. The Tribe requests that we reconsider the likely rate impacts and economic effects of the new license. The Tribe points out that, in the relicense order, we found that the new license conditions would likely result in increased electric rates to the District's customers. The Tribe adds that, in its stay [*145] request, the District argued that if the rate impacts of the new license conditions should force Ponderay to close, the District's remaining customers might face a rate increase of over 350 percent. Based on the District's 2004 annual report, however, the Tribe suggests that the rate impacts would actually be minor if the District continues obtaining power from the City of Seattle's Boundary Project. The Tribe notes that the District's contract with the City may have expired, and requests that the Commission determine whether it has been renewed, and on what terms.

181. As discussed earlier, we denied the Tribe's request that we reopen the record to include a portion of this annual report. We use our economic analysis to provide a general estimate of potential power benefits and costs at the time of licensing, recognizing that circumstances may change and the cost of project power may be higher or lower than the cost of replacement power at any given time in the future. Once we have determined what conditions are needed for the new license term, it is up to the licensee to decide whether to accept the license and continue operating the project. Because our economic analysis is only [*146] one of many public interest factors that the Commission considers in determining whether or under what conditions to issue a license, no purpose would be served by continually revising or updating our analysis.

182. The Tribe argues that the protections afforded to it under section 4(e) of the FPA outweigh any need for power from the Box Canyon Project. The Tribe maintains that its reserved rights may not be diminished by balancing against economic interests, and that the project does not meet the overriding public interest standard for licensing as required by FPA section 10(a)(1). In support, the Tribe cites the Commission's decision in *Northern Lights*, which denied an original license for the Kootenai Project because the proposed development was not best adapted to a comprehensive plan for beneficial public uses of the waterway, including its use for wildlife and aquatic habitat and other recreational purposes, and for religious practices of the Kootenai people. n118 Among other things, the Commission found that, although the project's power would be needed by the time the development would be placed in service and the proposed project would provide the most economical source [*147] of power, the project would damage the aesthetic and religious value of Kootenai Falls and would adversely affect the riverine rainbow trout fishery immediately above and within the falls. On balance, the Commission concluded that the fishery and the falls should be preserved in the public interest.

n118 *Northern Lights, Inc.,* 39 FERC P61,352, at 62,101-02 (1987). *See also Udall v. FPC,* 387 U.S. 428, 450 (1967) (licensing requires consideration of all issues relevant to the public interest, including future power demand and supply, alternate sources of power, preserving reaches of wild rivers and wilderness areas, preserving anadromous fish for commercial and recreational purposes, and protection of wildlife); *Namekagon Hydro*

*Co. v. FPC, 216 F.2d 509 (7th Cir. 1954)* (upholding the Commission's denial of a license on the ground that the unique recreational value of a waterway outweighed the power value of the proposed project).

[*148]

183. The Tribe urges a similar outcome in this case. The Tribe states that the District is a small public utility district seeking to relicense a hydroelectric project that provides only a small amount of energy when compared with the total electric power of 32.5 million MWh generated annually by public utility districts in Washington State, which in turn is only ten percent of electric generation in the Northwest. n119 The Tribe maintains that this small amount of energy does not justify the environmental costs and other non-developmental considerations involved in relicensing the Box Canyon Project.

> n119 Tribe's request for rehearing at 51.

184. Under sections 4(e) of the FPA, the Commission must give equal consideration to the developmental and environmental uses of the waterway on which a project is located. Under section 10(a)(1) of the FPA, the Commission must find that licensing the project will be in the public interest; that the project will be best adapted to a comprehensive plan for improving or developing [*149] a waterway or waterways for all beneficial public uses. We must make our public interest determination for each project on an individual basis. If project power will be beneficial to the licensee and will contribute to the power needs of the region, there is a need for the power that the project would produce. But we must also consider whether other, non-developmental values outweigh the project's power and developmental values. In other words, need for power is simply one aspect of this overall balancing of competing factors, and a project's small size relative to the energy needs of an entire region would not disqualify it from licensing as long as the public interest standard is met.

185. In this case, we have determined that the new license for the Box Canyon Project, as conditioned, reflects an appropriate balance of developmental and non-developmental values and that the project is best adapted to a comprehensive plan for improving or developing the waterway for all beneficial public uses. Thus, licensing is in the public interest. We therefore deny the Tribe's request for rehearing of this issue.

186. The District and Ponderay argue that the Commission failed to give equal [*150] consideration to power and developmental purposes as well as non-developmental purposes, as required by FPA section 4(e), by failing to consider the detailed economic analysis prepared by the District's consultant, Charles River Associates (the CRA Report). Based on the CRA Report, the District and Ponderay point out that, if the rate increases resulting from the terms and conditions of the new license should force Ponderay to close, it would be reasonable to expect that, by 2010, Pend Oreille County would lose 671 jobs, or nearly 15 percent of all jobs in the county, and would lose nearly 18 percent of the county's population. They add that personal income would fall by over 13 percent, and taxes collected by the state and local government would fall by approximately 25 percent. They conclude that these losses would be extremely difficult for the county's economy to absorb, because the county is already burdened by high unemployment, high poverty, and low per capita income.

187. As the District and Ponderay recognize, staff analyzed the socioeconomic impacts of increased energy costs under different scenarios in the final EIS. n120 As part of this analysis, staff considered the [*151] possibility that increased electric rates could result in Ponderay's closing of its newsprint mill, which would have large adverse socioeconomic impacts on Pend Oreille County. Specifically, staff found that, if the mill could not bear the increased costs and were forced to close, large adverse socioeconomic effects would include reduced employment, reduced household disposable income and spending, increased taxes, and adverse effects on Ponderay's suppliers. n121 As explained in the EIS, staff declined to use the analysis of the CRA Report because of concerns about the assumptions and economic model used. n122 However, the conclusions reached in the EIS and the CRA Report are similar.

> n120 FEIS at 248-55.

n121 *Id.*

n122 *Id.* at 246-47.

188. The District and Ponderay argue that, by failing to consider the CRA Report, staff seriously underestimated the socioeconomic effects of increased energy costs. They add that, as a result, the Commission failed to give equal consideration to power and developmental [*152] values under FPA section 4(e), and to issue a license that meets the comprehensive development standard of FPA section 10(a). Implicit in these arguments is the assumption that, if we were to reconsider our economic analysis in light of the CRA Report, we would issue a new license with conditions that are less costly.

189. As explained above in connection with the Tribe's arguments concerning these statutory provisions, we use our economic analysis to determine the cost of project power relative to alternatives at the time of licensing. We do not use it to determine whether a project can "afford" to undertake various environmental measures before determining whether those measures are needed. Similarly, we analyze socioeconomic impacts as part of our environmental review to ensure that the effects of relicensing are considered as part of our overall balancing of public interest factors, not to determine whether the environmental measures that we have found are needed should or should not be required as license conditions. Although the District and Ponderay argue that staff's anaylsis underestimates the socioeconomic effect of relicensing, the conclusions of the CRA Report and our [*153] analysis are similar, and differ only in matters of degree. Reanalysis based on that report would not produce a different result in this case. We therefore deny rehearing of this issue.

## C. The District's Record of Compliance

190. The Tribe argues that the District's poor record of compliance reflects an "egregious record of attempts to circumvent and stonewall full application of the Federal Power Act" and that the District "engaged in repeated efforts to relitigate matters decided against it by raising contentions rejected by the federal courts" in the state supreme court and before the Commission. n123 The Tribe points out that the District consistently told the Commission that the state owned all land located below the annual flood elevation of 2,041 feet m.s.l. The Tribe adds that, after a federal district court determined that the reservation boundary along the Pend Oreille River was actually 2,028 feet m.s.l. and not 2,041 feet m.s.l., the District attempted to challenge that determination in state court, but the Washington Supreme Court held that state law had been clear since at least 1912 that state ownership of the bed of the Pend Oreille River extended only to [*154] the ordinary high water mark of 2,028 feet. n124 The Tribe also objects to the District's attempt to relitigate matters decided by the federal courts by filing a petition for a declaratory order with the Commission in 1996, noting that the Commission denied the District's request. n125 Finally, the Tribe points out that the District did not obtain authorization to occupy the reservation until the 1999 amendment proceeding, nearly fifty years after the original license was issued. The Tribe suggests that the District's record of noncompliance should result in license denial, or at the very least an admonishment and warning that the Commission expects full compliance with the new license and all applicable law in the future.

n123 Tribe's request for rehearing at 3.

n124 *Id.* at 52 (and cases there cited).

n125 *See Public Utility District No. 1 of Pend Oreille County, Washington, 77 FERC P61,146, at p. 61,545-46 (1996).*

191. As explained in the relicense order, the Commission [*155] examined this issue in the 1999 amendment proceeding and concluded that, although the original license did not authorize the District to flood reservation lands, it also did not require the District to obtain the necessary authorization. For this reason, the Commission found no basis to conclude that the District was in violation of its license, or that its relicense application should be denied. Under FPA sec-

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

tion 15(a)(3), the Commission must consider the licensee's record of compliance with the existing license in the reli-
censing process. The use of the word "record" in this provision suggests that Congress intended the Commission to ex-
amine existing documentary evidence of license compliance, as opposed to initiating new investigations of allegations
of noncompliance. n126 In this case, the original license did not clearly address the issue of the District's occupancy of
the reservation. Although the original license was not fully compliant with the FPA, this was a deficiency of the license
itself; the District's occupation of reservation lands, although unauthorized, did not constitute a license violation. Staff
reviewed the existing record of the District's compliance with its [*156] original license and found it satisfactory. Ac-
cordingly, we find no basis for denial of a new license based on the District's record of compliance.

   n126 *See City of Tacoma, Washington, 104 FERC P61,092 at P 44 (2003). See also Friends of the Cowlitz
   v. FERC, 253 F.3d 1161, 1172* (9 th Cir. 2001) (finding the Commission has virtually unreviewable discretion to
   determine whether to initiate an investigation).

   **D. Consultation with the Tribe**

192. The Tribe argues that it has been inappropriately excluded from the consultation process in Articles 402, 403, and
415. Article 402 concerns the filing of a schedule for construction of permanent fish passage facilities, and requires con-
sultation with the FWS, Forest Service, and Washington DFW. Article 403 concerns operation of the project in a run-of-
river mode, and allows temporary modification of such operations during operating emergencies upon mutual agree-
ment among the licensee, FWS, Washington DFW, [*157] and Idaho Department of Fish and Game, with notification
to the Commission. Article 415 requires the licensee to file a plan to install a staff gauge in Trimble Creek within the
Cusick Unit of the Little Pend Oreille National Wildlife Refuge to monitor water levels in Trimble Creek and to corre-
late those levels with water levels in the Box Canyon reservoir, and requires that the licensee prepare the plan in consul-
tation with FWS, Washington DFW, and the U.S. Geological Survey.

193. The Tribe asserts that it must be included as a consulted entity in these articles so that it can evaluate potential ad-
verse impacts and mitigation measures in light of its role as a resource manager and its reserved rights in land and other
resources. Other than this conclusory statement, the Tribe does not explain why it believes that it should be consulted
with respect to these articles. However, because part of the reservoir is located on the reservation and fish are a resource
of importance to the Tribe, we grant the Tribe's request for consultation and amend these articles accordingly.

   **E. Annual Charges for Use of Tribal Land** s

194. Interior and the Tribe argue that the FPA requires [*158] the Commission to establish an annual charge for the use
of tribal lands in this case. Section 10(e) of the FPA requires the Commission to fix a reasonable annual charge for the
use of tribal lands embraced within Indian reservations, subject to the approval of the tribe having jurisdiction of the
lands. Commission regulations provide that annual charges for the use of tribal lands will be determined on a case-by-
case basis. n127 The Commission generally prefers that these charges be based on agreements between the parties, the
terms of which we will then incorporate in the license unless they are patently unreasonable. Article 201 of the license
allowed a six-month period for negotiation of an annual charge for the use of Kalispel Indian Reservation lands, after
which the Commission would determine the annual charge if no agreement had been reached. Article 201 also specifies
that annual charges must be paid effective as of the first day of the month in which the new license is issued.

   n127 *See* 18 C.F.R. § 11.4(a) (2006). Annual charges for other federal lands are calculated under 18 C.F.R.
   § 11.2(b) (2006).

   [*159]

195. Interior and the Tribe object to this approach, arguing that the Commission has a statutory obligation to establish
annual charges for the use of tribal reservation lands, without requiring the parties to attempt to negotiate an agreement.
Despite this objection, however, the Tribe entered into negotiations with the District. The District and the Tribe subse-
quently filed three joint requests for extensions of time to complete negotiations. Commission staff granted these re-
quests. Staff also provided clarification of certain economic information to assist the Tribe and its consultant in under-
standing staff's economic analysis and negotiating an annual charge. The letter requesting the third extension, which

runs until November 15, 2006, indicates that the District will provide additional information to allow the Tribe to complete its review of the latest proposals, and the parties are interested in pursuing further negotiations to attempt to reach an agreement. n128

> n128 *See* letter from James Vasile (attorney for the District) to Magalie Salas, FERC (filed Sept. 15, 2006).

[*160]

196. As noted in the relicense order, the Commission has used a variety of procedures in the past to satisfy its section 10(e) obligation to determine annual charges for the few projects that occupy tribal reservation lands. n129 In our experience, allowing a limited period of time for the parties to seek to reach an agreement generally works well, and results in annual charges that are mutually beneficial to the licensee and the tribe. If the parties are unable to reach agreement, we will fix an annual charge. Tribes are not harmed by an opportunity to attempt to negotiate an annual charge, because the charge is subject to the tribe's approval and the licensee's obligation to pay annual charges is retroactive to license issuance. Contrary to Interior's and the Tribe's objections, we believe this approach is fully consistent with FPA section 10(e). We therefore deny rehearing of this issue.

> n129 *See Public Utility District No. 1 of Pend Oreille County, Washington, 112 FERC P61,055, at P 83 n. 83* (and cases there cited).

[*161]

### F. <u>Request for a Trial-Type Hearing</u>

197. The District argues that we erred in denying its request for a trial-type hearing on mandatory conditions and staff's socioeconomic analysis in the final EIS. The District maintains that the following are "critical disputed issues of material fact" that must be resolved in a trial-type hearing: (1) whether the Box Canyon Project has changed the essential nature of the Pend Oreille River; (2) whether river temperatures have increased significantly; (3) whether river velocities have significantly changed; (4) whether fish habitats have been significantly altered; (5) whether fish populations have been significantly affected; and (6) whether the mandatory conditions inappropriately require mitigation for non-project impacts. We denied the District's request on the grounds that the extensive record in this proceeding contains sufficient evidence regarding these issues, there is no need for a trial-type hearing to analyze and decide them, and the decision whether to conduct a trial-type hearing is in the Commission's discretion. n130

> n130 *Id.* at P 77-79.

[*162]

198. The District argues that the final EIS confirms the need for a trial-type hearing, because the Commission decided issues not based on it, but despite it. In support, the District points out that the EIS did not endorse many of the mandatory conditions that the Commission included in the new license, including Interior's trout assessment and rehabilitation plan, fishway prescriptions, and conditions requiring water quality monitoring, wildlife habitat replacement, and recreation management; and the Forest Service's conditions requiring a boundary survey, recreation management, sensitive species management, cottonwood and wet shrub habitat, native amphibian habitat, and integrated weed management. The District asserts that a hearing is needed so that the Commission can determine the veracity of science witnesses and the validity of their reports by placing them under oath and subjecting them to cross-examination.

199. We disagree. The fact that scientific and technical experts may disagree about resource needs and conditions to address them does not mean that an adjudicatory hearing must be held. Moreover, in this case the necessary information and analysis can be found in [*163] the final EIS, and we have taken the further step of indicating our disagreement with certain mandatory conditions in this decision on rehearing. As explained earlier, the Commission lacks the authority to reject mandatory conditions with which it disagrees. Under these circumstances, an adjudicatory hearing would add little of value to the record, and would not likely affect the result.

200. Although the District asserts that matters of credibility are at issue, it provides no basis for this assertion other than the fact that expert witnesses disagree. We therefore find no basis for accepting the District's arguments that a trial-type hearing is required by section 556 of the Administrative Procedure Act, the substantial evidence requirement of section 313(b) of the FPA, or procedural due process considerations. We therefore deny rehearing of this issue. In any event, as noted above, the burden is on Interior and the Forest Service, not the Commission, to provide record support for their mandatory conditions.

### G. Dikes and Related Facilities

201. The District argues that the Commission erred in requiring it to include in the project boundary the railroad dike, culvert, [*164] and gates adjacent to the Calispell Creek Pumping Plant. The District also argues that the Commission erred in requiring it to conduct an evaluation of additional structures to determine whether they should be included as project works.

202. The District proposed in its license application to include as project works the two pumping stations that it owns and operates at Calispel Creek. However, the District asserts that the nearby railroad dike, culvert, and gates, which it does not own, are not project works and should not be included. The District maintains that these structures are neither "used and useful" nor " necessary or appropriate" to operation of the project, as those terms are used in section 3(11) of the FPA, n131 because they were built more than forty years before the project was constructed, were not intended for any hydroelectric purposes, and would continue to be used for flood control and agricultural purposes today, if the project did not exist.

  n131 *16 U.S.C. § 796*(11) (2000).

 [*165]

203. Section 4(e) of the FPA n132 authorizes the Commission to issue licenses "for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient . . . for the development, transmission, and utilization of power . . . upon any part of the public lands and reservations of the United States . . . ." Section 23(b)(1) of the FPA n133 makes it "unlawful for any person, State, or municipality, for the purposes of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto . . . upon any part of the public lands or reservations of the United States." Thus, hydroelectric projects that are located on any part of U.S. lands or reservations fall under the Commission's mandatory licensing jurisdiction. n134

  n132 *16 U.S.C. § 797*(e) (2000).

  n133 *16 U.S.C. § 817*(1) (2000).

  n134 If any part of a hydroelectric project is located on U.S. lands or reservations, the entire project must be licensed. *See Big Bear Area Regional Wastewater Agency, 33 FERC P 61,115, at p. 61,246 (1985); Escondido Mutual Water Co., 6 FERC P61,189, at p. 61,388 (1979), aff'd in pertinent part, Escondido Mutual Water Co. v. FERC, 692 F.2d 1223, 1231* (9 th Cir. 1982), *reh'g denied, 701 F.2d 826 (1983), rev'd on other grounds, Escondido Mutual Water Co. v. La Jolla Indians, 466 U.S. 765 (1984).*

 [*166]

204. Section 3(12) of the FPA n135 defines "project works" as "the physical structures of a project." Section 3(11) of the FPA n136 defines "project" as "a complete unit of improvement or development," including, among other things, "all miscellaneous structures used and useful in connection with said unit . . ., and all . . . rights-of-way . . . lands or interest in lands the use and occupancy of which are necessary or appropriate in the maintenance and operation of said unit."

n135 *16 U.S.C. § 796*(12) (2000).

n136 Section 3(11) provides:

(11) "project" means complete unit of improvement or development, consisting of a power house, all water conduits, all dams and appurtenant works and structures (including navigation structures) which are a part of said unit, and all storage, diverting, or forebay reservoirs directly connected therewith, the primary line or lines transmitting power therefrom to the point of junction with the distribution system or with the interconnected primary transmission system, all miscellaneous structures used and useful in connection with said unit or any part thereof, and all water rights, rights-of-way, ditches, dams, reservoirs, lands or interest in lands the use and occupancy of which are necessary or appropriate in the maintenance and operation of such unit.

*16 U.S.C. § 796*(11) (2000).

[*167]

205. As written, section 3(11) sets forth five categories of structures, facilities, and interests that are part of a complete unit of development: (1) listed and appurtenant structures that are part of the project, (2) reservoirs directly connected with the project, (3) primary transmission lines, (4) miscellaneous structures used and useful in connection with the project or any part of it, and (5) rights, structures, lands, or interests which are necessary or appropriate in the maintenance and operation of the project. In determining whether licensing is required for miscellaneous structures, the FPA requires a determination of whether the structure is used and useful in connection with a complete unit of development or any part thereof, or whether it is necessary or appropriate in the maintenance and operation of the project.

206. The District concedes that the Calispell Creek Pumping Plant is used and useful in connection with operation of the Box Canyon Project and is, therefore, a project work. The District uses the pumping plant to pump water over the railroad dike near the mouth of the creek into the project reservoir. This allows the District to maintain a higher reservoir [*168] elevation for the project and thus to produce more power. The railroad dike and gates are directly connected to the project reservoir, in that they help to determine its elevation. Moreover, they are integral to operation of the pumping plant because they retain the water in the reservoir, preventing it from flowing back into the creek and flooding adjacent agricultural lands. Operation of the pumping plant would be ineffective without the existence of the railroad dike and gates. Thus, these structures are necessary for the operation of the pumping plant, and are "used and useful" in connection with operation of the project. The District argues that these structures cannot be project works because they preceded the project and were originally built for agricultural and flood control purposes (to prevent flooding of crop lands during spring and summer). However, the fact that they were originally constructed for non-project purposes is irrelevant to a determination of whether they are currently "used and useful" for project operation. n137

n137 The District cites Commission cases involving upstream dams, reservoirs, and conduits in support of a "common sense" approach, arguing that structures that are unrelated and only incidental to power production should not be considered project works. *See* District's request for rehearing at 63-65 and cases there cited. In evaluating whether storage reservoirs that are not directly connected to other project works must be licensed as part of a complete unit of development, the Commission considers whether the reservoir has a significant effect on downstream generation as part of its examination of whether the facility is " necessary or appropriate" to operation of the project. *See Chippewa and Flambeau Improvement Company, 112 FERC P61,115 at P16 (2005).* Here, because the structures at issue are directly connected to the reservoir, which is a project work, a "significance" test is inapplicable and we need only consider whether the structures are "used and useful" for project operation.

[*169]

207. The District also object to our requirement in Article 302 that it conduct an evaluation of additional structures, such as dikes, pump stations, and gated culverts, to determine whether they impound waters that contribute to the project's generating capacity. The District argues that these dikes and small pump stations are pre-existing flood control facilities, originally installed by local farmers, the Diking Districts, or the Corps to help control annual flooding along the Pend Oreille River. The District asserts that these facilities do not directly allow increased power production, are not operated

to enhance power generation, and have very little impact on the overall system. As an example, the District cites the Trimble Creek pumping plant, which has a single 20 horsepower pump.

208. As we have seen, the fact that these structures were originally constructed for non-project purposes is irrelevant to a determination of whether they are currently "used and useful" for project operation. Similarly, it doe not matter who originally constructed the dikes and pumping plants. Article 302 requires the District to evaluate these structures and file a report documenting the [*170] results, with recommendations, for Commission approval, to include the appropriate structures as part of the project. Thus, the District can provide additional information about the way in which these structures are currently used and their effect on project operation, to allow the Commission to determine whether these structures are, in fact, used and useful for project operation.

209. Finally, the District argues that we erred in stating that the railroad dike is owned by Diking District No. 2 of Pend Oreille County. n138 The District asks that we correct the license order to indicate that the railroad dike is owned by the Pend Oreille Valley Port District. We grant the District's request. We note, however, that ownership of the railroad dike has no bearing on whether it must be included as part of the licensed project works.

n138 *Public Utility District No. 1 of Pend Oreille County, Washington, 112 FERC P61,055, at P 13, n.13.*

**H. Compliance with the National Environmental Policy** [*171] **Act**

210. The District argues that the Commission erred in failing to fulfill its NEPA obligation to take a "hard look" at the environmental consequences of relicensing the Box Canyon project. The District maintains that, under the "hard look" review, courts will overturn an agency's decision as arbitrary and capricious if: "(1) the decision does not rely on the factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise." n139

n139 *Sierra Club v. U.S. Army Corps of Engineers, 395 F.3d 1209* (11 th Cir. 2002) (*citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983).*

211. The District claims that the license order did not rely on the factors that [*172] Congress intended the Commission to consider in that it "ignored critical economic impact analysis and failed to include appropriate FPA section 15 findings." n140 The District further maintains that the order failed entirely to consider an important aspect of the problem because if failed to require a supplemental EIS that would address the economic analysis of the CRA Report.

n140 District's request for rehearing at 174.

212. We addressed the District's arguments regarding our economic analysis and the CRA Report earlier in this order in connection with the need for power and project economics. For the reasons already discussed, we conclude that further analysis of the CRA Report would not cause us to reject the agencies' mandatory conditions or determine that a new license should not be issued for the Box Canyon Project. Both the EIS and the license order examined the economic impact of relicensing the project with the agencies' mandatory conditions, and the license order made the requisite findings under section [*173] 15 of the FPA. As noted earlier, the final EIS and the CRA Report reach similar conclusions about socioeconomic effects, differing only in degree. Therefore, no purpose would be served by requiring a supplemental EIS to consider that report in greater detail.

213. The District argues that the license order violates NEPA because it offers explanations which run counter to the evidence. The District further maintains that the order is so implausible that it cannot be the result of differing viewpoints or agency expertise, because assumptions underlying the ultimate conditions are simply incorrect. Finally, the

District claims that the Commission failed to give careful scientific scrutiny to the evidence before it and failed to respond to all legitimate concerns raised. In support, the District simply reiterates its arguments that the Commission failed to consider the CRA Report, and failed to give proper scrutiny to substantial evidence in the record that did not support the agencies' mandatory conditions. The District maintains that these conditions are unlawful because the Box Canyon Project did not change the essential nature of the Pend Oreille River and its habitat. The District [*174] also criticizes the Commission's failure to adopt staff's analysis and conclusions in the final EIS regarding the necessity of fishways, trout assessment and restoration, and other unfounded conditions. The District reiterates that the Commission's actions must be based on substantial evidence in the record, including a NEPA analysis that supports the Commission's decision to adopt license conditions. The District concludes that, in order to comply with NEPA, the Commission must explicitly state that these conditions are not supported in the record, despite their inclusion in the license.

214. As discussed throughout this order, the *Cushman* decision requires that we include the agencies' mandatory conditions without limitation. The final EIS examines the environmental effects of the agencies' mandatory conditions and the evidence (or lack thereof) in support of them. Moreover, we have expressed our views, as appropriate, regarding the need for and cost of these conditions. Nothing more is required for compliance with NEPA.

215. Finally, the District argues that the order is unlawful because it includes mandatory conditions that the Secretaries issued in violation of NEPA. [*175] The District maintains that, because the Commission's final EIS did not support many of the agencies' mandatory conditions, Interior and the Forest Service cannot claim to have relied on or adopted the Commission's EIS and must either with draw their inconsistent section 4(e) conditions or prepare their own analysis in support of them. This argument concerns the responsibilities and actions of Interior and the Forest Service, rather than the Commission. We have no authority to determine whether or when an agency with conditioning authority under the FPA may be required to prepare a separate NEPA analysis in support of its conditions. Accordingly, this matter must be decided by a reviewing court in the event of judicial review.

## I. Historic Preservation

216. The District argues that the relicense order requires compliance with an improper programmatic agreement in an effort to satisfy the Commission's responsibilities under section 106 of the National Historic Preservation Act (NHPA). The District takes issue with the programmatic agreement because it requires that the project's historic properties management plan (HPMP) incorporate the provisions of the Forest Service's section [*176] 4(e) Condition 6. The District maintains that, under the FPA, section 4(e) conditions may only be imposed through a Commission-issued license and not through execution of a programmatic agreement by Commission staff under section 106 of the NHPA. The District adds that it refused to sign the agreement as a concurring party because it objected to the inclusion of this provision. The District also takes issue with some of the specific requirements of the Forest Service's condition 6.

217. Section 106 of the NHPA requires the Commission to take into account the effect of its actions on historic properties and to afford the Advisory Council on Historic Preservation a reasonable opportunity to comment. Commission staff generally uses a programmatic agreement to document compliance with section 106 and to provide a procedural framework for avoiding or minimizing any adverse effects to historic properties that may result from licensing the project or that may arise during the term of a license. The programmatic agreement, in turn, typically requires or references the licensee's preparation of an HPMP. The District is correct in observing that a licensee's responsibilities are defined by [*177] the terms and conditions of the license rather than a programmatic agreement or an HPMP as such. However, the Commission's usual practice is to incorporate the terms of a programmatic agreement by reference in the license, thus making compliance with the agreement and any associated HPMP a requirement of the license itself. Because the source of the obligations thus imposed is the license itself and not the programmatic agreement as such, we find nothing improper in this practice.

218. The District argues that it is unaware of any previous instance in which the Commission staff has used a programmatic agreement to impose section 4(e) conditions in a license, and that the District should not be singled out for disparate treatment in this manner. We agree that section 4(e) conditions concerning historic properties need not be included in a programmatic agreement. Under the *Cushman* decision, however, such conditions must be included without limitation. Therefore, the District must comply with them in any event, and their inclusion in the programmatic agreement is thus of no practical significance. If they are modified or reversed on judicial review, the District can file an application [*178] for a license amendment to reflect any changes.

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

219. The District argues that, because the Forest Service's final section 4(e) conditions were not filed until after the final EIS was issued, staff has not made findings with respect to their validity other than the statement in the programmatic agreement that the provisions of Condition 6 are reasonable and should be included in the agreement. The EIS examines the effects of relicensing the Box Canyon Project on historic properties and cultural resources. The fact that more detailed provisions may appear in the Forest Service's section 4(e) condition does not undermine the analysis in the EIS or render it inadequate.

220. The District maintains that certain provisions in Condition 6 are inconsistent with staff's finding in the final EIS and are not supported by substantial evidence. Specifically, the District argues that the Forest Service is requiring the curation of some material previously recovered from two identified sites without indicating why this is necessary or how these materials relate to any effects of the project or its relicensing, and asserts that staff found in the final EIS that the District should curate artifacts [*179] obtained during surveys related to the relicensing proceeding. n141 The District also objects to a provision that refers to new interpretive displays on National Forest System lands, arguing that Commission staff found in the final EIS that no additional interpretive facilities are currently required. n142 The District adds that it should not be required to perform annual monitoring of properties on Forest Service lands that are determined to be not eligible for listing in the National Register of Historic Properties.

       n141 *See* FEIS at 228.

       n142 *Id.* at 214.

221. The District's cites to staff's findings in the final EIS mentioned above do not address the specific issues that the District raises. For example, the EIS did not specifically address curation of artifacts; it simply stated that the HPMP would ensure that any adverse effects on historic properties arising from project operations or project-related enhancement measures would be avoided or satisfactorily resolved. Similarly, staff's analysis [*180] in the EIS did not concern cultural resource interpretive displays, but rather pertained to signs at public recreation facilities. Thus, it does not follow that staff's findings and the provisions of Forest Service Condition 6 are inconsistent, as the District suggests. We would expect that the District would clarify and resolve these issues in consultation with the Forest Service during preparation of the HPMP. In any event, the *Cushman* decision requires us to include this condition without modification. We therefore deny rehearing of this issue.

### J. Requests for Correction or Clarification

222. The District requests that we clarify Article 403 to provide that, although the article limits the rate of reservoir draw down, it is not intended to restrict the rate of reservoir filling. The District originally proposed to limit the draw down of the reservoir to a rate of three inches per hour to reduce the potential for erosion and fish stranding. As written, Article 403 provides that the licensee shall not change the surface elevation of the reservoir by a rate that exceeds three inches per hour as measured at Box Canyon Dam. The District argues that this could be read to [*181] limit the rate of reservoir filling, which does not create a risk of erosion or fish stranding. Moreover, the District argues that inflows to the reservoir are beyond the District's control, because they are directly determined by releases from the upstream Albeni Falls Dam. It was not our intention to limit the rate of reservoir filling. Accordingly, we amend Article 403 to clarify that it limits the rate of reservoir draw down.

223. Washington DFW notes a likely typographical error in Interior's Condition 6.C.2, as set forth in Appendix A to the license order. The dollar amount is identified as $356.441, which Washington DFW indicates was likely means to be $356,441. We amend the condition to correct this error.

224. Finally, Interior's Bureau of Land Management (BLM) requests that Article 202 be amended to require the District to send a set of aperture cards with Exhibits F and G drawings and form FERC-587 to the State Director of BLM's Oregon/Washington State Office. Article 202 currently requires these materials to be sent to BLM's Idaho State Office. BLM points out that only about one mile of the 55-mile long reservoir is located in Idaho, and the remaining 54 miles are [*182] located in Washington. Accordingly, we amend Article 202 to require that these materials also be sent to BLM's Oregon/Washington State Office in Portland, Oregon.

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

The Commission orders:

(A) The requests for rehearing filed on August 10, 2005, by Public Utility District No. 1 of Pend Oreille County, Washington; Kalispel Tribe of Indians; U.S. Department of the Interior; U.S. Department of Agriculture, Forest Service; Washington Department of Fish and Wildlife; and Ponderay Newsprint Company; are granted in part and denied in part, as indicated in this order.

(B) The requests to reopen the record filed on August 10, 2005, by Public Utility District No. 1 of Pend Oreille County, Washington, and the Kalispel Tribe of Indians, are denied.

(C) The requests to defer consideration of all pending rehearing requests to allow for consideration of matters raised pursuant to section 241 of the Energy Policy Act, filed on August 10, 2005, by Public Utility District No. 1 of Pend Oreille County, Washington, and Ponderay Newsprint Company, are denied. The Commission reserves its authority to amend the new license to make whatever changes might be necessary in response to pending litigation concerning [*183] that section.

(D) The request for a stay, pending rehearing and judicial review, of certain mandatory conditions of the new license, filed on October 6, 2006, by Public Utility District No. 1 of Pend Oreille County, Washington, is denied.

(E) Ordering Paragraph (D) of the Commission's "Order issuing New License," issued in this proceeding on July 11, 2005, is revised to delete the phrase, "to the extent that those conditions apply to reservation lands or waters within the project boundary." This license is subject to the conditions submitted by the U.S. Department of the Interior under section 4(e) of the Federal Power Act as those conditions are set forth in Appendix A to the Commission's July 11, 2005 order, with the following correction: The dollar amount in Interior's Condition 6.C.2 is corrected to read "$356,441."

(F) Ordering Paragraph (E) of the Commission's "Order issuing New License," issued in this proceeding on July 11, 2005, is revised to delete the phrase, "to the extent that those conditions apply to reservation lands or waters within the project boundary." This license is subject to the conditions submitted by the U.S. Department of Agriculture under section 4(e) of [*184] the Federal Power Act as those conditions are set forth in Appendix B to the Commission's July 11, 2005 order.

(G) Article 403 is amended to read as follows:

*Article 403. Run-of-River Operation.* The licensee shall at all times operate the project in a run-of-river mode. The licensee shall minimize the fluctuation of the Box Canyon reservoir surface elevation by maintaining a discharge from the project so that flows, as measured immediately downstream of the project tailrace, approximate the sum of inflows to the project reservoir. The licensee shall not exceed a maximum reservoir elevation of 2,041 feet mean sea level at Cusick (river mile 70.1) and shall limit the backwater effect in the Albeni Falls tailrace to two feet or less. The licensee, in an effort to minimize the fluctuation of the Box Canyon reservoir surface elevation, shall not reduce the surface elevation by a rate that exceeds three-inches-per-hour as measured at Box Canyon Dam.

Run-of-river operations may be temporarily modified if required by operating emergencies beyond the control of the licensee, or for short periods, upon mutual agreement among the licensee, Washington Department of Fish and Wildlife, [*185] Idaho Department of Fish and Game, the U.S. Fish and Wildlife Service, and the Kalispel Indian Tribe. If the flow is so modified, the licensee shall notify the Commission as soon as possible, but not later than 10 days after each such incident.

(H) The title and first sentence of Article 406 are amended to read as follows: " *Article 406. Native Trout Protection.* For the protection of native trout, including bull trout, the licensee shall comply with the Department of the Interior's (Interior) Conditions 4(C)(4)(f), 4(D)(3), and 6, which are contained in Appendix A to this order."

(I) In Articles 402 and 415, the Kalispel Tribe of Indians is added as an entity to be consulted.

(J) Paragraph (a) of Article 202 is amended to read as follows:

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

(a) Five sets of the exhibit drawings shall be reproduced on silver or gelatin 35mm microfilm. All microfilm shall be mounted on Type D (31/4" x 7 3/8") aperture cards. Prior to microfilming, the FERC Drawing Number (*e.g.*, P-1234-1001 through P-1234- # # # ) shall be shown in the margin below the title block of the approved drawing. After mounting, the FERC Drawing Number shall be typed on the upper right corner of each aperture card. [*186] Additionally, the Project Number, FERC Exhibit (*e.g.*, F-1, G-1, etc.), Drawing Title, and date of this license shall be typed on the upper left corner of each aperture card.

Two of the sets of aperture cards along with form FERC-587 shall be filed with the Secretary of the Commission, ATTN: OEP/DHAC. The third set shall be filed with the Commission's Division of Dam Safety and Inspections Portland Regional Office. The remaining two sets of aperture cards and a copy of form FERC-587 shall be filed with the Bureau of Land Management offices at the following addresses:

State Director, Bureau of Land Management, Land Services Section (ID-943-A), 1387 S. Vinnell Way, Boise, ID 83709-1657 ATTN: FERC Withdrawal Recordation

State Director, Oregon/Washington State Office, Bureau of Land Management, Water Power Withdrawals (OR 936.1), P.O. Box 2965, Portland, OR 97208-2965 ATTN: FERC Withdrawal Recordation

By the Commission. Commissioner Kelly dissenting in part with a separate statement attached.

Commissioner Wellinghoff concurring with a separate statement attached.

**CONCURBY:** WELLINGHOFF

**CONCUR:**

WELLINGHOFF, Commissioner, <u>concurring</u>:

[Issued November 17, 2006]

Section 10(e) of the FPA [*187] requires the Commission to establish a reasonable annual charge for the use of tribal lands embraced within Indian reservations, subject to the approval of the tribe having jurisdiction of the lands. The Commission generally prefers that these charges be based on agreements between the parties, the terms of which we incorporate into the license for the project in question, unless those terms are patently unreasonable. On rehearing, Interior and the Kalispel Tribe object to this approach, arguing that the FPA requires the Commission to establish the annual charge.

I believe that our current practice of allowing some time for the parties to reach agreement as to a reasonable annual charge is not inconsistent with our statutory obligations. It is also noteworthy that, notwithstanding their objection to that approach, the Kalispel Tribe entered into negotiations with the District. Article 201 of the existing license allowed a six-month period for such negotiations, and the District and the Kalispel Tribe have subsequently filed three joint requests for extensions of time to complete those efforts. I appreciate the parties' efforts, but if those negotiations do not soon produce an [*188] agreement, I would not be inclined to grant substantial further extensions. Instead, I believe that it would be time that we fix an annual charge.

The Commission has used a variety of procedures in the past to determine an annual charge in satisfaction of its section 10(e) obligation. Because our regulations provide that this issue will be addressed on a case-by-case basis, n147 I want to take this opportunity to highlight some of the factors that I would consider in setting an annual charge.

n147 18 C.F.R. § 11.4(a) (2006).

Because the Kalispel Reservation is a relatively small Indian reservation, I believe that the Box Canyon Project has a disproportionate impact on the Kalispel Tribe. We have acknowledged that the Project floods some 492 acres of land within the Kalispel Reservation, comprising approximately 10 percent of its total acreage and making that area unavail-

117 F.E.R.C. P61,205; 2006 FERC LEXIS 2656, *

able for the Kalispel Tribe's use. n148 The Kalispel Tribe further states that the flooding of reservation lands not only prevents it from pursuing [*189] agricultural uses of the area in question, but also impairs the Tribe's access to and use of native fish and wildlife species and other resources. Indeed, the Kalispel Tribe asserts that the Project takes away the meaningful use of its most important fishing areas. It is also important to recognize that the flooded lands limit the Kalispel Tribe's management and development choices for the reservation.

> n148 *112 FERC P61,055 at P30 (2005).*

While the conditions included in the license help to ameliorate the negative impacts of the Project, the conditions do not restore the Kalispel Tribe's ability either to decide the uses of particular lands within the reservation or to exercise its rights regarding resources anywhere within the reservation as the Tribe sees fit. Consequently, I would take these considerations into account when establishing an annual charge.

For these reasons, I respectfully concur with the Commission's order.

Jon Wellinghoff

Commissioner

**DISSENTBY:** KELLY (In Part)

**DISSENT:**

KELLY, Commissioner, [*190] *dissenting in part*:

[Issued November 17, 2006]

In *City of Tacoma, Washington v. FERC*, the court reiterated that the Commission has absolutely no discretion to reject a resource agency's mandatory conditions. Indeed, the Court drove this point home by precluding the Commission from even placing time restrictions under which a mandatory conditioning agency should act. In so ruling, the court recognized that Congress delegated mandatory conditioning authority to other agencies, and "those agencies, and not FERC, determine how to exercise that authority, subject of course to judicial review." n143 Against this backdrop, I believe that it is inappropriate for the Commission to comment, in this or any licensing order, on the merits of mandatory conditions.

> n143 *City of Tacoma, Washington v. FERC*, No. 05-1054 (D.C. Cir., Aug. 22, 2006).

The majority's only stated reason for doing so here is to "assist" or "facilitate" judicial review. This is not our role, nor should it be. The Commission should not be in [*191] the business of, *sua sponte*, facilitating a licensee's (or any other stakeholder's) ability to mount a legal challenge, for the simple reason that it is the resource agency's responsibility to identify, explain, and ultimately defend its mandatory conditions and their evidentiary and legal basis. n144 As the D.C. Circuit has noted, where mandatory conditions are concerned, it is not the Commission's role to judge the validity of a resource agency's position, either procedurally or substantively, because the Commission performs

> primarily as a neutral forum responsible for compiling the record for the benefit of the court of appeals. It may subsequently on review take a position or not as it wishes, but it is certainly not its responsibility to investigate or prosecute any part of the case below. n145

> n144 *See Bangor-Hydro Electric Company v. FERC*, 78 F.3 659, 662 (D.C. Cir. 1996). *See also* 18 C.F.R. § 4.34(b)(1) (2006).

n145 *Id.* at 663.

Moreover, there is nothing in the Federal Power Act [*192] to indicate that Congress wants the Commission to second-guess the resource agencies. Rather, Congress intended that the Commission have exclusive authority to issue licenses, but that the resource agencies play the key role in determining what conditions would be included in licenses in order to protect the resources under their respective jurisdictions. Accordingly, I do not believe it is appropriate for the Commission to unnecessarily insert itself into a process over which the resource agencies' statutory authority is straightforward and virtually unbounded.

This does not mean that resource agencies have no accountability in imposing conditions, nor are licensees and others without recourse in challenging the conditions. In addition to the ability to seek judicial review, section 241 of the Energy Policy Act of 2005 provides additional incentive to ensure that mandatory conditions imposed by resource agencies are cost-effective and supported by substantial evidence. n146

n146 First, section 241 entitles any party to a relicensing proceeding to an expedited, trial-type hearing where there are disputed material facts regarding mandatory conditions. Second, it allows parties to propose alternatives to mandatory conditions. Third, before issuing a mandatory condition, the agency must document that it gave equal consideration to the economic and environmental impacts of the condition. *See* Energy Policy Act of 2005, Pub. L. No. 109-58, § 241, 119 Stat. 594 (2005).

[*193]

Moreover, the Commission is required to determine whether issuance of a new license appropriately balances power and non-power values under FPA section 4(e) and is consistent with a comprehensive plan for development and improvement of the waterway under FPA section 10(a)(1). If we believe that the mandatory conditions are incompatible under FPA sections 4(e) and 10(a)(1), then we can, and indeed are required to, provide the ultimate view on mandatory conditions, by refusing to issue a license.

For all of these reasons, I do not believe commenting on mandatory conditions is a proper use of the Commission's time and resources. Opening the door here begs the question of under what circumstances we will do so, and needlessly complicates a process over which we have no jurisdiction. Having said this, if a court asks our position on challenged mandatory conditions in order to assist it on judicial review, then we should stand ready to oblige. However, unless and until asked, it is the prescribing agency, not the Commission, that has the statutory duty to assure that its mandatory conditions have adequate support in the record and are otherwise lawful.

For these reasons, I dissent in part.   [*194]

Suedeen G. Kelly